# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Amy Elizabeth Krekelberg,

          Plaintiff,

v.

Anoka County;  City of Coon Rapids; City
of Minneapolis; Minneapolis Park and
Recreation Board; City of Roseville; City of
St. Paul; James Psyck, acting in his
individual capacity as a Deputy of the
Anoka County Sheriff's Department; Travis
Wold, acting in his individual capacity as a
Deputy of the Anoka County Sheriff's
Department; Taylor Arneson, acting in his or
her individual capacity as an Officer of the
Coon Rapids Police Department; Paul
Frakie, acting in his individual capacity as
an Officer of the Coon Rapids Police
Department; Jarrod H. Guy, acting in her
individual capacity as an Officer of the
Coon Rapids Police Department; Cameron
Clark Gustafson, acting in his individual
capacity as an Officer of the Coon Rapids
Police Department; Robert Goodsell, acting
in his individual capacity as an Officer of
the Minneapolis Park and Recreation Board
Police Department; Keith Rowland, acting
in his individual capacity as an Officer of
the Minneapolis Park and Recreation Board
Police Department; Mark Swanson, acting in
his individual capacity as an Officer of the
Minneapolis Park and Recreation Board
Police Department; John Wurm, in his
individual capacity as a Park Patrol Agent of
the Minneapolis Park and Recreation Board;
Police Department; Philip Alejandrino,
acting in his individual capacity as an
Officer of the Minneapolis Police
Department; Gilles Antaya, acting in his

Civil File No.  13-cv-3562 (DWF/TNL)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

individual capacity as an Officer of the
Minneapolis Police Department; Tyrone
Barze, acting in his individual capacity as an
Officer of the Minneapolis Police
Department; Troy Carlson, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Aaron
Collins, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Brian Cummings, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Christopher
Cushenbery, acting in his individual capacity
as an Officer of the Minneapolis Police
Department; Mark Durand, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; David
Elliott, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Andrew Enriquez, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Carlos
Baires Escobar, acting in his individual
capacity as an Officer of the Minneapolis
Police Department; Eric Faulconer, acting in
his individual capacity as an Officer of the
Minneapolis Police Department; Mark
Gasior, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Scott Grabowski, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Dennis
Hamilton, acting in his individual capacity
as an Officer of the Minneapolis Police
Department; Richard Hand, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Joseph
Haspert, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Anna Hedberg, acting in her
individual capacity as an Officer of the
Minneapolis Police Department; Thomas
Hendrickson, acting in his individual

capacity as an Officer of the Minneapolis
Police Department; Roland Hillstrom, acting
in his individual capacity as an Officer of
the Minneapolis Police Department; David
Honican, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Daniel Horn, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Christopher
House, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Robert Illestschko, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Kurt
Indehar, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Bruce Johnson, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Heather
Jorges, acting in her individual capacity as
an Officer of the Minneapolis Police
Department; Kristopher Kramer, acting in
his individual capacity as an Officer of the
Minneapolis Police Department; Robert
Krebs, acting in his individual capacity as an
Officer of the Minneapolis Police
Department; Dennis Kreft, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Jennifer
Lazarchic, acting in her individual capacity
as an Officer of the Minneapolis Police
Department; Alan Liotta, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Thomas
Lopez, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Oscar Macias, acting in his
individual capacity as an Officer of the
Minneapolis Police Department; Timothy
Mattson, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; Matthew McLean, acting in his
individual capacity as an Officer of the

Minneapolis Police Department; Johnny Mercil, acting in his individual capacity as an Officer of the Minneapolis Police Department; Sherral Miller, acting in her individual capacity as an Officer of the Minneapolis Police Department; Jamiel Mohammud, acting in his individual capacity as an Officer of the Minneapolis Police Department; Beth Mota, acting in her individual capacity as an Officer of the Minneapolis Police Department; Blake Moua, acting in his individual capacity as an Officer of the Minneapolis Police Department; David Neil, acting in his individual capacity as an Officer of the Minneapolis Police Department; Matthew Olson, acting in his individual capacity as an Officer of the Minneapolis Police Department; George Peltz, acting in his individual capacity as an Officer of the Minneapolis Police Department; Lucas Peterson, acting in his individual capacity as an Officer of the Minneapolis Police Department; Michael Pfaff, acting in his individual capacity as an Officer of the Minneapolis Police Department; Patrick Reuben, acting in his individual capacity as an Officer of the Minneapolis Police Department; Bryce Robinson, acting in his individual capacity as an Officer of the Minneapolis Police Department; Antonio SanRoman, acting in his individual capacity as an Officer of the Minneapolis Police Department; Todd Sauvageau, acting in his individual capacity as an Officer of the Minneapolis Police Department; Jarrod Silva, acting in his individual capacity as an Officer of the Minneapolis Police Department; John Staufenberg, acting in his individual capacity as an Officer of the Minneapolis Police Department; Christopher Tuma, acting in his individual capacity as an Officer of the Minneapolis Police

Department; Matthew Vana, acting in his individual capacity as an Officer of the Minneapolis Police Department; Gregory Wenzel, acting in his individual capacity as an Officer of the Minneapolis Police Department; David Wilson, acting in his individual capacity as an Officer of the Minneapolis Police Department; Patrick Windus, acting in his individual capacity as an Officer of the Minneapolis Police Department; Mark Wisocki, acting in his individual capacity as an Officer of the Minneapolis Police Department; Steve Wuorinen, acting in his individual capacity as an Officer of the Minneapolis Police Department; Jeffrey York, acting in his individual capacity as an Officer of the Minneapolis Police Department; Bryan Anderson, acting in his individual capacity as an Officer of the Roseville Police Department; Maia Gardner, acting in her individual capacity as an Officer of the Roseville Police Department; Dennis Kim, acting in his individual capacity as an Officer of the Roseville Police Department; Michael Parkos, acting in his individual capacity as an Officer of the Roseville Police Department; Thomas Roth, acting in his individual capacity as an Officer of the Roseville Police Department; Matthew Koncar, acting in his individual capacity as an Officer of the St. Paul Police Department; Joshua Lynaugh, acting in his individual capacity as an Officer of the St. Paul Police Department; Tong Yang, acting in his individual capacity as an Officer of the St. Paul Police Department; Charles Luedtke, acting in his individual capacity as an Officer of the Veteran Affairs Police Department – Minneapolis;

John and Jane Does (1 – 1,000) acting in their individual capacity as supervisors, officers, deputies, staff, investigators,

employees or agents of the other
governmental agencies; and Entity Does (1-
50) including cities, counties, municipalities,
and other entities sited in Minnesota,

        Defendants.

For her First Amended Complaint, for which she demands trial by jury on all claims so triable, Plaintiff Amy Elizabeth Krekelberg ("Krekelberg") hereby states and alleges as follows:

## INTRODUCTION

This is a case to redress the invasion of privacy and abuse of power by numerous law-enforcement personnel and public employees who impermissibly accessed the Minnesota Department of Public Safety's system for maintaining the personal, private information of Minnesota citizens. Officers and employees from over 40 different law-enforcement agencies and entities chose to violate federal law, Minnesota and federal policy and the constitutionally and statutorily protected privacy rights of Plaintiff Amy Elizabeth Krekelberg, a respected police officer, almost 1,000 times.

These personnel violated the federal Driver's Privacy Protection Act ("DPPA") and violated Krekelberg's civil rights under 42 U.S.C. § 1983, by unlawfully accessing her protected driver's license information without any legitimate purpose. More disturbing, these personnel, charged with protecting and serving the public, knowingly abused their positions of trust to invade the private life of Krekelberg, without her knowledge or consent, and without ever informing her of their activities. They did so for personal reasons, for curiosity, for sexual interest, for physical attraction, for animus

towards female police officers, and out of jealousy of successful female police officers. The utter disregard for her privacy rights by law-enforcement personnel, public employees, and others caused Krekelberg emotional distress and a logical fear for her personal safety.

