# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Amy Elizabeth Krekelberg,                          Civil No. 13-3562 (DWF/TNL)

          Plaintiff,

v.                                                 **REDACTED MEMORANDUM**
                                                   **OPINION AND ORDER**

City of Minneapolis; Minneapolis Park &
Recreation Board; Keith Rowland, acting
in his individual capacity as an Officer of
the Minneapolis Park and Recreation Board
Police Department; John Wurm, in his
individual capacity as a Park Patrol Agent
of the Minneapolis Park and Recreation
Board Police Department; Mark Gasior,
acting in his individual capacity as an
Officer of the Minneapolis Police
Department; Heather Jorges, acting in her
individual capacity as an Officer of the
Minneapolis Police Department; Matthew
Olson, acting in his individual capacity as
an Officer of the Minneapolis Police
Department; John and Jane Does (1-1000),
acting in their individual capacity as
supervisors, officers, deputies, staff,
investigators, employees or agents of the
other governmental agencies; Entity Does
(1-50), including cities, counties,
municipalities, and other entities sited in
Minnesota,

          Defendants.

---

Jeffrey M. Montpetit, Esq., Marcia K. Miller, Esq., and Susan M. Holden, Esq.,
SiebenCarey, P.A.; and Lorenz F. Fett, Jr., Esq., Sonia L. Miller-Van Oort, Esq.,
Robin M. Wolpert, Esq., and Jonathan A. Strauss, Esq., Sapientia Law Group PLLC;
counsel for Plaintiff.

Brian Scott Carter and George Norris Henry, Assistant City Attorneys, Minneapolis City Attorney's Office, counsel for Defendants City of Minneapolis and Heather Jorges.

Ann E. Walther, Esq., and Erik Bal, Esq., Rice, Michels & Walther, LLP, counsel for Defendants Minneapolis Park & Recreation Board, Keith Rowland, and John Wurm.

Joseph E. Flynn, Esq., Jason M. Hill, Esq., Jardine Logan & O'Brien PLLP, counsel for Defendant Matthew Olson.

---

# INTRODUCTION

This matter is before the Court on Defendant City of Minneapolis's Motion for Judgment on the Pleadings (Doc. No. 446) and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 451). For the reasons set forth below, the Court denies the motions. Also before the Court is Plaintiff's appeal (Doc. No. 440) of Magistrate Judge Tony N. Leung's August 9, 2017 Order addressing a number of discovery motions (Doc. No. 430). Upon careful review, the Court sustains Plaintiff's objection and respectfully sets aside the Magistrate Judge's order to the extent it precludes the parties from seeking attorney fees and costs in connection with particular discovery motions.

# BACKGROUND

This case relates to the alleged unlawful access of Plaintiff Amy Elizabeth Krekelberg's personal information by various government entities and their employees. According to Plaintiff, Defendants viewed her information—contained in the Department of Vehicle Services' ("DVS") motor-vehicle records database for Minnesota drivers—in violation of the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et seq.* ("DPPA"). A prior order in this case, issued on November 7, 2014, contains a summary of

Krekelberg's factual allegations. (Doc. No. 118.) The Court incorporates that summary by reference. The specific procedural and factual background relevant to each of the pending motions is detailed below.

## DISCUSSION

### I. City of Minneapolis's Motion for Judgment on the Pleadings

#### A. Background

On December 17, 2013, Plaintiff filed the original Complaint in this matter against numerous entity defendants as well as individual officers identified as John and Jane Doe. (Doc. No. 1 at 1-2.) Approximately eighteen months later,[1] on June 16, 2015, Plaintiff filed an Amended Complaint naming individual Doe defendants. (Doc. No. 137 at 1-6.) The Amended Complaint alleged DPPA violations against all defendants, including vicarious liability against entity defendants for the actions of the individual defendants. (*See id.* ¶¶ 277-98.)

On August 19, 2016, the Court concluded that the claims against numerous individual named defendants were barred by the statute of limitations. (Doc. No. 246 at 13-18.) Thus, the Court dismissed the claims against these defendants with prejudice, and they were dismissed from the lawsuit. (*See id.* at 22-23.) Minneapolis now seeks judgment on the pleadings, arguing that the dismissal of the claims against these

---

[1] For a summary of the intervening litigation—in part through which Plaintiff sought to obtain the names of individual defendant officers—see the Court's August 19, 2016 Order at pages 8-9. (Doc. No. 246.)

individual officers mandates dismissal of the corresponding vicarious liability claims against Minneapolis. (*See* Doc. Nos. 446, 448.)

### B. Legal Standard

A party may move for judgment on the pleadings at any point after the close of the pleadings, so long as it moves early enough to avoid a delay of trial. Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law[.]" *See Ashley Cty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)). The Court evaluates a motion for judgment on the pleadings under the same standard as a motion brought under Federal Rule of Civil Procedure 12(b)(6). *See id.*

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative

level." *Id.* at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

### C.     Minneapolis's Vicarious Liability for Time-Barred Officers

Minneapolis argues that the prior dismissal of Plaintiff's claims against individual Minneapolis officers on statute-of-limitations grounds bars Plaintiff's vicarious liability claims against Minneapolis based on those officers' lookups. Because these officers have been dismissed from the action with prejudice, Minneapolis argues, the Court should hold as a matter of law that the corresponding vicarious liability claims against Minneapolis based on those officers' conduct are barred. Minneapolis emphasizes that Plaintiff must establish the underlying liability of these officers under the DPPA in order to assert successful vicarious liability claims against Minneapolis. However, Minneapolis contends, Plaintiff cannot establish these officers' liability because a statute-of-limitations dismissal operates as an adjudication on the merits of Plaintiff's claims under the federal common law as well as the Federal Rules of Civil Procedure. As a result, Minneapolis suggests, this dismissal has a preclusive effect as to subsequent claims. Minneapolis argues that the case law reaching a different conclusion is either distinguishable or wrong. Further, Minneapolis asserts that policy considerations weigh against imposing vicarious liability based on these time-barred claims.

Plaintiff, on the other hand, argues that the statute-of-limitations dismissal of the individual officers does not exonerate Minneapolis for these officers' conduct. As a preliminary matter, Plaintiff contends that a motion seeking judgment on the pleadings should only address the pleadings. In her complaint, Plaintiff contends, she has adequately pled Minneapolis's vicarious liability for its officers' actions. In addition, Plaintiff suggests that the majority of courts hold that a dismissal on statute-of-limitations grounds does not eliminate the liability of the principal. According to Plaintiff, the cases cited by Defendant holding otherwise are not persuasive. Plaintiff also disputes Defendant's suggestion that res judicata or collateral estoppel have any application here because the claims at issue are not identical, and the court did not address the underlying facts relating to the officers' liability. Relatedly, Plaintiff emphasizes that a statute-of-limitations defense is personal to the individual and notes that Plaintiff could have sued Minneapolis alone for vicarious liability without even adding the individual officers as Defendants. Finally, Plaintiff argues that policy considerations support imposing vicarious liability against Minneapolis for its officers' conduct.