The State of Minnesota, itself, has found that at least 50% of all officers statewide are engaged in the use of this database for impermissible purposes, and therefore violating federal civil and criminal laws.  Moreover, the access permitted to law-enforcement officers, public employees, and others is easily obtained and makes highly private information available, including health information and social security numbers. At no time have the Commissioners, including the current Commissioner, taken adequate steps to prevent these intrusions.  They have disclosed this information to persons simply because of their membership in a class, such as government employees, police officers, or insurance personnel, rather than ascertaining a specific, permissible purpose for the obtaining of this information as required by the DPPA.  As a result, the information is readily available to and is easily and often accessed by persons in those classes, or possessing that status, without having and without expressing a permissible purpose. Krekelberg has no control over the Defendants accessing of her personal information, and impermissible, and inappropriate accessing has been deliberately concealed and conducted in a surreptitious fashion.  These Defendants are the window-peepers of the electronic data age.  Through lax policies and apathetic enforcement of the law, these officials and governmental units have caused direct damage to Krekelberg, just as they have trampled upon the clear legislative protections of all citizens' right to feel secure in

7

their privacy.

### General Background of Law and Facts

1.      This is an action for injunctive relief and money damages for injuries sustained when personnel from various entities in Minnesota illegally obtained Krekelberg's private, personal and confidential driver's license information without a legitimate or permissible law-enforcement purpose or any other lawful purpose, as set forth in the Introduction to this Complaint, which is incorporated into this paragraph.

2.      These law-enforcement personnel, public employees, and others viewed and obtained Krekelberg's private information over nine hundred and seventy-five (975) times between 2003 and 2013.

3.      Attached to this Complaint as Exhibit A is a copy of an audit prepared by the Minnesota Department of Public Safety showing the accesses of Krekelberg's driver's license information by name, not license plate number, with her driver's license number removed, and showing the "station," as reported by DPS, meaning the police department, sheriff's office, or other government entity through which the officer accessed her information.

4.      Attached to this Complaint as Exhibit B is a list that itemizes the accesses reported in a DPS audit performed in response to Plaintiff's subpoena regarding accesses of Krekelberg's driver's license information.

5.      Attached to this Complaint as Exhibit C is a list that itemizes the accesses reported in a DPS audit performed in response to Plaintiff's subpoena regarding accesses of Krekelberg's driver's license information.

6.      Exhibits B and C were received by Plaintiff on April 27, 2015.

7.      Exhibit B shows various agencies' historical accesses of Krekelberg's driver's license information—done by querying Krekelberg's name, not her license plate number.

8.      Exhibits B and C identify the "EsupportStationName" as reported by DPS, meaning the police department, sheriff's office or other entity through which individuals obtained Plaintiff's Private Data.

9.      Exhibits B and C identify the "Esupport Full Name," as reported by DPS as the individual who obtained Plaintiff's driver's license information.

10.     The rows that have been crossed out on Exhibits B and C represent accesses for which Plaintiff no longer make claims in this lawsuit.

11.     Without legitimate, permissible reasons, these individuals obtained Krekelberg's private information from Department of Vehicle Services' ("DVS") database or Bureau of Criminal Apprehension ("BCA") database.

12.     Upon information and belief, these individuals further impermissibly used or disclosed Krekelberg's private information.

13.     Each unauthorized, impermissible use, disclosure, obtainment, or access of her private information, made while acting under color of state and law, violated Krekelberg's federal civil rights and constituted behavior prohibited by the federal constitution, federal statute, Minnesota statute, common law, and agency and departmental regulations prohibiting some or all of the conduct engaged in by Defendants in this case.

9

14.     Krekelberg brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments of the United States Constitution, 28 U.S.C. §§ 1331 and 1343(a)(3), the Driver's Privacy Protection Act ("DPPA") 18 U.S.C. § 2721 *et seq.*, and Minnesota common law invasion of privacy.[1]

15.     The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

16.     This Court has jurisdiction over Krekelberg's state law claims pursuant to 28 U.S.C. § 1367.

17.     The amount in controversy exceeds $75,000, excluding interests and costs.

**The Parties**

18.     Amy Elizabeth Krekelberg is, and was at all times material herein, a citizen of the United States and a resident of the State of Minnesota.

19.     Defendant Anoka County is a county in Minnesota, which can be sued under Minn. Stat. § 466.01 *et seq.*

20.

21.     Defendant City of Coon Rapids is a home rule charter city in Minnesota, which can be sued under Minn. Stat. § 466.01 *et seq.*

22.     Defendant City of Minneapolis is a home rule charter city in Minnesota,

---

[1] On November 7, 2014, the Court dismissed several of Plaintiff's  dismissed several of Plaintiff's claims.  To the extent necessary to show the scope of the violations against Plaintiff, Plaintiff has maintained several general allegations from the initial Complaint. For this First Amended Complaint, to the extent Plaintiff has struck any allegations related to Defendants that the Court dismissed; Plaintiff expressly states that she does not waive her appellate rights as to any parties or claims in her initial Complaint.

which can be sued under Minn. Stat. § 466.01 *et seq.*

23.    Defendant City of Roseville is a statutory city in Minnesota, which can be sued under Minn. Stat. § 466.01 *et seq.*

24.    Defendant City of St. Paul is a home rule charter city in Minnesota, which can be sued under Minn. Stat. § 466.01 *et seq.* [2]

25.    All the cities and counties listed in the preceding paragraphs are "municipalities" as defined by Minn. Stat. § 466.01, subd. 1, and can be sued under Minn. Stat. § 466.01 *et seq.*

26.    The Board of Commissioners of the Minneapolis Park and Recreation Board is an independently elected, semi-autonomous body responsible for maintaining and developing the Minneapolis Park system; the Board was created by the Minnesota Legislature in 1883 and is itself a suable entity under Minn. Stat. § 466.01 *et seq.*

27.    Defendants Entity Does (1-50) are various unknown municipalities as defined by Minn. Stat. § 466.01, subd. 1 that can be sued under Minn. Stat. § 466.01 *et seq.* or other statutes, and federal departments and agencies, which can be sued under 28

---

[2] It appears the Court inadvertently dismissed in its November 7, 2014 Order regarding Defendants' motion for summary judgment. Based on the reasoning in the Order, the Court dismissed all claims made by Amy Krekelberg before December 17, 2009 as barred by the statute of limitations, but found all other accesses timely. Plaintiff noted seven claims by personnel from the City of St. Paul were dismissed even though they occurred after December 17, 2009, Specifically, St. Paul PD User 12 obtained Ms. Krekelberg's driver's license information twice on September 27, 2010; St. Paul PD User 5 obtained Ms. Krekelberg's driver's license information twice on April 15, 2011; St. Paul PD User 6 obtained her information three times on February 18, 2010. (*See* Dkt. 1-1 p. 24). Plaintiff has asked the Court to amend its Order to reinstate Plaintiff's claims against St. Paul for these seven timely accesses.

U.S.C. § 1346 or other statutes.

28.     Krekelberg will refer to the entities named in paragraphs 19 to 27 above, along with the Entity Does, collectively as the "Defendant Entities" or "Entity Defendants."

29.     Defendant James Psyck ("Psyck"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as a Deputy of the Anoka County Sheriff's Department.

30.     Defendant Travis Wold ("Wold"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as a Deputy of the Anoka County Sheriff's Department.

31.     Defendant Taylor Arneson ("Arneson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his or her individual capacity as an Officer of the City of Coon Rapids Police Department.