Minneapolis has identified caselaw out of seven jurisdictions which holds that a statute-of-limitations dismissal of an agent bars the imposition of vicarious liability against the principal. *See Preis v. Lexington Ins. Co.*, 508 F. Supp. 2d 1061, 1078 (S.D. Ala. 2007), *aff'd,* 279 F. App'x 940 (11th Cir. 2008); *Al-Shimmari v. Detroit Med. Ctr.*, 731 N.W.2d 29, 36-38 (Mich. 2007); *Stephens v. Petrino*, 86 S.W.3d 836, 843 (Ark. 2002); *Buettner v. Cellular One, Inc.*, 700 So. 2d 48, 48-49 (Fla. Dist. Ct. App. 1997); *Greco v. Univ. of Del.*, 619 A.2d 900, 903-04 (Del. 1993); *Karaduman v. Newsday, Inc.*,

416 N.E.2d 557, 563 (N.Y. 1980);[2] *Kapitan v. DT Chicagoland Express Inc.*, Civ.

No. 2:12-321, 2013 WL 5655704, at *2-4 (N.D. Ind. Oct. 15, 2013). Minneapolis also

cites *Brown v. Garlich Printing Co.*, Civ. No. 4:07CV1668, 2008 WL 942861 (E.D. Mo.

Apr. 7, 2008), which holds that "[d]ismissal for failure to comply with the statute of

limitations operates as an adjudication on the merits," thereby rendering some support to

Minneapolis's argument here. *See id.* at *2.

Of the cases cited by Minneapolis, the Michigan Supreme Court's *Al-Shimmari*

decision contains the most thorough discussion of the issue presented and follows the

reasoning advanced by Minneapolis here. *See Al-Shimmari*, 731 N.W.2d at 36-38.

Specifically, the court focused on the fact that the dismissal of the plaintiff's claims

against the agent based on the statute of limitations "operate[d] as an adjudication on the

merits" under the relevant rule of procedure, precluding an underlying finding of

negligence to support vicarious liability against the remaining defendant principals. *Id.* at

37 (quoting MCR 2.504(B)(3)). Other courts have applied similar reasoning to reach this

outcome. *See Buettner*, 700 So. 2d at 48-49; *Greco*, 619 A.2d at 903-04.

In contrast, Plaintiff has identified four jurisdictions that permit vicarious liability

claims to proceed even if the claim against the agent is barred by the statute of

limitations. *See Stanley ex rel. Estate of Hale v. Trinchard*, 579 F.3d 515, 520-21 (5th

---

[2]     As Minneapolis acknowledges in its reply brief, New York courts are not all in
accord on this issue. *Compare, e.g.*, *Ahrorgulova v. Mann*, 42 N.Y.S.3d 203, 204-05
(N.Y. App. Div. 2016), *and Magriz v. St. Barnabas Hosp.*, 841 N.Y.S.2d 245, 246 (N.Y.
App. Div. 2007).

Cir. 2009) (applying Louisiana law); *Juarez v. Nelson*, 2003-NMCA-011, ¶¶ 26-29, 61

P.3d 877, 886-87, *overruled on other grounds by Tomlinson v. George*,

2005-NMSC-020, 116 P.3d 105; *Cohen v. Alliant Enters., Inc.*, 60 S.W.3d 536, 537-39

(Ky. 2001); *Leow v. A & B Freight Line, Inc.*, 676 N.E.2d 1284, 1285-89 (Ill. 1997).

Plaintiff also relies on decisions out of the Eighth Circuit which appear to support

permitting vicarious liability in analogous circumstances. *See Byrd v. J Rayl Transp.,*

*Inc.*, 106 F. Supp. 3d 999, 1001-02 (D. Minn. 2015); *Gronseth v. Chester Rural Fire*

*Prot. Dist.*, Civ. No. 07-4163, 2009 WL 983130, at *2-5 (D.S.D. Apr. 9, 2009).

Under the circumstances of this case, the Court will permit the vicarious liability

claims against Minneapolis to proceed. Both parties acknowledge that there is no binding

precedent on this issue, and after reviewing competing authorities, the Court is persuaded

that Minneapolis should not be permitted to avoid liability for three reasons.

First, the Court is persuaded that there is a meaningful distinction between a

dismissal that actually confronts the merits of the agent's liability and a dismissal for

some other purely procedural or tactical reason. This distinction is relevant because, as

numerous courts have acknowledged, vicarious liability is based on the underlying

*conduct* of the agent. Where an agent has been dismissed for reasons that do not address

the actual merits of the plaintiff's claim, the agent's liability may still be established in

the agent's absence. As explained in the *Byrd* decision:

> All [plaintiff] must do in order to recover from [the principal] is establish
> that [the agent] was negligent; he need not proceed directly against [the
> agent], and hence it makes no difference whether a claim against [the agent]
> would be barred by the [relevant] statute of limitations or could not be
> brought in [the forum state] for jurisdictional reasons.

*Byrd*, 106 F. Supp. 3d at 1002; *see also* 2A C.J.S. *Agency* § 463 (June 2018 Update) ("[I]t is essential that the tort liability of the agent be established, but the fact that an agent is able to escape liability because the statute of limitations has run as to the agent will not necessarily insulate the principal from vicarious liability.").  Courts in multiple jurisdictions have applied similar reasoning.  *See Cohen*, 60 S.W.3d at 538 ("It is the negligence of the servant that is imputed to the master, not the liability."); *Women First OB/GYN Assocs., L.L.C. v. Harris*, 161 A.3d 28, 30, 45 (Md. Ct. Spec. App. 2017) (permitting vicarious liability notwithstanding the agent's voluntary dismissal, in part because "the merits of the tort claim against the agent have not actually been adjudicated before the dismissal"); *Juarez*, 2003-NMCA-011, ¶ 28, 61 P.3d at 886 ("'[E]xoneration of the servant' commonly is understood to mean acquittal of the employee or agent following a trial on the merits."); *Gallegos v. City of Monte Vista*, 976 P.2d 299, 301 (Colo. App. 1998) ("[A]lthough a finding that an employee is not negligent requires a finding that the employer is not legally responsible, an action may proceed against an employer if the claim against the employee has been dismissed or barred, not on the merits of the claim, but on procedural grounds.").

In *Hughes v. Doe*, 639 S.E.2d 302 (Va. 2007), the Supreme Court of Virginia addressed markedly similar circumstances to this case.  Specifically, plaintiff filed a complaint against a medical facility and its employee, identified as "Jane Doe" in the original complaint.  *Id.* at 303.  The plaintiff moved to amend her complaint to name the employee once she learned her identity, but the trial court ultimately dismissed the

employee from the action with prejudice based on the statute of limitations. *Id.* The lower court determined that the medical facility could not be held vicariously liable for the dismissed employee's conduct, but the Supreme Court of Virginia reversed, emphasizing "the fact that the crux of respondeat superior liability is a finding that the employee was negligent." *Id.* at 303-04. It explained that the lower court's dismissal order "was not a holding on the merits of [the agent's] alleged negligence and therefore neither exonerated [the medical facility] nor otherwise precluded [the plaintiff] from pursuing her claim against [the medical facility] for [the agent's] negligence on a theory of respondeat superior." *Id.* at 304. The Court agrees with these cases that a dismissal based on the statute of limitations should not operate to preclude vicarious liability because it does not actually address if the agent's conduct supports an actionable claim.