32.     Defendant Paul Frakie ("Frakie"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the City of Coon Rapids Police Department.

33.     Defendant Jarrod H. Guy ("Guy"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly

appointed and acting in his individual capacity as an Officer of the City of Coon Rapids Police Department.

34.   Defendant Cameron Clark Gustafson ("Gustafson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the City of Coon Rapids Police Department.

35.   Defendant Robert Goodsell ("Goodsell"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Park Police.

36.   Defendant Keith Rowland ("Rowland"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Park Police.

37.   Defendant Mark Swanson ("Swanson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Park Police.

38.   Defendant John Wurm ("Wurm"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as a Park Patrol Agent of the Minneapolis Park Police.

39.     Defendant Philip Alejandrino ("Alejandrino"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

40.     Defendant Gilles Antaya ("Antaya"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

41.     Defendant Tyrone Barze ("Barze"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

42.     Defendant Troy Carlson ("Carlson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

43.     Defendant Aaron Collins ("Collins"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

44.     Defendant Brian Cummings ("Cummings"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of

Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

45.     Defendant Christopher Cushenbery ("Cushenbery"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

46.     Defendant Mark Durand ("Durand"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

47.     Defendant David Elliot ("Elliot"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

48.     Defendant Andrew Enriquez ("Enriquez"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

49.     Defendant Carlos Baires Escobar ("Escobar"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

50.     Defendant Eric Faulconer ("Faulconer"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

51.     Defendant Mark Gasior ("Gasior"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

52.     Defendant Scott Grabowski ("Grabowski"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

53.     Defendant Dennis Hamilton ("Hamilton"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

54.     Defendant Richard Hand ("Hand"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

55.     Defendant Joseph Haspert ("Haspert"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota,

16

duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

56.     Defendant Anna Hedberg ("Hedberg"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in her individual capacity as an Officer of the Minneapolis Police Department.

57.     Defendant Thomas Hendrickson ("Hendrickson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

58.     Defendant Roland Hillstrom ("Hillstrom"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

59.     Defendant David Honican ("Honican"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

60.     Defendant Daniel Horn ("Horn"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

61.     Defendant Christopher House ("House"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

62.     Defendant Robert Illestschko ("Illestschko"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

63.     Defendant Kurt Indehar ("Indehar"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

64.     Defendant Bruce Johnson ("Johnson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

65.     Defendant Heather Jorges ("Jorges"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in her individual capacity as an Officer of the Minneapolis Police Department.

66.     Defendant Kristopher Kramer ("Kramer"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of

Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

67. Defendant Robert Krebs ("Krebs"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

68. Defendant Dennis Kreft ("Kreft"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

69. Defendant Jennifer Lazarchic ("Lazarchic"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in her individual capacity as an Officer of the Minneapolis Police Department.

70. Defendant Alan Liotta ("Liotta"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

71. Defendant Thomas Lopez ("Lopez"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

72.     Defendant Oscar Macias ("Macias"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

73.     Defendant Timothy Mattson ("Mattson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

74.     Defendant Matthew McLean ("McLean"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

75.     Defendant Johnny Mercil ("Mercil"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

76.     Defendant Sherral Miller ("Miller"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.  Defendant Jamiel Mohammud ("Mohammud"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the

20

Minneapolis Police Department.

77.    Defendant Beth Mota ("Mota"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in her individual capacity as an Officer of the Minneapolis Police Department.

78.    Defendant Blake Moua ("Moua"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

79.    Defendant David Neil ("Neil"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

80.    Defendant Matthew Olson ("Olson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

81.    Defendant George Peltz ("Peltz"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

82.    Defendant Lucas Peterson ("Peterson"), upon information and belief, was

at all times herein, a citizen of the United States and a resident of the State of Minnesota,

duly appointed and acting in his individual capacity as an Officer of the Minneapolis

Police Department.

83.     Defendant Michael Pfaff ("Pfaff"), upon information and belief, was at all

times herein, a citizen of the United States and a resident of the State of Minnesota, duly

appointed and acting in his individual capacity as an Officer of the Minneapolis Police

Department.

84.     Defendant Patrick Reuben ("Reuben"), upon information and belief, was at

all times herein, a citizen of the United States and a resident of the State of Minnesota,

duly appointed and acting in his individual capacity as an Officer of the Minneapolis

Police Department.

85.     Defendant Bryce Robinson ("Robinson"), upon information and belief, was

at all times herein, a citizen of the United States and a resident of the State of Minnesota,

duly appointed and acting in his individual capacity as an Officer of the Minneapolis

Police Department.

86.     Defendant Antonio SanRoman ("SanRoman"), upon information and belief,

was at all times herein, a citizen of the United States and a resident of the State of

Minnesota, duly appointed and acting in his individual capacity as an Officer of the

Minneapolis Police Department.

87.     Defendant Todd Sauvageau ("Sauvageau"), upon information and belief,

was at all times herein, a citizen of the United States and a resident of the State of

Minnesota, duly appointed and acting in his individual capacity as an Officer of the

Minneapolis Police Department.

88.     Defendant Jarrod Silva ("Silva"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

89.     Defendant John Staufenberg ("Staufenberg"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

90.     Defendant Christopher Tuma ("Tuma"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

91.     Defendant Matthew Vana ("Vana"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

92.     Defendant Gregory Wenzel ("Wenzel"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

93.     Defendant David Wilson ("Wilson"), upon information and belief, was at

all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

94.    Defendant Patrick Windus ("Windus"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

95.    Defendant Mark Wisocki ("Wisocki"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

96.    Defendant Steve Wuorinen ("Wuorinen"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

97.    Defendant Jeffrey York ("York"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Minneapolis Police Department.

98.    Defendant Bryan Anderson ("Anderson"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Roseville Police

Department.

99.     Defendant Maia Gardner ("Gardner"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in her individual capacity as an Officer of the Roseville Police Department.

100.    Defendant Dennis Kim ("Kim"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Roseville Police Department.

101.    Defendant Michael Parkos ("Parkos"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Roseville Police Department.

102.    Defendant Thomas Roth ("Roth"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Roseville Police Department.

103.    Defendant Matthew Koncar ("Koncar"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the St. Paul Police Department.

104.    Defendant Joshua Lynaugh ("Lynaugh"), upon information and belief, was

at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the St. Paul Police Department.

105.    Defendant Tony Yang ("Yang"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the St. Paul Police Department.

106.    Defendant Charles Luedtke ("Luedtke"), upon information and belief, was at all times herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting in his individual capacity as an Officer of the Veteran Affairs Police Department - Minneapolis.

107.    Defendants John and Jane Does (1-1000), upon information and belief, were, at all times material herein, citizens of the United States and residents of the State of Minnesota, duly appointed and acting in their individual capacities as law-enforcement supervisors, officers or employees of the Defendant Entities or other federal, state, county or municipal entities in Minnesota.

108.    Krekelberg will refer to the individual Defendants (with the exception of "Supervisor Defendants" defined below), including John and Jane Does, collectively as the "Individual Defendants" or "Defendant Individuals."

109.    Krekelberg will refer to the Defendants with supervisory authority over the Individual Defendants, including any John and Jane Does with such supervisory authority, collectively as the "Defendant Supervisors" or "Supervisor Defendants."

## FACTUAL ALLEGATIONS

**Despite Krekelberg Being a Highly Respected Police Officer, Including Being Named Officer of the Year for her Department, She Was Frequently Subjected to Unwanted Attention from Other Law-Enforcement Officers**

110.    From 2004 to 2007, Krekelberg worked in security and loss prevention for the cities of Roseville, Minneapolis, St. Paul, Blaine, Maple Grove, Maplewood, Apple Valley, Woodbury and Bloomington.