Second, the Court is not persuaded that principles of res judicata and collateral estoppel control the issue before the Court. In particular, the Court finds the reasoning of the United States District Court for the District of South Dakota in *Gronseth* to be persuasive on this issue. *Gronseth* involved a vehicle accident between plaintiff and a volunteer firefighter, Bauman, employed by defendants Chester Rural Fire Protection District and Chester Fire Department ("Chester Fire"). *Gronseth*, 2009 WL 983130, at *1. The plaintiff's lawsuit included a claim of negligence against Bauman and alleged vicarious liability against Chester Fire. *Id.* The parties agreed to voluntarily dismiss Bauman, and the district court entered a dismissal "with prejudice and on the merits." *Id.* As Minneapolis argues here, Chester Fire argued that the vicarious liability claim was subject to dismissal because Bauman had been dismissed. *Id.* The district court

acknowledged the basic premise "that, generally, a voluntary dismissal with prejudice constitutes a final judgment on the merits for purposes of res judicata." *Id.* at *3. However, the court declined to hold that Bauman's dismissal precluded the plaintiff's vicarious liability claim against Chester Fire. *Id.* at *5.

Relying on Eighth Circuit precedent discussing res judicata and collateral estoppel principles, the court determined that "the intent of the parties, no consideration, and the lack of any actual adjudication" made it improper to dispose of the plaintiff's vicarious liability claim. *Id.* at *3-4. In particular, the court noted the Eighth Circuit's recognition "that both res judicata and collateral estoppel 'are premised on a finding that there has been an adjudication *on the merits* in a prior proceeding.'" *Id.* at *3 (quoting *Gall v. S. Branch Nat'l Bank of S.D.*, 783 F.2d 125, 127 (8th Cir. 1986) (emphasis in original)). In addition, the court pointed to the Eighth Circuit's determination that collateral estoppel "is appropriate only if 'it is clearly shown that the parties intended to foreclose a particular issue in future litigation.'" *See id.* at *4 (quoting *United States v. Brekke*, 97 F.3d 1043, 1049 (8th Cir. 1996)). The Court finds that these governing principles are relevant and the reasoning in *Gronseth* is persuasive here. Because there has been no actual adjudication of liability with respect to the individual officers' conduct and because the parties did not clearly contemplate that the statute-of-limitations dismissals of the individual officers would preclude Minneapolis's vicarious liability, the Court declines to apply principles of res judicata or collateral estoppel to bar Plaintiff's vicarious liability claims in this matter.

Third, the Court rejects the notion that Federal Rule of Civil Procedure 41(b) easily disposes of the issue as Minneapolis suggests. This rule provides that "[u]nless the dismissal order states otherwise, a dismissal under this subdivision (b) [addressing involuntary dismissals] and any dismissal not under this rule—except for one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits." Fed. R. Civ. P. 41(b). Likewise, as Minneapolis points out, "the federal rule is that 'the rules of finality . . . treat a dismissal on statute-of-limitations grounds the same way they treat a dismissal for failure to state a claim, for failure to prove substantive liability, or for failure to prosecute: as a judgment on the merits.'" *Manalo v. Wyeth*, Civ. No. 07-4557, 2008 WL 2705495, at *3 n.4 (D. Minn. July 9, 2008) (quoting *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 228 (1995)). However, the fact that Plaintiff's claims against the individual officers have been dismissed "on the merits" as to the individual officers does not plainly establish that Minneapolis cannot now be held liable for their alleged unlawful conduct.

Multiple courts addressing similar circumstances have rejected the notion that an "on-the-merits" dismissal of an agent plainly disposed of the corresponding vicarious liability claim against the principal. *See, e.g.*, *Gronseth*, 2009 WL 983130, at *3-5. In *Leow*, for example, the Supreme Court of Illinois recognized Illinois Supreme Court Rule 273[3] which is analogous to Federal Rule of Civil Procedure 41(b) as well as an

---

[3]     As explained in *Leow*, that rule provides: "[u]nless the order of dismissal or a statute of this State otherwise specifies, an involuntary dismissal of an action, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join an

(Footnote Continued on Next Page)

Illinois case establishing "that the dismissal of a claim on statute of limitation grounds operate[s] as an adjudication on the merits." *See Leow*, 676 N.E.2d at 1287. However, the court rejected the defendant's argument that this rule precluded vicarious liability against the principal following a statute-of-limitations dismissal of the agent. *See id.* at 1286-89. It explained that "[w]here a different defendant is involved, . . . Rule 273 cannot be applied mechanically, because doing so would yield absurd and unjust results." *Id.* at 1287-88. Ultimately, the court determined "that the policy behind Rule 273, and its model, Federal Rule 41(b), would not be furthered by treating an involuntary dismissal on statute of limitations grounds as an adjudication on the merits under these circumstances." *Id.* at 1289. Thus, the *Leow* court determined that the dismissal of the agent did not operate as an adjudication on the merits to support *res judicata* against the principal. *Id.*

The *Women First* court similarly rejected a blanket application of Rule 41(b) to preclude vicarious liability against a principal. *Women First*, 161 A.3d at 39-40, 45. Relying on the Supreme Court's decision in *Semtek International Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001), the court explained:

> An order that is an adjudication upon the merits under Rule 41(b), so as to prevent the same plaintiff from re-filing the same claim in the same court, is not necessarily an adjudication upon the merits for preclusive effect, as an element of the substantive law of the defense of *res judicata*. In other words, context matters.

---

(Footnote Continued From Previous Page)
indispensable party, operates as an adjudication upon the merits." *Leow v. A & B Freight Line, Inc.*, 676 N.E.2d 1284, 1287 (Ill. 1997) (quoting 134 Ill.2d R. 273).

*Women First*, 161 A.3d at 39-40. The Court agrees that context matters with respect to the application of Rule 41(b) and declines to apply an overly simplistic and technical reading of this rule to preclude vicarious liability here.

For the reasons outlined above, the Court concludes that Plaintiff's claims against the City of Minneapolis based on the lookups of dismissed individual defendant officers may proceed. Thus, Minneapolis' Motion for Judgment on the Pleadings is denied, and the Court will proceed to evaluate the remaining matters pending before the Court.

## II.    Plaintiff's Motion for Partial Summary Judgment

### A.    Background

#### 1.    Plaintiff's Employment History with Minneapolis

Plaintiff has held multiple positions with Minneapolis throughout her law enforcement career. Beginning in 2006, Plaintiff served as a Park Agent for the Minneapolis Park and Recreation Board. (Doc. No. 453 ("Miller-Van Oort Aff.") ¶ 35, Ex. Q ("Krekelberg Dep.") at 13-14.) In 2008, she began a position as a Park Police Officer. (*Id.* at 27-28.) And in September 2012, she transferred to a position with the Minneapolis Police Department. (Miller-Van Oort Aff. ¶ 36, Ex. R ("Conf. Krekelberg Dep.") at 118-19.) As revealed in her DVS Audit, Plaintiff's motor vehicle record was accessed by fellow Minneapolis officers a significant number of times between 2009 and 2014. (Miller-Van Oort Aff. ¶ 3, Conf. Dep. Ex. 248 ("DVS Audit").)