111.    In those positions, she would have frequent contact with law-enforcement personnel.

112.    Krekelberg joined the Minneapolis Park Police Department in 2005, working as a Park Agent.

113.    Krekelberg became a Park Police Officer in 2008.

114.    From 2008 to 2012, Krekelberg worked as an Officer for the Minneapolis Park Police Department.

115.    The Minneapolis Park Police Department is operated by the Minneapolis Park and Recreation Board.

116.    In 2009 she began dating a police officer who had previously been her trainer, and eventually married him.  That started an incredible amount of gossip and recrimination, as many officers accused her of dating him and sleeping with him just to pass her training, which was patently false.  Many rumors circulated, and Krekelberg was constantly asked questions about where she was living, and who she was dating.

117.    Several times Krekelberg was told by supervisors to "make sure her address was correct in our system and on her driver's license," which was not demanded of other

officers to the best of her knowledge, and on information and belief this was to determine if she were living with her then boyfriend, whom she later married.

118. Both before and after her marriage Krekelberg was asked out on dates and propositioned by numerous other officers. This was so oppressive that officers were told to "back off" by her supervisors and trainers.

119. Officers did not "back off" but intensified their unwanted attentions, and Krekelberg was constantly asked out on dates even after refusing them, by mainly male officers but also on occasion by female officers; was repeatedly forced to listen to sexual comments; text messages; asked if she were single; had not given them her telephone number; and was physically touched many times on the posterior and even had her hair pulled.

120. In 2010, Minneapolis Park Police Department Chief Linda Bergstrom presented Krekelberg with the Officer of the Year Award.

121. In receiving the award, Chief Bergstrom praised Krekelberg for her dedication to the parks and surrounding neighborhoods, hard work, attention to detail and pride in her work.

122. Unwanted, unsolicited, and unwelcome attentions, gestures, comments, and behavior, including physical contact, increased after her Officer of the Year Award, as did, Krekelberg is aware in retrospect, the accesses of her private, personal information.

123. In 2012, Krekelberg joined the Minneapolis Police Department.

124.    She was on one occasion asked her full name and shortly asked out on a date by an officer; she was not aware then that her information was obtained by these officers and likely by their partners on the DVS database.

125.    This pattern repeated itself several times, being asked for her full name, even without being asked out on a date later; the audit lists a number of obtainments by officers in Saint Paul about the time they were asking for her full name; Krekelberg never worked for the Saint Paul Police Department.

126.    Krekelberg has served honorably as a police officer and never been disciplined.

127.    Krekelberg states that none of the officers obtained, used or disclosed her information for a purpose permitted under the DPPA.

128.    Krekelberg further states that all the above events and circumstances, particularly Krekelberg's relative youth, her gender, her physical attractiveness, her having dated and married a police officer, her entry into a male-dominated profession, and her great success at that profession, and resultant jealousy, curiosity, sexual interest, and other human emotions, were the reasons and purposes why her personal information was obtained and used by other police officers and others so many times, and none of them are permissible purposes under the DPPA.

**Law Enforcement Officers and Other Personnel from Entities Across Minnesota Viewed Plaintiffs' Private Information Outside the Scope of Any Investigation or Official Police Business**

129.    The Driver and Vehicle Services Division ("DVS") of the DPS maintains a database containing the motor vehicle records of Minnesota drivers. ("DVS Database").

130.    The DVS Database contains "personal information" and "highly restricted personal information," as defined by 18 U.S.C. § 2725 ("Private Data"), including but not limited to names, dates of birth, driver's license numbers, addresses, driver's license photos, weights, heights, social security numbers, various health and disability information, and eye colors of Minnesota drivers, both current and former information dating back to the driver's first license issued in Minnesota.

131.    The Minnesota Driver's License Application states: "you must provide your Social Security number…"

132.    According to the Minnesota Driver's License Application, "[i]f you don't provide the information requested, DPS cannot issue you a driver's permit, license, or identification card, and your existing driving privileges, may be affected."

133.    As early as 2003, Individual Defendants began looking up Krekelberg's Private Data on the DVS Database.

134.    After the Individual Defendants looked up Krekelberg's Private Data, they gained knowledge of the contents of the Private Data.  In gaining such knowledge, the Individual Defendants obtained Krekelberg's Private Data.

135.    Exhibits A and B, incorporated herein, reflects excerpts of an audit provided by DPS showing each time Krekelberg's Private Data was obtained or used by an Individual Defendant.

136.    Each act of the Individual Defendants in obtaining Krekelberg's Private Data also constituted a disclosure by the Commissioner Defendants, because any release or access of information, whether permitted or not, necessarily requires a disclosure; and

30

the method of setting up the DVS Database and of providing constant access to it constituted a disclosure of Private Data under the DPPA.

137.    Column "EsupportStationName" of Exhibits A, B, and C incorporated herein, reflect the department or entity which, upon information and belief, employed the Individual Defendant that obtained or used Krekelberg's Private Data.

138.    Column "EsupportPath" of Exhibits A, B and C incorporated herein, reflect the type of Private Data that was obtained or used by the Individual Defendant.

139.    Columns "AccessDay" and "AccessDate," of Exhibits A, B and C incorporated herein, reflect the day of the week, date, and time when the Individual Defendant obtained or used Krekelberg's Private Data.

140.    DPS does not provide the name of the individual who obtained or used Krekelberg's Private Data, but Plaintiff has learned them through early discovery.

141.    Each line not crossed out in Exhibits B and C incorporated herein, reflects the audit of each time Krekelberg's information, upon information and belief, was obtained or used by an Individual Defendant without a permissible purpose.

142.    Officers employed by, licensed by, or otherwise accessing through Anoka County impermissibly accessed Krekelberg's Private Data five times.

143.    On Exhibit B, DPS identified Psyck, and Wold as individuals who obtained Krekelberg's Private Data from Anoka County in the four years preceding the filing of Plaintiff's initial Complaint.

144.    Attached to the First Amended Complaint as Exhibit C is an audit received by Plaintiff from DPS on April 27, 2015.  Exhibit C is an audit of license-plate-number

accesses of Plaintiff's driver's license information since December 17, 2009 through the DVS Database.

145.   Defendant Anoka County's obtainment and use of Plaintiff's personal information, as shown in Exhibit B, was not for any use in carrying out any law enforcement, governmental, judicial or litigation-related function.

146.   Plaintiff has never been charged with or suspected of committing a crime in Anoka County, has never been involved in any civil, criminal, administrative or arbitral proceeding in or involving Anoka County, and there was no legitimate reason for Plaintiff to have been the subject of any investigation by Anoka County.

147.   Rather, Anoka County's obtainment and use of Plaintiff's personal information was for purposes that were purely personal to Anoka County's personnel.

148.   Officers employed by, licensed by, or otherwise accessing through the City of Coon Rapids impermissibly accessed Krekelberg's Private Data eleven (11) times.

149.   On Exhibit B, DPS identified Arneson, Frakie, Guy and Gustafson as individuals who obtained Krekelberg's Private Data from the City of Coon Rapids in the four years preceding the filing of Plaintiff's initial Complaint.

150.   Defendant City of Coon Rapids' obtainment and use of Plaintiff's personal information was not for any use in carrying out any law enforcement, governmental, judicial or litigation-related function.

151.   Plaintiff has never been charged with or suspected of committing a crime in the City of Coon Rapids, has never been involved in any civil, criminal, administrative or arbitral proceeding in or involving the City of Coon Rapids, and there was no legitimate

reason for Plaintiff to have been the subject of any investigation by the City of Coon Rapids.

152.     Rather, the City of Coon Rapids' obtainment and use of Plaintiff's personal information was for purposes that were purely personal to the City of Coon Rapids' personnel.