### 2. Individual Accesses

#### i. Johnny Mercil (January 24, 25, and 26, 2011)

Johnny Mercil accessed Plaintiff's information on January 24, 2011 at 9:35 p.m., on January 25, 2011 between 12:57 a.m. and 1:06 a.m.[4], and on January 26, 2011 at 6:45 p.m.[5] (DVS Audit at 4.) On these dates, Mercil was scheduled to be working in the First Precinct between 4:30 p.m. and 2:30 a.m. (Miller-Van Oort Aff. ¶ 6, Conf. Dep. Ex. 384 ("████████████") at 3.) ████████████████████████, Mercil explained that he knew Plaintiff professionally because they had answered calls with one another. (Miller-Van Oort Aff. ¶ 4, Conf. Dep. Ex. 255 ("████████") at MPLS002010. ) On January 24, 2011 from approximately 5:30 p.m. to 7:30 p.m., Plaintiff and Mercil were both assigned to a shooting incident in the First Precinct. (Miller-Van Oort Aff. ¶ 7, Conf. Dep. Ex. 385.) Although he stated he does not specifically recall why he looked up Plaintiff's record, Mercil believes he looked it up on January 24, 2011 in order to confirm Plaintiff's identity because she and her partner "looked alike and [Mercil] could never remember which one is which." (████████ at MPLS002011-12; *see also* Miller-Van Oort Aff. ¶ 32, Ex. N ("Mercil Dep.") at 15-17.)

---

[4]    The Eighth Circuit has clarified "that sequential accesses occurring within a several-minute time span should be considered as one obtainment rather than several." *Tichich v. City of Bloomington*, 835 F.3d 856, 867 (8th Cir. 2016). Thus, the Court will treat Mercil's January 25, 2011 accesses at 12:57 a.m. and 1:06 a.m. as one obtainment of Plaintiff's record. The Court will do the same for similar accesses by other individuals.

[5]    Mercil accessed two separate driver's license numbers associated with Plaintiff within the same minute on January 26, 2011 at 6:45 p.m. (Doc. No. 453 ("Miller-Van Oort Aff.") ¶ 3, Conf. Dep. Ex. 248 ("DVS Audit") at 4.)

He denied looking up Plaintiff out of curiosity and asserted that he was "[j]ust trying to put a face with a name." (████████████ at MPLS002012.) Mercil also denies acting flirtatiously with Plaintiff on January 24, 2011. (Doc. No. 494 ("Mercil Aff.") ¶ 5.) ██

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

(Miller-Van Oort Aff. ¶ 5, Conf. Dep. Ex. 383 ("████████████") at 1.) ████████

████████████████████████████████████. (*Id.* at 2.)

Plaintiff questions Mercil's explanation that he used the DVS database to look up Plaintiff because he could not tell her apart from her partner, noting that she and her partner are of different races. (*See* Doc. No. 510 ("Krekelberg Decl.") ¶¶ 3-7.) Plaintiff recalls Mercil behaving in a flirtatious manner with her and her partner during the January 24th shooting incident and in messages sent afterward. (Miller-Van Oort Aff. ¶ 37, Ex. S ("Krekelberg Dep. Vol. II") at 628-30.) Plaintiff was offended by Mercil's flirtatious comments because he was a supervisor, and his statements made her uncomfortable. (*Id.* at 630.) Plaintiff testified, "I believe he was interested in me" in light of his communications. (*Id.* at 632.)

### ii. Bryce Robinson (August 21, 2010 and January 18, 2011)

Bryce Robinson accessed Plaintiff's DVS record on August 21, 2010 at 4:05 p.m., and on January 18, 2011 at 1:49 p.m. (DVS Audit at 3-4.) Robinson was scheduled to be working in the Third Precinct on these dates between 6:15 a.m. and 4:15 p.m. (█

████████ at MPLS001821.) Robinson recalled being on one call with Plaintiff in 2013 or 2014, and he explained that he knew her only professionally. (*Id.*) He does not recall accessing her DVS record. (*Id.* at MPLS001821-22.) ████████████████████ no specific information to provide a law enforcement justification for Robinson's access of Plaintiff's information. (Miller-Van Oort Aff. ¶ 23, Ex. E ("Conf. Gomez Dep.") at 317-18.) Robinson and Plaintiff had a mutual friend, and Robinson recalled Plaintiff contacting him about painting the friend's house at some time in 2013 or 2014. (Miller-Van Oort Aff. ¶ 34, Ex. P ("Robinson Dep.") at 40-41.) ████████████

███████████████████████████████████████████████████

████████████████████████████████. (*See* Miller-Van Oort Aff. ¶ 10, Conf. Dep. Ex. 402 ("███████████") at 1.) ██████████████████ ███████████████████. (*Id.* at 2.)

Plaintiff asserts that Robinson had probably heard of her through their mutual friend by the time of Robinson's August 21, 2010 access. (Krekelberg Dep. Vol. II at 520-22.) Plaintiff knew who Robinson was at that time. (*Id.* at 520.) In approximately 2012 or 2013, Plaintiff recalls meeting Robinson in person during a call together. (*Id.* at 523.) According to Plaintiff, Robinson made flirtatious comments about her hair and nails. (*Id.* at 523-26.) Plaintiff believes Robinson looked her up out of curiosity in 2010 and 2011 based on these later comments. (*Id.* at 526-27, 531.)

### iii. Jarrod Silva (July 18, 2010)

Jarrod Silva looked up Plaintiff's information on July 18, 2010 at 12:00 a.m. (DVS Audit at 3.) On this date, Silva was scheduled to work in the First Precinct from

5:30 p.m. to 3:30 a.m. (Miller-Van Oort Aff. ¶ 13, Conf. Dep. Ex. 412 ("███████████

████") at 2.) ████████████████, Silva asserted he did not know Plaintiff and had no

recollection of accessing her DVS record. (███████ at MPLS001881.) He also

testified that he did not know Plaintiff during his subsequent deposition.

(Miller-Van Oort Aff. ¶ 28, Ex. J ("Silva Dep.") at 14-15.) ████████████████

██████████ did not reveal a law enforcement purpose for the lookup. (Conf. Gomez

Dep. at 325.) ████████████████████████████████████

████████████████████████████████████████

██████████████. (*See* Miller-Van Oort Aff. ¶ 12, Conf. Dep. Ex. 411 ("████

████") at 1-2.) Plaintiff testified that she did not know Silva on the date of his access or

have any reason to think he knew who she was. (Krekelberg Dep. Vol. II at 509-11.)

### iv.      Gregory Wenzel (September 20, 2010)

Gregory Wenzel access Plaintiff's information on September 20, 2010 at

9:33 a.m.[6] (DVS Audit at 3.) On September 20, 2010, Wenzel was assigned to be

working from 7:30 a.m. to 3:30 p.m. (Miller-Van Oort Aff. ¶ 15, Conf. Dep. Ex. 420

("█████████████") at 2.) Wenzel explained ███████████████ that he did

not know Plaintiff in either a personal or professional capacity. (███████████ at

MPLS001870.) In his deposition, he similarly stated that he had "[n]ever met her."

(Miller-Van Oort Aff. ¶ 30, Ex. L ("Wenzel Dep.") at 12.) ██████████████ Wenzel's

access did not reveal a law enforcement purpose to explain the lookup. (Conf. Gomez

---

[6]      Wenzel accessed two separate driver's license numbers associated with Plaintiff
within the same minute on September 20, 2010 at 9:33 a.m. (DVS Audit at 3.)