153.     Officers employed by, licensed by, or otherwise accessing through the City of Minneapolis impermissibly accessed Krekelberg's Private Data five hundred seventy five (575) times.

154.     On Exhibit B, DPS identified Alejandrino, Antaya, Barze, Carlson, Collins, Cummings, Cushenbery, Durand, Elliott, Enriquez, Escobar, Faulconer, Gasior, Grabowski, Hamilton, Hand, Haspert, Hedberg, Hendrickson, Hillstrom, Honican, Horn, House, Illestschko, Indehar, Johnson, Jorges, Kramer, Krebs, Kreft, Lazarchic, Liotta, Lopez, Macias, Mattson, McLean, Mercil, Miller, Mohammud, Mota, Moua, Neil, Olson, Peltz, Peterson, Pfaff, Reuben, Robinson, SanRoman, Sauvageau, Silva, Staufenberg, Tuma, Vana, Wenzel, Wilson, Windus, Wisocki, Wuorinen, York as individuals who obtained Krekelberg's Private Data from the City of Minneapolis in the four years preceding the filing of Plaintiff's initial Complaint.

155.     As shown in Exhibit B, McLean obtained Plaintiff's Private Data twice through name searches on February 14, 2014, and, as shown on Exhibit C, twice through license plate searches on the same date.  None of these name or license-plate accesses were for a permitted reason under the DPPA and Plaintiff brings claims for each of them.

156.     Defendant City of Minneapolis' obtainment and use of Plaintiff's personal

information was not for any use in carrying out any law enforcement, governmental, judicial or litigation-related function.

157.    Other than three traffic violations, which she has excluded from Exhibit A and this lawsuit, Plaintiff has never been charged with or suspected of committing a crime in the City of Minneapolis, has never been involved in any civil, criminal, administrative or arbitral proceeding in or involving the City of Minneapolis, and there was no legitimate reason for Plaintiff to have been the subject of any investigation by the City of Minneapolis.

158.    Plaintiff has been employed as a police officer for the City of Minneapolis Police Department since 2012.

159.    Antanya, Barze, Carlson, Collins, Jorges, Kreft, Macias, Mattson, Mercil, Olson, Peterson, Reuben, Robinson and Windus each expressed romantic interest in Plaintiff.

160.    Reuben pulled over Plaintiff for a moving violation once, she believes in 2008 or 2009.  His eight obtainments of Plaintiff's Private Data on May 2, 2010, June 11, 2010, August 3, 2010, and January 8, 2011 were well after the traffic stop, particularly considering the frequent romantic interest Reuben showed in Plaintiff,

161.    Other than McLean, Plaintiff knows each of the Minneapolis personnel who obtained her Private Data and knew them before they obtained it.

162.    Plaintiff considered herself friends with Cummings, Elliot, Escobar, Hedberg, Hendrickson, Lazarchic, Liotta, Miller, Mota, Moua, Sauvageau, Vana and York at time they obtained her Private Data.

163.    None of her friends' accesses or the other Minneapolis accesses complained about were made for permissible law-enforcement or government reasons.

164.    The City of Minneapolis' obtainment and use of Plaintiff's personal information was for purposes that were purely personal to the City of Minneapolis' personnel.

165.    Officers employed by, licensed by, or otherwise accessing through the Minneapolis Park and Recreation Board impermissibly accessed Krekelberg's Private Data ninety nine (99) times.

166.    On Exhibit B, DPS identified Linda Bergstrom,[3] Goodsell, Rowland, Swanson and Wurm as individuals who obtained Krekelberg's Private Data from the Minneapolis Park Police in the four years preceding the filing of Plaintiff's initial Complaint.

167.    Krekelberg dated, became engaged to and married Rowland while they were both worked for the Minneapolis Park Police.  Nothing about their relationship was against department regulations.  They have since divorced.

168.    Krekelberg never consented to Rowland obtaining her Private Data.

169.    Since filing this suit, Rowland has contacted Plaintiff in an attempt to persuade her to state that a) she consented to him obtaining her Private Data, b) she used his password, and c) that she used his password to look up herself.  None of that is true. In fact, she later learned Rowland misappropriated her password information for the DPS

---

[3] Former Chief Linda Bergstrom is deceased.  Minneapolis Park and Recreation Board remains liable for her impermissible obtainment of Krekelberg's Private Data.

Database and other websites during their marriage.

170.    Bergstrom, Goodsell and Swanson all showed interest in her living situation and address because of her relationship with Rowland, even though their relationship and marriage were not prohibited by the Park Board.  Bergstrom told Krekelberg that she was not happy with her living with Rowland at about the time she obtained Krekelberg's Private Data.

171.    Wurm showed romantic interest in Krekelberg.

172.    As shown in Exhibit B, Goodsell obtained Plaintiff's Private Data twice through name searches on March 6, 2012, and, as shown on Exhibit C, three times through license plate searches on the same date.  None of these name or license-plate accesses were for a permitted reason under the DPPA and Plaintiff brings claims for each of them.  Plaintiff believes Goodsell was checking to see if Plaintiff was living with Rowland and that his obtainments were made strictly out of curiosity.

173.    None of the Minneapolis Park Police listed above had any permissible basis to obtain Krekelberg's Private Data.

174.    Defendant Minneapolis Park and Recreation Board obtainment and use of Plaintiff's personal information was not for any use in carrying out any law enforcement, governmental, judicial or litigation-related function.

175.    Plaintiff has never been charged with or suspected of committing a crime in the area of the Minneapolis Park and Recreation Board, has never been involved in any civil, criminal, administrative or arbitral proceeding in or involving the Minneapolis Park and Recreation Board, and there was no legitimate reason for Plaintiff to have been the

subject of any investigation by the Minneapolis Park and Recreation Board.

176.    Plaintiff was employed by the Minneapolis Park and Recreation Board as a Park Agent and a police officer from 2005 to 2012

177.    Rather, the Minneapolis Park and Recreation Board's obtainment and use of Plaintiff's personal information was for purposes that were purely personal to the Minneapolis Park and Recreation Board's personnel.

178.    Officers employed by, licensed by, or otherwise accessing through the City of Roseville impermissibly accessed Krekelberg's Private Data seventy-two (72) times.

179.    On Exhibit B, DPS identified Anderson, Gardner, Kim, Parkos and Roth as individuals who obtained Krekelberg's Private Data from the City of Roseville in the four years preceding the filing of Plaintiff's initial Complaint.

180.    Plaintiff worked in loss prevention for the Marshall's store at the Har Mar Mall in Roseville from 2002 until 2006.  As part of her duties, she would provide reports to police officers regarding shoplifting.   Through her work in loss prevention, Plaintiff knew Anderson, Gardner, Kim, Parkos and Roth.  Her contact information was included in all her shoplifting reports, so there was no reason for them to look her up on the DPS Database, certainly not after 2006, when she stopped working for that store.  The accesses at issue took place in 2010 and 2011.

181.    Defendant City of Roseville's obtainment and use of Plaintiff's personal information was not for any use in carrying out any law enforcement, governmental, judicial or litigation-related function.

182.    Plaintiff has never been charged with or suspected of committing a crime in

the City of Roseville, has never been involved in any civil, criminal, administrative or

arbitral proceeding in or involving the City of Roseville, and there was no legitimate

reason for Plaintiff to have been the subject of any investigation by the City of Roseville.

183.  Rather, the City of Roseville's obtainment and use of Plaintiff's personal

information was for purposes that were purely personal to the City of Roseville's

personnel.

184.  Officers employed by, licensed by, or otherwise accessing through the City

of St. Paul impermissibly accessed Krekelberg's Private Data fifty-four (54) times.