Dep. at 330.) ███████████████████████████████████

███████████████████████████████████████████████████

█████████████████████. (Miller-Van Oort Aff. ¶ 14, Conf. Dep. Ex. 419 ("████

██████") at 1-2.) As of Wenzel's September 20, 2010 access, Plaintiff recalled being

familiar with Wenzel's name based on various calls and messages. (Krekelberg Dep.

Vol. II at 537-38.) Beyond that, however, she could not testify as to whether he would

have any reason to know who she was. (*Id.* at 538.)

**v.      Steve Wuorinen (December 30, 2010)**

Steve Wuorinen looked up Plaintiff's DVS record on December 30, 2010 at

6:33 p.m. (DVS Audit at 4.) On this date, Wuorinen was scheduled to work from 5:00

p.m. to 3:00 a.m. (Miller-Van Oort Aff. ¶ 17, Conf. Dep. Ex. 426 ("██████████

████████") at 2.) █████████████████████, Wuorinen explained that he knew

Plaintiff in a professional capacity and that she had been recommended to him to work at

a part-time job he held. (██████████ at MPLS001956.) He was not sure if she

actually ended up working at the part-time position. (*Id.*) Wuorinen did not know why

he looked up Plaintiff's record on December 30, 2010, and he did not remember having

any law enforcement interactions with her that day. (*Id.* at MPLS001956-57.) At his

deposition, Wuorinen testified that he knew Plaintiff. (Miller-Van Oort Aff. ¶ 31, Ex. M

("Wuorinen Dep.") at 16.) He explained that it was possible that he had met Plaintiff

prior to the December 30, 2010 lookup, but he was not sure. (*Id.* at 21.) ████████████

████████ did not explain a law enforcement purpose for the lookup. (Conf. Gomez

Dep. at 333-34.) █████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████. (Miller-Van Oort Aff. ¶ 16, Conf. Dep. Ex. 425

("██████████████") at 1-2.)

Plaintiff testified that she had interacted with Wuorinen in a professional capacity

through a couple of DWI matters prior to December 30, 2010. (Krekelberg Dep. Vol. II

at 591-94.) Plaintiff did not know whether Wuorinen knew who she was at that time.

(*Id.* at 594.) She also testified that she was pulled over by officer Wuorinen when she

was either a driver or a passenger; she recalls this likely taking place in either 2011, 2012,

or possibly 2010. (*See id.* at 592-93.)

### vi.        Lucas Peterson (October 27, 2010 and April 14, 2011)

Lucas Peterson accessed Plaintiff's record on October 27, 2010 at 5:41 p.m., and

on April 14, 2011 from 7:49 to 7:50 p.m. (DVS Audit at 4-5.) Both the October 27,

2010 and April 14, 2011 lookups took place during Peterson's scheduled work hours.

(*See* Miller-Van Oort Aff. ¶ 9, Conf. Dep. Ex. 397 ("██████████████████") at 2;

Miller-Van Oort Aff. ¶ 20, Ex. B ("Peterson IA File") at MPLS002908.) ██████████

██████████████████████████████████████████. (Conf. Gomez Dep. at

310-12.) ████████████████████ related to his 2010 lookup, Peterson stated the he

only knew Plaintiff by her name and that they had no professional or personal

relationship. (██████████ at MPLS001909.) With respect to the 2011 lookup,

Peterson asserted in his IA statement that he did not recall accessing her record or why he

would have done so, but he did say her picture looked familiar. (Peterson IA File at

MPLS002913-14.) In his deposition, Peterson explained that he knew who Plaintiff was

based on working together. (Miller-Van Oort Aff. ¶ 33, Ex. O ("Peterson Dep.") at 17.)

He did not know why he looked up Plaintiff's record in 2010 or 2011. (*Id.* at 17, 21.)

Minneapolis was unable to determine a law enforcement purpose for Peterson's

2010 lookup. (Miller-Van Oort Aff. ¶ 27, Ex. I ("Conf. Case Dep. Vol. II") at 531-32.)

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████. (*See id*; *see also* Conf. Gomez Dep. at 310-13; Miller-Van Oort Aff.

¶ 8, Conf. Dep. Ex. 396 ("██████████████████") at 1-2.) Peterson received a written

reprimand letter in connection with the 2011 lookup based on a violation of the

department's Confidential Department Records policy. (Peterson IA File at

MPLS002905, MPLS003043.) The memorandum explaining the disciplinary

recommendation stated that the review panel "determined there was sufficient evidence

to support the allegation[] that Sgt. Peterson accessed the DVS data of Amy Krekelberg

in 2011 . . . without a law enforcement purpose for doing so." (*Id.* at MPLS003038.)

Plaintiff explained that she knew Peterson and had met him in person as of the

time of his 2010 lookup. (*See* Krekelberg Dep. Vol. II at 564-65, 571.) Specifically, she

knew him because they worked together on some calls, and he was the cousin of one of

Plaintiff's colleagues. (*Id.* at 564-65.) Plaintiff also testified that Peterson had sent her

messages inviting her to a bar and to social gatherings with officers after work. (*Id.* at

565-68.) Based in part on these personal messages, Plaintiff did not believe that

Peterson's accesses were for a law enforcement reason. (*Id.* at 572-74.)

### 3.     Minneapolis's Internal Affairs Investigation

Commander Jason Case serves as the IA Commander for Minneapolis and testified on behalf of Minneapolis in connection with this case.  (Miller-Van Oort Aff. ¶ 25, Ex. G ("Case Dep.") at 12, 47-49.)  According to Case, the role of an IA investigator is to serve as a "[f]inder of facts," and an investigator should "approach[] an allegation of misconduct in a non-biased way and do an exhaustive look into any available evidence."  (*Id.* at 54.)  In a typical case, an IA investigator would not be instructed regarding specific information that he or she should or should not look into.  (*See id.* at 85-86.)  In general, Case explained, the time when an alleged incident of misconduct occurred would not affect the nature of an IA investigation.  (*See id.* at 83.)  However, he stated that "if it happened so long ago that there's staleness that would be an issue as far as investigating people or interviewing people."  (*Id.* at 126.)

Case testified that Minneapolis approached IA investigations differently if they arose from allegations in a DVS lawsuit.  (Conf. Case Dep. Vol. II at 400-01.)  He explained that "much of it had to do with resources and the fact that they were older cases so they're different than a normal allegation that comes in."  (*Id.* at 401; *see also id.* at 402.)  One factor that Minneapolis specifically considered ███████████████████ ██████████████████████████ was how long ago the alleged access occurred.  (*See* Miller-Van Oort Aff. ¶ 26, Ex. H ("Conf. Case Dep.") at 235-36; *see also* ████████ ████████████████████████████████████████████ ████████████████.)  Case explained that this factor was relevant in part based on the applicable reckoning period for a particular policy violation; a reckoning period

designates the length of time a violation would have an impact on similar subsequent violations. (*See* Conf. Case Dep. at 235-39.)