185.  On Exhibit B, DPS identified Koncar, Lynaugh, and Yang as individuals

who obtained Krekelberg's Private Data from the City of St. Paul in the four years

preceding the filing of Plaintiff's initial Complaint.

186.  Defendant City of St. Paul's obtainment and use of Plaintiff's personal

information was not for any use in carrying out any law enforcement, governmental,

judicial or litigation-related function.

187.  Other than two traffic violations, which Plaintiff has excluded from Exhibit

A and this lawsuit, Plaintiff has never been charged with or suspected of committing a

crime in the City of St. Paul, has never been involved in any civil, criminal,

administrative or arbitral proceeding in or involving the City of St. Paul, and there was no

legitimate reason for Plaintiff to have been the subject of any investigation by the City of

St. Paul.

188.  Rather, the City of St. Paul's obtainment and use of Plaintiff's personal

information was for purposes that were purely personal to the City of St. Paul's personnel.

189.    Officers employed by, licensed by, or otherwise accessing through the Veteran Affairs Police Department - Minneapolis impermissibly accessed Krekelberg's Private Data two times.

190.    On Exhibit B, DPS identified Luedtke as individual who obtained Krekelberg's Private Data from the Veteran Affairs Police Department - Minneapolis.

191.    Defendant Veteran Affairs Police Department - Minneapolis obtainment and use of Plaintiff's personal information was not for any use in carrying out any law enforcement, governmental, judicial or litigation-related function.

192.    Plaintiff has never been charged with or suspected of committing a crime by the Veteran Affairs Police Department - Minneapolis, has never been involved in any civil, criminal, administrative or arbitral proceeding in or involving the Veteran Affairs Police Department - Minneapolis, and there was no legitimate reason for Plaintiff to have been the subject of any investigation by the Veteran Affairs Police Department - Minneapolis.

193.    Rather, the Veteran Affairs Police Department - Minneapolis obtainment and use of Plaintiff's personal information was for purposes that were purely personal to the Veteran Affairs Police Department - Minneapolis personnel.

194.    Officers or employees employed by the Entity Defendants, along with those Individual Defendants currently identified as John and Jane Does, obtained or used Krekelberg's Private Data approximately 987 times.

195.    Each of the above accesses was committed knowingly; each of the above accesses was impermissible, meaning that the Defendants had no law-enforcement reason

for accessing the information.

196.    Defendants accessed the information out of curiosity or for personal reasons completely unrelated to their position as law-enforcement officers, public employees, or in their job functions.

197.    Krekelberg being named Officer of the Year by the Minneapolis Park Police in 2010, spurred much attention in the law-enforcement community.

198.    As a community, law-enforcement officers are particularly known to spread gossip and rumors, for a variety of reasons, including that they tend to be and perceive themselves as a close-knit community; many of them have attended academy or other training together, and remain in touch afterward, accounting on many occasions for the reason why someone in a remote county will have accessed Krekelberg's private information, as that person may have gone to training with or simply know another officer in the Twin Cities metropolitan area who in turn knows Krekelberg; the law-enforcement field tends to be strongly male-dominated, so that the visible success of a female police officer like Krekelberg is a source of interest, comment, rumor and gossip, particularly when she is young and physically attractive, like Krekelberg.

199.    Krekelberg is a young, female, divorced woman, who received many advances from law-enforcement officers.

200.    Krekelberg's ex-husband was a law-enforcement officer for Minneapolis Park Police Department.

201.    Individual Defendants viewed Krekelberg's Private Data from her State-issued driver's license including her home address, color photograph or image, date of

birth, eye color, height, weight, driver identification number, and upon information and belief, medical and social security information.

202.    Curiosity about Krekelberg or other personal reasons are not purposes permitted for obtaining information under the DPPA.

203.    The Individual Defendants mentioned above who made these accesses primarily did so using Krekelberg's name, not pursuant to a license plate look-up, and there is seldom any law-enforcement function that would permit accessing Krekelberg's private information by name; Krekelberg was not involved in any criminal activity nor suspected of any such activity; she had not committed any act that would entitle Entity Defendants and Individual Defendants to access her information under any of the permissible exceptions; to the extent any such permissible reason could exist, Krekelberg has eliminated permissible access from the accesses here complained of; and no Defendant has proposed a valid, credible reason for accessing Krekelberg's information.

204.    The policy of the State of Minnesota is to uphold the provisions of the law, both state and federal, and to protect and safeguard the privacy rights of the State's citizens and inhabitants, including its drivers' privacy rights, and including those rights as are required to be protected by federal law.

205.    In particular, it is the policy of the State of Minnesota, as outlined in Minn. Stat. § 171.12, subd. 7, to comply with the provisions and requirements of the DPPA.

206.    This policy is also set forth in the driver's license application and set forth in statutory language with proper citation to that federal statute.

207.    This system permitted, and on information and belief still permits, the

accessing of the database from personal computers.

208.   This system allowed individuals to give out their personal passwords to others.

209.   This system permitted, and on information and belief may still permit, the accessing of the system by persons without any accountability or even in some instances without the ability to trace the person who made the access.

210.   From 2003 through 2010, this system did not require reasonably adequate training on the use of the DVS database of sworn-law enforcement officers.

211.   From 2011through today, this system still does not require reasonably adequate training on the use of the DVS database of sworn-law enforcement officers.

212.   Many viable methods were and are available to prevent this illegal accessing of private information.

213.   The information contained in the DPS database is far greater and contains more private personal information than is customarily known to non-law enforcement personnel.

214.   The information contained in the DPS database includes the social security numbers of the drivers.

215.   The information contained in the DPS database includes drivers' health information.

216.   These accesses are committed surreptitiously, and without the knowledge of the victims, including Krekelberg, which knowledge is kept hidden and concealed from the victims, including Krekelberg.

42

217.    There has not been a single instance of which Krekelberg is aware involving her or anyone else where an officer has informed her that he or she has accessed her information.

218.    Law-enforcement officers have gone to great lengths to avoid letting Krekelberg know they have accessed her personal private information.

219.    The surreptitious, concealed, and hidden accesses are kept secret from the general public and from the victims, including Krekelberg.

220.    Paradoxically, the practice of impermissibly viewing drivers' private information on the DVS Database and BCA Database is well known throughout the law-enforcement community, from top ranking officers to the lowest ranking personnel.

221.    Accessing the DVS Database without a permissible reason is a breach of confidentiality.

222.    Krekelberg contacted DPS to inquire whether law enforcement officers had been viewing her private information.

223.    Plaintiff requested an audit from Kim Jacobson at DPS.

224.    The Minnesota Department of Motor Vehicles is a division of DPS.

225.    On May 1, 2013, Jacobson provided the results of the audit to Krekelberg.

226.    This initial audit request and the results furnished, were for name look-ups only and specifically did not include any license plate or driver's license number look-ups.

227.    Krekelberg was shocked and disgusted to learn from DPS that it had determined that officers and personnel from over forty different departments and agencies had reviewed, and impermissibly obtained or used, her Private Data approximately 987

43

times since 2003.  *See* Exhibit A.

228.    Before receiving the audit report, Krekelberg had no knowledge that her Private Data had been accessed through the DVS Database.

229.    The only reason anyone, including any law-enforcement officer would have looked up Plaintiff's name is that he or she would be curious about her, either because Plaintiff is a woman, because Plaintiff is well-known in the law-enforcement community, because she was publicly named Officer of the Year, because of Plaintiff's physically attractiveness, because Plaintiff is interesting to law-enforcement officers, or for other personal reasons.

230.    Plaintiff was not under any criminal investigation; she had committed no crimes; she was not seeking the assistance of law-enforcement; she was not of any legitimate interest to law enforcement other than for personal reasons, such as curiosity or romantic attraction.