Minneapolis investigated the alleged improper accesses of Plaintiff's DVS record in two stages. On March 1, 2011, Minneapolis had issued an Administrative Announcement reminding employees of its existing policy regarding access of DMV records (Policy 4-501) and advising employees that DVS conducted audits regarding DVS accesses. (Case Dep. at 99-100; *see also* Miller-Van Oort Aff. ¶ 18, Conf. Dep. Ex. 433 ("███████████") at MPLS000763.) The date of this Administrative Announcement marked a dividing line by which officers were divided into separate groups for IA investigation. (Conf. Case Dep. at 289-95.) Sergeant Matthew McLean completed IA investigations for the officers with accesses after the March 2011 time period; Sergeant Frank Gomez and Sergeant Clark Goset completed IA investigations for the earlier accesses. (*See* Miller-Van Oort Aff. ¶ 22, Ex. D ("Gomez Dep.") at 226-27; Miller-Van Oort Aff. ¶ 24, Ex. F ("McLean Dep.") at 7, 82.) ██████████

████████████████████████████████████████████████████████████

███████████████:

███████████████████████████████████████

(████████ at MPLS000428.) ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████.” (*See* Conf.

Case Dep. Vol. II at 396-97; *see also* DVS Audit; ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████”

(*Id.* at 397-98; *see also id.* at 575.)

A number of investigations took place in 2015 upon request by the City Attorney's

Office in connection with this lawsuit in part to evaluate potential conflicts of interest

between the City and the officers. (*See* Doc. No. 399 ("Granger Aff.") ¶¶ 3-4.) Gomez

completed twenty-five of these investigations, ████████████████████████████.

(*See* Gomez Dep. at 183; *see also* ████████████████████████████████

████████████████████████████████████████

█████████.) Gomez "was fairly new" at the time. (Gomez Dep. at 200.) He

instructed not to interview Plaintiff in connection with these investigations even though

an investigation would typically include interviewing the victim of alleged conduct. (*Id.*

at 198-200.) He was also instructed that he should not or need not interview the partners

of the officers under investigation. (Conf. Gomez Dep. at 265-67.)

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████. (*See* Doc. No. 493 ("Case Aff.")

¶¶ 2-5.) ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████ " (*Id.* ¶ 4.)

## B.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Where, as here, "the movant bears the burden of proof on a claim at trial, . . . [i]t must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the

record is so one-sided as to rule out the prospect of the nonmovant prevailing."  10A

Charles Alan Wright, et al., *Federal Practice and Procedure* § 2727.1 (4th ed. April 2018

Update).

### C.   Summary Judgment Against Minneapolis With Respect to Lookups by Officers Mercil, Peterson, Robinson, Silva, Wenzel, and Wuorinen

It is a violation of the DPPA for a defendant to:  (1) knowingly; (2) obtain,

disclose or use personal information; (3) from a motor vehicle record; (4) for a purpose

not permitted.  *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015) (citing

18 U.S.C. § 2724(a)); *Mallak v. Aitkin Cty.*, 9 F. Supp. 3d 1046, 1055 (D. Minn. 2014).

However, there are a number of exceptions for which obtaining, disclosing, or using

driver's license information is permitted.  *See* 18 U.S.C. § 2721(b)(1)-(14); *Kost v. Hunt*,

983 F. Supp. 2d 1121, 1124-25, 1133 (D. Minn. 2013).  For example, various

governmental and business purposes, such as "use by any government agency, including

any court or law enforcement agency, in carrying out its functions," are permissible.  *See*

18 U.S.C. § 2721(b)(1).  To establish an actionable DPPA violation, a plaintiff bears the

burden to establish that her information was accessed for an impermissible purpose.  *See*

*Kost*, 983 F. Supp. 2d at 1133; *see also Potocnik v. Carlson*, 9 F. Supp. 3d 981, 988 (D.

Minn. 2014) ("§ 2724 requires the *plaintiff* to plead and prove that the defendant had a

*bad* purpose.").

Plaintiff argues that the undisputed facts establish that officers Mercil, Robinson,

Silva, Wenzel, Wuorinen, and Peterson committed violations of the DPPA in accessing

Plaintiff's DVS record, entitling Plaintiff to summary judgment against Minneapolis

based on its vicarious liability for these officers' conduct. First, Plaintiff argues that

Minneapolis has not identified a legitimate law-enforcement purpose for these officers'

accesses of Plaintiff's information. Second, Plaintiff suggests that "███████████

████████████████████████████████████████████████████████

████████████████████████████" (Doc. No. 455 at 27.) Plaintiff also

argues that the weight of authority, including this Court in a separate DPPA case, holds

that entities such as Minneapolis may be vicariously liable for their employees' conduct

under the DPPA.

Minneapolis argues that Plaintiff is not entitled to summary judgment because

"[t]he facts surrounding the six officers . . . either demonstrate a law-enforcement

purpose for a lookup or are completely devoid of any information to determine if there

was a legitimate law-enforcement purpose for the lookup or not." (Doc. No. 490 at 24.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████. Separately, Minneapolis also argues that the

Court should deny summary judgment because Plaintiff cannot establish that Minneapolis

is vicariously liable under the DPPA for its employees' conduct committed outside the

scope of employment. Minneapolis argues that Plaintiff did not plead a vicarious liability

claim based on apparent authority, and even if she did, such a claim would not be

established on the facts presented. Minneapolis asks the Court to reconsider its prior

determination in a separate DPPA case that vicarious liability can be imposed where an

employee was aided in accomplishing the wrongful conduct through the existence of the

agency relationship—specifically, through the use of entity workstations and DVS passwords provided by the entities.

The Court concludes that Plaintiff is not entitled to summary judgment with respect to Minneapolis's liability for the accesses of Plaintiff's DVS record by officers Mercil, Robinson, Silva, Wenzel, Wuorinen, and Peterson. In particular, the Court finds that Plaintiff has failed to establish that she is entitled to judgment as a matter of law with respect to the permissible-purpose element of her DPPA claim. Viewing the evidence in the light most favorable to Minneapolis, the Court is not persuaded that a reasonable jury could only conclude that the officers accessed Plaintiff's record for an impermissible purpose. At this stage, the Court declines to reach the opposite conclusion—that a jury could not reasonably infer an impermissible purpose for any of the accesses at issue. Instead, the Court simply holds that the record relating to the accesses by these six officers is not as one-sided as Plaintiff argues. In particular, resolving whether the officers' accesses were for an impermissible purpose will in many cases depend on credibility determinations appropriately reserved for the jury. The Court also disagrees that ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████. Because the record reveals sufficient evidence to establish a genuine dispute as to a material element of Plaintiff's DPPA claim, the Court declines to grant summary judgment in Plaintiff's favor.

Plaintiff's motion for summary judgment is denied based on the disputed facts underlying the permissible-purpose element of her DPPA claim. Thus, it is unnecessary

for the Court to resolve the parties' disputes regarding Minneapolis's vicarious liability for its officers' conduct under the DPPA at this stage. However, as both parties have noted, this Court has previously determined in another DPPA matter that vicarious liability may properly be imposed against entities under the DPPA where the agents are aided in accomplishing DPPA violations by the existence of the agency relationship. *See generally Mallak v. City of Brainerd*, Civ. No. 13-2119, 2017 WL 440249, at *15-17 (D. Minn. Feb. 1, 2017) (discussing and applying Restatement (Second) of Agency § 219(2)(d)'s aided-in-the-agency-relation theory of vicarious liability). At this stage, the Court is not persuaded that a different rule should apply in this case.