231.    There is no law-enforcement function that would have made invading Plaintiff's privacy permissible under the DPPA.

232.    Before filing suit, Plaintiff (through her attorneys) contacted the Entity Defendants, providing the relevant portion of the audit, sending them a letter in which she requested the Entity to provide her with any permissible reason it or its employees, agents, and officers had in looking up her information.

233.    Krekelberg believes that even more unauthorized accesses and viewings will occur in the future if the policies of Entity Defendants and other police departments and law-enforcement agencies similarly situated are not changed to bring the actual

custom and practice of these Entity Defendants and others similarly situated into

compliance with their own written rules, with the rules of the Department of Public

Safety, and with federal law, including the DPPA.

234.    Included in the audit is the listing of various law-enforcement agencies with

the Defendant Entities that obtained Krekelberg's Private Data.

235.    According to DPS, Individual Defendants primarily used Krekelberg's

name, not her license plate numbers, to look up her private, personal information.

236.    With the exception of those limited instances specifically excluded , there

was no valid law-enforcement related reason that any law-enforcement officer would

have looked up the Plaintiff by name.

237.     Individual Defendants' identities (John and Jane Does) are not presently

known, and will not be revealed by DPS or the Entity Defendants be revealed pursuant to

the Minnesota Government Data Practices Act.  Krekelberg anticipates that these yet-to-

be-named Individual Defendants will become known through discovery.

238.    Supervisor Defendants are not presently known.  Krekelberg anticipates

that the yet-to-be-named Supervisor Defendants who should have monitored, prevented

and stopped the unauthorized accesses to Krekelberg's information will become known

through discovery.

239.    The remaining Entity Defendant identities (Entity Does) are not presently

known, because not all of the entities identified by the DPS have provided sufficient

information to determine if their personnel's access to the database was unauthorized.

Krekelberg anticipates that these yet-to-be-named Entity Defendants will become known

through discovery.

240.   None of the obtainments of Krekelberg's information were for a purpose permitted by the DPPA.

241.   Whatever training, monitoring, or inquiry into the officers' usage of the information systems has been adopted is woefully inadequate to ensure that access is used properly and lawfully.

242.   On information and belief, despite this training, Defendant Entities and Defendant Supervisors, allowed their employees, including but not limited to Individual Defendants, to view Krekelberg's Private Data for unlawful purposes.

243.   On information and belief, Defendant Entities and Defendant Supervisors, permitted, condoned, or acquiesced in this illegal access to Krekelberg's private information, and knew or should have known that it was occurring.

244.   On information and belief, this illegal access occurs with regularity not only of Krekelberg's private information, but of other Minnesota drivers' private information.

245.   Defendant Entities and Defendant Supervisors have lax policies or lax enforcement of these policies that allow for these intrusions.

246.   Defendant Entities and Defendant Supervisors either have no viable method of or have an inadequate method of ascertaining and controlling the illegal access to individuals' private information by their officers.

247.   The Driver's License application assures Minnesota drivers their information will be safeguarded and kept private, "DPS releases this information to local,

46

state, and federal government agencies only as authorized or required by state and federal law."

248.    The failure of Defendant Entities and Defendant Supervisors to keep this information private is a flagrant breach of a promise of confidentiality.

249.    Defendant Entities and Defendant Supervisors either have no viable method of or have an inadequate method of ascertaining and controlling the illegal access to individuals' private information by their officers.

250.    The extent of this illegal access is widespread and pervasive throughout departments, and is a custom and practice.

251.    The widespread practice is demonstrated by the systematic tolerance of illegal accesses.

252.    Further evidence of the custom and practice can be found in actual statements made by current officers, one of whom was quoted in a magazine article about the illegal access into previous cases involving this same breach of privacy as saying that "every single cop in the state has done this.  Chiefs on down."

253.    Further evidence is based on actual statements made by former officers, one of whom was quoted in a magazine article about illegal accesses of other individuals as saying that "[y]ou used to look up people without a second thought.  You'd look up old friends from high school or just someone you used to know."

254.    Each individual with access to the DPS Database has a password allowing that individual access to the DPS Database.

255.    Personnel can access the DPS Databases from any computer with internet

access.

256.    Personnel occasionally gave other individuals their passwords, contrary to requirements.

257.    The system for accessing accountability and responsibility was and is prone to error and fails to reasonably protect drivers' private information.

258.    On further information and belief, this illegal access of Private Data occurs disproportionately to women.

259.    When Defendant personnel viewed Krekelberg's private information, they did not do so to carry out official police functions.

260.    Krekelberg committed no crimes or transgressions that would explain or legitimize the unauthorized access of their Private Data.

261.    The Individual Defendants obtained Krekelberg's personal information without probable cause or reasonable suspicion to believe that Krekelberg had engaged in any criminal activity or any activity even remotely related to criminal activity.

262.    Krekelberg never waived the protections of the DPPA.

263.    Defendants' actions have violated the United States Constitution, the DPPA, 42 U.S.C. § 1983, and Minnesota State law.

264.    The sheer volume of the intrusions into her private life demonstrates that law-enforcement personnel, public employees, and others are unfairly hostile and careless toward Krekelberg's privacy and safety.

265.    As a result of these invasions of privacy, Krekelberg has suffered and continues to suffer emotional distress.

266.    Upon information and belief, the misuse of private information is the main complaint of most police chiefs and human resources personnel.

267.    At a Legislative Audit Subcommittee hearing in February 2013, at which DPS Commissioner Dohman testified, the testimony of the Legislative Auditor revealed that at least 50% of law enforcement officers are misusing the DPS database by obtaining, disclosing, and/or using the driver license personal information for an impermissible purpose.

268.    Experts in the field of police training report that the primary complaint of many police departments is that law enforcement personnel misuse private information. This is an established, well-known, and pervasive problem with law enforcement.

269.    On information and belief, the only changes and improvements to the DPS system to increase the protection of privacy, especially from law enforcement, have occurred only after litigation involving the DPS, specifically the lawsuit titled Anne Marie Rasmusson v. City of Bloomington, No. 12-CV-00632 (SRN/JSM).  In that case Plaintiff sued, among others, the Commissioners of the DPS and was able to obtain through settlement significant changes to the DVS database, including numerous protections such as different types of periodic audits.  On information and belief, the 19,000 improper accesses of former Department of Natural Resources Captain John Hunt were discovered in part due to those changes.  The vast majority of the restrictions and protections on driver privacy have occurred due to the Rasmusson case and others like it. The Commissioners in Minnesota remains highly resistant to improving the DPS

database, instead looking to the individual officers and local governments to institute

changes, which is a far less effective method of instituting changes and will result in

piecemeal and inadequate changes in protections at best.

270.    On information and belief, states other than Minnesota have far greater

restrictions and protections in place to protect the data on their drivers' license databases

from being obtained, disclosed or used for a reason not permitted by the DPPA.

271.    For instance, on further information and belief, North Dakota requires a

daily report of anyone who obtains driver photos and its system generates weekly reports

listing all individuals with accesses of over 25 images a day.  These reports are sent to the

North Dakota Attorney General to make inquiries as to whether the information was

obtained for a job-related reason.  North Dakota also requires the users of the database to

declare the reason why they were looking at the record.  North Dakota also requires its

users to take a certification test before being given access to the database.

272.    Also on information and belief, the State of California's DMV cooperates

with its law-enforcement agencies and California's Department of Justice to ensure

access to its drivers' license information is limited to agencies that satisfy specific

requirements before they are issued a confidential requester code that permits access to

law-enforcement information only.  Each law-enforcement agency is responsible for

limiting access to necessary personnel.  California also periodically reviews law-

enforcement applications to ensure the agency and person requesting the information is

still entitled to obtain the information.  During a recent audit, California's DMV reviewed

questionable agencies and even reclassified some to prevent them from having further

access to the database.