### D. Punitive Damages

Plaintiff next asks the Court to rule as a matter of law that punitive damages may be considered by the jury in this case against Minneapolis. Plaintiff argues that the DPPA's plain language and the particular facts of this case support presenting the issue of punitive damages to the jury. According to Plaintiff, "[t]he record is replete with evidence of deliberate, intentional, and reckless disregard of the DPPA by high-ranking Minneapolis Commanders who conducted and ordered sham IA 'investigations' that were purposefully intended to cover up the misconduct at issue, make probative evidence stale, and shield Minneapolis from liability." (Doc. No. 455 at 30-31.) Plaintiff argues that Minneapolis's conduct demonstrates that it ratified the wrongful actions of its officers. Plaintiff also argues that public policy supports permitting the punitive damages issue to be presented to the jury in this case. Defendant argues that the Court should deny Plaintiff's motion on this issue as well because the Court has previously determined in a

separate DPPA case that punitive damages may not be imposed against municipalities under the DPPA.

The Court hereby adopts and incorporates its prior reasoning on this issue as outlined in another DPPA case. *See Mallak v. City of Brainerd*, Civ. No. 13-2119, 2017 WL 3668759, at *16-17 (D. Minn. Aug. 23, 2017). Specifically, the Court concludes that the DPPA does not permit the imposition of punitive damages against municipalities because such damages are not "expressly authorized" in the statute. *See id.* at *17 (quoting *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (citation omitted)). The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains." 18 U.S.C. § 2724(a). Further, the statute provides that "[t]he court may award . . . punitive damages upon proof of willful or reckless disregard of the law." *Id.* § 2724(b)(2). A "person" within the meaning of the DPPA includes "an individual, organization or entity, but does not include a State or agency thereof." *Id.* § 2725(2). The Court rejects Plaintiff's argument that this language expressly authorizes punitive damages against municipalities. *See Mallak*, 2017 WL 3668759, at *17; *see also Senne v. Vill. of Palatine*, Civ. No. 10 C 5434, 2013 WL 68703, at *3 (N.D. Ill. Jan. 4, 2013).

The Court has considered the caselaw identified by Plaintiff in which courts have permitted punitive damages against municipalities under other federal statutes. *See, e.g.*, *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 244, 254-57 (2d Cir. 2005) (allowing liquidated damages against a public employer under the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621-34); *Maher v. City of Chi.*, 463 F. Supp. 2d 837, 838,

844 (N.D. Ill. 2006) (permitting punitive damages against municipalities under the

Uniformed Services and Reemployment Rights Act, 38 U.S.C. §§ 4301-33). These cases

are distinguishable, however, because the federal statutes at issue incorporated or

contained explicit provisions clarifying that public entities would be subject to the

specific damages in question. *See Cross*, 417 F.3d at 255-56 ("[A]n action to recover

[specified damages including liquidated damages] 'may be maintained against any

employer (including a public agency).'" (quoting 29 U.S.C. § 216(b))); *Maher*,

463 F. Supp. 2d at 844 ("Under USERRA, a 'State' is subject to 'the same remedies . . .

as may be imposed upon any private employer under this section.'" (quoting 38 U.S.C.

§ 4323(d)(3))). Absent such an explicit provision within the DPPA, the Court declines to

read an express authorization to impose punitive damages into the DPPA's statutory text.

The Court does not reach Plaintiff's argument that the unique circumstances of

this case and Minneapolis's IA investigations support presenting the punitive damages

issue to the jury. Because punitive damages are unavailable against Minneapolis as a

matter of law under the DPPA, Plaintiff's Motion for Summary Judgment on this issue is

denied.

### III.  Plaintiffs' Appeal of the Magistrate Judge's Discovery Order

Finally, the Court considers Plaintiff's appeal (Doc. No. 440) of Magistrate Judge

Tony N. Leung's August 8, 2017 Order (Doc. No. 430). Minneapolis filed a response to

Plaintiff's objections on September 6, 2017. (Doc. No. 445.) The Court must modify or

set aside any portion of a Magistrate Judge's order found to be clearly erroneous or

contrary to law.  *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); Local Rule 72.2(a).

This is an "extremely deferential" standard.  *Reko v. Creative Promotions, Inc.*,

70 F. Supp. 2d 1005, 1007 (D. Minn. 1999).  "A finding is 'clearly erroneous' when

although there is evidence to support it, the reviewing court on the entire evidence is left

with the definite and firm conviction that a mistake has been committed."  *Chakales v.

Comm'r of Internal Revenue*, 79 F.3d 726, 728 (8th Cir. 1996) (quoting *Chase v. Comm'r

of Internal Revenue*, 926 F.2d 737, 740 (8th Cir. 1991)).  "A magistrate judge's ruling is

contrary to law when it either fails to apply or misapplies pertinent statutes, case law or

rules of procedure."  *Coons v. BNSF Ry. Co.*, 268 F. Supp. 3d 983, 991 (D. Minn. 2017)

(citing *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1043 (D. Minn.

2010)).

In the August 9, 2017 Order, Magistrate Judge Tony N. Leung ruled on four

discovery motions brought by the parties.  At the outset of the order, the Magistrate Judge

observed that "the confounding inability of Plaintiff and Defendant City of Minneapolis

to engage in concepts of reasonable mutual compromise and communication has led to

near-continuous cantankerous squabbling that has ground this litigation to a halt while

fees and costs continue to mount."  (Doc. No. 430 at 2.)  As a result, the Magistrate Judge

asserted a need to "step in to end the squabbling, order the parties out of their litigation

trenches to realize the admonition of Rule 1, and impose strict boundaries to govern the

remainder of this litigation."  (*Id.*)

First, the Magistrate Judge evaluated Motions to Quash Subpoenas brought by

multiple third-party officers.  Service of subpoenas for depositions of these officers was

to be completed through the parties' cooperation according to specific directions established by the Magistrate Judge in a February 22, 2017 Order. The Magistrate Judge concluded that Plaintiff failed to timely serve subpoenas on these officers along with proper fees. In particular, he explained, "Plaintiff waited until the eleventh hour . . . to attempt to comply with the February 22, 2017 Order. Plaintiff cannot now turn to her incorrect interpretation of the February 22, 2017 Order to entirely alleviate her self-inflicted woes." (*Id.* at 21.) The Magistrate Judge also faulted Minneapolis for its role in contributing to the subpoena issues, noting that "Minneapolis cannot drag its feet in an effort to derail this litigation and avoid participating in discovery." (*Id.* at 24.) Thus, the motions to quash were granted in part, and Plaintiff was denied the opportunity to depose three of these officers. However, the Magistrate Judge also imposed sanctions against Minneapolis under Federal Rule of Civil Procedure 37 for failing to comply with the February 22, 2017 Order.