273.    On further information and belief, the California DMV has a dedicated law-enforcement unit to analyze data inquiries.  Each data request is logged and technicians are trained to look for developing patterns in the requester's history.  The California DMV also conducts periodic historical reviews of a specific agency's requests to determine if the accesses were authorized.  The California DMV may also require a law-enforcement entity to supply an explanation of events, describe their protocols for accessing DMV information, what policies or access requirements were violated, what corrective or administrative steps are being taken to admonish the officer, and what steps the agency is taking to avoid future occurrences.  All users annually complete an information security form.  Finally, the California DMV is very restrictive on the types of information it releases.

274.    On information and belief Defendants Entities knew or should have known of the policies and practices of other States, but did not at the time that Krekelberg's drivers' license information was being impermissibly obtained, require any of the protections and safeguards to the Minnesota DPS Databases utilized by other states.

275.    Given that other states do and did have safeguards and protections in place to protect their drivers' private information from impermissible accessing, use, and disclosure, Defendants Entities reasonably should have  implemented such safeguards and protections for Minnesota drivers, including Krekelberg.

276.    The implementation of some or all of these safeguards and protections by Defendants would have prevented many of the impermissible obtainment, uses and

disclosures of Krekelberg's private data.

## COUNT I: VIOLATION OF THE DPPA, 18 U.S.C. § 2721, *et seq.*

*(Against all Defendants)*

277.    Krekelberg reaffirms and realleges the allegations in Paragraphs 1 through 276.

278.    Krekelberg provided personal information to the DPS including her address, color photograph, date of birth, weight, height, eye color, social security number and medical information for the purpose of acquiring and utilizing a State of Minnesota driver's license.

279.    The DPS Database also maintained Krekelberg's driving record.

280.    Krekelberg did not provide her consent for any of Defendant Individuals to obtain, disclose or use, or for any of Defendant Entities or Defendant Supervisors to disclose or to allow Defendant Individuals to obtain, disclose or use, her private information for anything but official law-enforcement business.

281.    Knowingly obtaining, disclosing or using Private Data for a purpose not permitted by the DPPA is a violation of the DPPA.  The statute provides for criminal fines and civil penalties.  18 U.S.C. §§ 2723, 2724.

282.    The DPPA provides redress for violations of a person's protected interest in the privacy of their motor vehicle records and the identifying information therein.

283.    Minnesota law is to enforce and follow the DPPA and to hold all information obtained pursuant to an application for a driver's license confidential and private; even prior to the passage of the DPPA in 1994 Minnesota law pledged to hold all

this information private and confidential, and on one's driver's license application these promises of confidentiality are all made; Defendants' actions in accessing this information is a flagrant breach of that pledge of confidentiality.

284.   Each of the Defendants invaded Krekelberg's legally protected interest under the DPPA.

285.   According to the Department of Vehicle Services, the Individual Defendants knowingly obtained, disclosed or used Krekelberg's personal information, from a motor vehicle record, for a purpose not permitted under the DPPA.  18 U.S.C. § 2724(a).

286.   None of the Individual Defendants' activities fell within the DPPA's permitted exceptions for procurement of Krekelberg's private information.

287.   By the actions described above, each Defendant Individual was acting within the scope of his or her employment when he or she obtained, disclosed or used Krekelberg's personal information from the DPS Databases for a purpose not permitted by the DPPA.

288.   Individual Defendants knew that their actions related to Krekelberg's Private Data were in violation of the DPPA.

289.   Defendant Entities and Defendant Supervisors knowingly authorized, directed, ratified, approved, acquiesced in, committed or participated in obtaining, disclosing or using of Krekelberg's private personal information by Individual Defendants.

290.   Defendant Entities and Defendant Supervisors' actions constitute a

knowing disclosure of the personal information of Krekelberg under the DPPA.

291.    Individual Defendants knowingly used Defendant Entities' computers, passwords and passcodes to obtain Krekelberg's private information.

292.    Krekelberg's private information was obtained by each Individual Defendant for purposes that are not permitted under the DPPA.

293.    Defendant Entities are each vicariously liable for the acts of Defendant Individuals.

294.    Krekelberg has suffered harm because her private information has been obtained and viewed unlawfully.

295.    Krekelberg has further suffered harm because her private information has been obtained unlawfully.  Krekelberg suffered and continues to suffer harm by virtue of the increased risk that her protected information is in the possession of Individual Defendants who obtained it without a legitimate purpose.

296.    This is precisely the harm Congress sought to prevent by enacting the DPPA and its statutory remedies.

297.    Individual Defendants and Supervisor Defendants each willfully and recklessly disregarded the law, entitling Krekelberg to punitive damages under the DPPA, see 18 U.S.C. § 2724(b)(2), which is not subject to the pleading requirement of Minnesota state law as set forth in Minn. Stat. § 549.20.  Krekelberg is entitled to actual damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred, and such other preliminary and equitable relief as the court determines to be appropriate.  18 U.S.C. § 2724(b).

298.    In addition, under the DPPA, Krekelberg is entitled to a baseline liquidated damages award of at least $2,500 for each violation of the DPPA.  18 U.S.C. § 2721(b)(1). Krekelberg need not prove actual damages to receive said liquidated damages.

## JURY DEMAND

299.    Krekelberg demands a jury trial as to all issues of fact herein properly triable to a jury under any statute or under common law.

WHEREFORE, Amy Elizabeth Krekelberg prays for judgment against the Defendants as follows:

1.    A money judgment against all Defendants for liquidated, actual and compensatory damages in an amount in excess of seventy five thousand ($75,000) dollars and punitive damages in an amount to be determined by the jury, together with their costs, including reasonable attorney fees, under 42 U.S.C. § 1988, the DPPA, and other applicable laws, and prejudgment interest;

2.    Actual damages, punitive damages, attorneys' fees and other litigation costs and such other preliminary and equitable relief as the court determines to be appropriate under 18 U.S.C. § 2724(b);

3.    Liquidated damages of at least $2,500 for each violation of the DPPA under 18 U.S.C. § 2721(b)(1);

4.    An injunction, permanently enjoining all Defendants from viewing Krekelberg's private information in violation of the DPPA, unless necessary for law enforcement purposes;

5.    An injunction, permanently and prospectively requiring Defendants to

establish and implement all effective monitoring and investigative procedures to end this

practice, discover and suspend permanently all accessing privileges to the violators; and

to provide full disclosure to all potential claimants of the entities and persons who have

violated their rights under the DPPA and the Constitution; and,

6.      For such other and further relief as this Court deems just and equitable.

                                        **SAPIENTIA LAW GROUP PLLC**

Dated:  June 15, 2015                   s/ Jonathan A. Strauss
                                        Jonathan A. Strauss (#0279602)
                                        Lorenz F. Fett (#196769)
                                        Sonia Miller-Van Oort (#278087)
                                        120 South Sixth Street, Suite 100
                                        Minneapolis, MN  55402
                                        (612) 756-7100, Fax: 612-756-7101
                                        jons@sapientialaw.com
                                        larryf@sapientialaw.com
                                        soniamv@sapientialaw.com

                                        and

                                        **SIEBEN GROSE VON HOLTUM &
                                        CAREY**

                                        s/Susan M. Holden
                                        Susan M. Holden (#0189844)
                                        Jeffrey M. Montpetit (#0291249)
                                        901 Marquette Avenue,
                                        Suite 500,
                                        Minneapolis, MN 55402
                                        (612) 333-4500

                                        **ATTORNEYS FOR PLAINTIFF
                                        AMY ELIZABETH KREKELBERG**