Second, the Magistrate Judge considered whether Minneapolis's response to one of Plaintiff's interrogatories warranted discovery sanctions. The Magistrate Judge acknowledged that Plaintiff belatedly raised a new argument relating to this interrogatory, representing "a prime example of the shoot-from-the-hip litigation that has dragged this lawsuit in a quagmire." (*Id.* at 36.) However, the Magistrate Judge ultimately concluded that Minneapolis's response was incomplete and imposed a Rule 37 against Minneapolis for its failure to provide complete discovery. Specifically, the sanction barred Minneapolis from defending the claims against it using any discovery not yet produced.

Third, and finally, the Magistrate Judge considered Minneapolis's argument that the IA files generated at the request of the City Attorney's Office were protected work product not subject to discovery. The Magistrate Judge concluded that the IA files were not protected work product and were instead "ordinary business records." (*Id.* at 40.) He therefore ordered Minneapolis to produce the complete IA files available for the officers at issue. The Magistrate Judge also ordered supplemental depositions of Case and Gomez because improper work product objections had been raised at their initial depositions.

In concluding the August 9, 2017 Order, the Magistrate Judge addressed the issue of fees. The Magistrate Judge declined to award any fees under the relevant discovery rules in connection with the pending motions. Going "one step further," the Magistrate Judge then stated that "Plaintiff and Minneapolis are hereby prohibited from seeking their expenses and attorney's fees related to any of the motions decided in this Order, . . . and the costs of service of subpoenas related to the February 22, 2017 Order." (*Id.* at 42.) The Magistrate Judge justified this measure "[a]s a prophylactic against further cantankerous litigation by both parties, and to enforce the admonition of Rule 1." (*Id.*)

Plaintiff lodges a narrow objection to the Magistrate Judge's August 9, 2017 Order, asserting that the Magistrate Judge erred in barring Plaintiff from seeking attorney fees and costs related to the discovery motions at issue. Plaintiff first emphasizes that the Magistrate Judge did not make any "specific finding of bad conduct" by Plaintiff aside from failing to timely serve subpoenas on third parties. (*See* Doc. No. 440 at 3.) Plaintiff then explains how her discovery motions were largely granted by the Magistrate Judge.

34

In particular, Plaintiff points out, the Magistrate Judge granted the majority Plaintiff's Rule 37(b)(2) Motion for Sanctions against Minneapolis. Plaintiff argues that the Magistrate Judge usurped this Court's role in evaluating appropriate fees to be awarded as damages under the DPPA at the conclusion of this case. In addition, Plaintiff contends that the Magistrate Judge's order was contrary to law because it failed to address any of the relevant factors for awarding fees under applicable Supreme Court precedent. Plaintiff also argues that the Magistrate Judge improperly imposed what is in effect a sanction against Plaintiff in the absence of any discovery misconduct. Plaintiff acknowledges that she failed to serve subpoenas in a timely fashion, resulting in the Magistrate Judge's decision that those officers could not be deposed. However, Plaintiff, contends, "[t]here is no basis set forth in Rule 37 for sanctioning a party for failing to get the discovery it wanted." (*Id.* at 11.) Finally, Plaintiff argues that the Magistrate Judge's order suggests that the time Plaintiff spent pursuing the discovery motions at issue was unreasonable. However, Plaintiff contends, "attorney time and fees spent drafting motions to try to force Minneapolis to properly engage in discovery is not fairly characterized as unreasonable." (*Id.* at 13.)

Minneapolis asks the Court to overrule Plaintiff's objections because the Magistrate Judge's order demonstrates that the discovery disputes at issue were caused by Plaintiff's own delay and ineffective litigation conduct. Minneapolis also disputes Plaintiff's suggestion that it committed any misconduct. In its response to Plaintiff's objection, Minneapolis details its view of the relevant procedural history, including Plaintiff's misunderstanding and lack of diligence with respect to the Magistrate Judge's

35

February 22, 2017 Order establishing a deadline to serve deposition subpoenas.

Minneapolis also contends that it was presented with last-minute arguments from

Plaintiff regarding the alleged insufficient interrogatory response. Minneapolis then

explains its arguably reasonable basis for asserting a work-product objection to certain

document requests. In short, Minneapolis argues, "the only reason for the motions at

issue here was Plaintiff's attorneys' lack of diligence and ineptitude, as well as a

reasonable attorney work-product objection." (Doc. No. 445 at 14.) As a result,

Minneapolis contends that the Magistrate Judge appropriately concluded that Plaintiff

should not be able to collect attorney fees in connection with these motions.

Having considered the parties' arguments, the Court respectfully sets aside the

Magistrate Judge's August 9, 2017 Order to the extent it bars the parties from seeking

attorney fees and costs associated with the discovery motions and subpoenas at issue in

that order. Although a Magistrate Judge may properly impose appropriate sanctions,

including attorney fees, under various discovery rules within the Federal Rules of Civil

Procedure, *see, e.g.*, Fed. R. Civ. P. 37(b)(2), the Magistrate Judge lacked the authority to

impose such a prohibition under the circumstances presented.

Notably, the Magistrate Judge's stated rationale for barring the parties from

subsequently seeking attorney fees was not a specific finding of discovery misconduct.

In fact, the Magistrate Judge specifically declined to grant fees to either party under the

relevant discovery rules. Instead, the Magistrate Judge relied on a desire to prevent

"further cantankerous litigation by both parties" and "the admonition of [Federal] Rule

[of Civil Procedure] 1," (Doc. No. 430 at 42), which states that the rules "should be

36

construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. This slender authority is an insufficient basis on which to preclude Plaintiff from seeking a form of damages which are explicitly authorized by the DPPA. *See* 18 U.S.C. § 2724(b)(3) ("The court may award . . . reasonable attorneys' fees and other litigation costs reasonably incurred.").

Further, the Magistrate Judge's determination prematurely decides the question of whether certain fees were reasonably expended in the absence of a final resolution of this case. *See Lash v. Hollis*, 525 F.3d 636, 642 (8th Cir. 2008) (noting that a critical factor for evaluating the reasonableness of fees "is the magnitude of the plaintiff's success in the case as a whole" (quoting *Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997)); *cf. Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) ("[T]he district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."). Thus, the Court respectfully revises the Magistrate Judge's August 9, 2017 Order by setting aside the first full paragraph contained on page 42 of that order. The Court will, however, take the Magistrate Judge's August 9, 2017 Order into appropriate consideration if Plaintiff subsequently moves for attorney fees in this matter.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant City of Minneapolis's Motion for Judgment on the Pleadings (Doc. No. [446]) is **DENIED**.

2.      Plaintiffs' Motion for Partial Summary Judgment (Doc. No. [451]) is **DENIED**.

3.      Plaintiff's appeal (Doc. No. [440]) of Magistrate Judge Tony N. Leung's August 9, 2017 Order is **SUSTAINED**.

4.      Magistrate Judge Tony N. Leung's August 9, 2017 Order (Doc. No. [430]) is hereby respectfully **SET ASIDE** to the extent it precludes Plaintiff and Minneapolis from seeking attorney fees and costs in connection with the discovery motions and subpoenas at issue in that order.

5.      This order is being filed under seal based on the number of confidential exhibits cited within the order.  This order will be un-sealed within three weeks of the date of this order.  Should either party wish to propose redactions to the Court prior to un-sealing, such redactions must be submitted to the Court no later than July 6, 2018.

Dated:  July 30, 2018                          s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               United States District Judge