UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Amy Elizabeth Krekelberg,          Civil File No. 13-3562 (DWF/TNL)

                Plaintiff,

v.

City of Minneapolis,
Minneapolis Park & Recreation
Board; et al.,

                Defendants.

---

## PLAINTIFF'S STATEMENT OF THE CASE

**Facts Plaintiff Intends to Prove at Trial**

**A.  Minnesota's Motor Vehicle Records Contain Drivers' Personal Information and Are Maintained in the "DVS Database."**

The Driver and Vehicle Services ("DVS") division of the Department of Public Safety ("DPS") maintains a database containing the motor-vehicle records of all Minnesota drivers ("DVS Database").  Records exist for each driver's license number issued to a driver.  Accordingly, there may be several separate motor vehicle records for one individual in the DVS Database.

Motor vehicle records contain a variety of personal information regarding individual drivers:

    (a)    a home address;

    (b)    a date of birth;

(c)     height, weight and eye color;

(d)     social security number;

(e)     driver's license number;

(f)     type of driver's license;

(g)     any restrictions on a driving license;

(h)     make and model of vehicles registered in the state;

(i)     driving violations;

(j)     medical information;

(k)     disabilities;

(l)     designated caregiver information;

(m)     organ donor status;

(n)     current driver's license photo; and

(o)     prior driver's license photos

(collectively referred to as "Private Data").  Some of this personal information is considered "highly restricted personal information."  An individual's photograph or image, social security number, or medical or disability information fall into this more highly-protected category.

Queries can be made within individual motor vehicle records searching by (i) name, (ii) license plate, or (iii) driver's license number.  These queries are tracked by DVS such that DPS knows which specific motor vehicle records have been accessed, using whose access credentials, from which government entity, from which government-issued computer, on what day and time, using which search queries.  DVS audits report

2

this information and also reveal what kind of personal data was viewable based on the accessor's navigation in the DVS Database.

**B.      DVS Records Establish When Defendant Minneapolis's Employees Obtained Plaintiff Krekelberg's Personal Information from the DVS Database.**

DPS can (and has) run audits showing when Defendants and their agents accessed Plaintiff Amy Krekelberg over time.  Every access at issue in this case relates to Defendants' and their agents' name-based queries for Plaintiff Krekelberg's personal information.  The DVS audits demonstrate how many times individual accessors opened (and in some instances, closed and later returned to re-open) Plaintiff Krekelberg's motor vehicle records on any given day.  The DVS audits also show whether the accessors were accessing other individuals' personal information at or around the same time as their accesses of Plaintiff Krekelberg.

DVS maintains two historical motor vehicle records for Plaintiff Krekelberg: "B6306xxx" and "K0696xxx." The historical records are of interest and relevance because they portray an earlier photograph of Plaintiff Krekelberg, typically what she looked like four years prior to the later photograph, as well as earlier physical information such as weight and address.  The DVS audits show that 58 different Minneapolis employees used their government-issued credentials to access Plaintiff Krekelberg's personal information from work computers.  There were 87 independent instances in which Minneapolis and its agents opened and viewed Plaintiff Krekelberg's motor vehicle records between December 17, 2009 and December 17, 2013:

| Officer | Access Date | # of Accesses of Plt.'s Motor Vehicle Records |
|---|---|---|
| Alejandrino | 3/11/2010 | 1 |
| | 6/21/2010 | 1 |
| Antaya | 6/11/2010 | 1 |
| Barze | 10/7/2010 | 1 |
| Carlson | 6/19/2010 | 1 |
| Collins | 12/4/2010 | 1 |
| Cummings | 5/21/2010 | 1 |
| Cushenbery | 8/20/2010 | 1 |
| Durand | 1/22/2010 | 1 |
| Elliot | 3/12/2010 | 2 |
| Enriquez | 3/2/2010 | 1 |
| Escobar | 1/5/2011 | 1 |
| Faulconer | 1/9/2011 | 1 |
| | 2/21/2011 | 1 |
| Gasior | 12/31/2009 | 1 |
| Grabowski | 6/19/2010 | 1 |
| Hamilton | 11/19/2010 | 1 |
| Hand | 3/25/2010 | 1 |
| Haspert | 7/1/2010 | 2 |
| Hedberg | 6/27/2010 | 2 |
| Hendrickson | 8/19/2010 | 1 |
| Hillstrom | 1/25/2011 | 1 |
| Honican | 4/8/2010 | 1 |
| Horn | 2/7/2011 | 1 |
| House | 3/29/2010 | 1 |
| Illetschko | 3/8/2010 | 1 |
| | 1/17/2011 | 1 |
| Indehar | 5/5/2010 | 1 |
| Johnson | 12/31/2010 | 1 |
| | 2/8/2011 | 1 |
| Jorges | 11/21/2011 | 2 |
| Kramer | 8/26/2010 | 1 |
| Krebs | 8/31/2010 | 1 |
| Kreft | 4/16/2010 | 1 |

| | | |
|---|---|---|
| Lazarchic | 4/28/2011 | 1 |
| Liotta | 10/17/2010 | 1 |
| Lopez | 4/8/2011 | 1 |
| Macias | 4/7/2010 | 2 |
| | 4/8/2010 | 1 |
| Mattsson | 1/15/2011 | 2 |
| Mercil | 1/24/2011 | 1 |
| | 1/25/2011 | 2 |
| | 1/26/2011 | 1 |
| Schmidt | 12/31/2009 | 1 |
| Mohammud | 1/22/2010 | 3 |
| Mota | 12/28/2009 | 1 |
| Moua | 10/1/2010 | 1 |
| Neil | 3/9/2010 | 1 |
| Olson | 8/23/2012 | 2 |
| Peltz | 7/6/2010 | 2 |
| Peterson | 10/27/2010 | 1 |
| | 4/14/2011 | 2 |
| Pfaff | 12/28/2009 | 1 |
| Reuben | 5/2/2010 | 1 |
| | 6/11/2010 | 1 |
| | 8/3/2010 | 1 |
| | 1/8/2011 | 1 |
| Robinson | 8/21/2010 | 1 |
| | 1/18/2011 | 1 |
| SanRoman | 7/9/2010 | 2 |
| Sauvageau | 1/24/2011 | 2 |
| Silva | 7/18/2010 | 1 |
| Staufenberg | 4/2/2010 | 1 |
| | 4/7/2010 | 1 |
| | 8/30/2010 | 1 |
| Tuma | 7/6/2010 | 2 |
| Vana | 11/26/2010 | 1 |
| Wenzel | 9/20/2010 | 1 |
| Wilson | 1/18/2011 | 1 |
| Wisocki | 7/1/2010 | 1 |
| Wuorinen | 12/30/2010 | 1 |
| York | 10/11/2010 | 1 |

**Total Accesses:**                                     87

The evidence will definitively confirm that the above accessors committed the accesses while "on-duty," acting as law enforcement, and using password credentials provided by Defendant Minneapolis because of its employee's law-enforcement role with it.  The DVS records will establish that most of the retrievals of information related to these accesses centered on current and historical photos of this female police officer.  The evidence will also show that many of the foregoing accesses occurred at late-night hours between 10:00 p.m. and 7:00 a.m.; twenty of the 58 accessors did so.

**C.     Plaintiff Amy Krekelberg Has Been a Stand-Up Law Enforcement
        Officer for 11 Years.**

From 2004 to 2007, Krekelberg worked in security and loss prevention for the cities of Roseville, Minneapolis, St. Paul, Blaine, Maple Grove, Maplewood, Apple Valley, Woodbury and Bloomington, during which she had contact with various law-enforcement personnel.  Krekelberg joined the Minneapolis Park Board as a "Park Agent" in 2005 and became a sworn officer for the Park Board in 2008.  In 2010 she was presented Officer of the Year award by Minneapolis Park Police Department Chief Linda Bergstrom.  She remained with the Park Police until she joined the Minneapolis Police Department in 2012.

**D.     Plaintiff Krekelberg's Marriage To Another Law Enforcement Officer
        Failed and Resulted in Much Gossip by Fellow Officers.**

In 2009, Plaintiff Krekelberg began dating Park Board Police Officer Keith Rowland, who had previously been her trainer.  Subsequently the couple was married.  This resulted in gossip and adverse personal comments against Plaintiff Krekelberg,

because some fellow officers accused her of dating him and sleeping with him just to pass her training, which was false.  Many rumors circulated, and Plaintiff Krekelberg was constantly asked questions about where she was living, and who she was dating. Krekelberg was told by supervisors to "make sure her address was correct in our system and on her driver's license," which was not demanded of other officers to the best of her knowledge.

>   **E.     In 2013, Plaintiff Krekelberg Finally Found Out that Many
>           Law Enforcement Officers Had Improperly Accessed Her Personal
>           Information Over Several Years, and She Took Action.**

The extent to which law-enforcement personnel had been excessively and morbidly curious about Plaintiff Krekelberg's personal information was revealed to her on May 1, 2013.  Kim Jacobson from DPS provided her with a DVS audit that disclosed more than 900 queries of her personal information had been made since 2003 using name-based queries in the DVS system.  Over 500 of these queries were by Defendant Minneapolis's law enforcement officers.

The evidence will show that many of the accessors were fellow law-enforcement officers, many of whom had worked and interacted with Plaintiff Krekelberg either at the Minneapolis Park Police of the Minneapolis Police.  Some of the accessors did not work directly with Plaintiff Krekelberg, but knew she was a member of the police force.  As set forth above, the accesses at issue in this trial involve 58 different Minneapolis officers-two of whom are individual defendants in this case (i.e., Defendant Olson and Defendant Young).

### E.   At all Relevant Times, Defendant Minneapolis and Its Employees Knew that Use of the DVS System Was Use for Official Purposes Only.

The evidence will show both through written policies and through the testimony of Commander Case that Defendant Minneapolis (i) allowed its employees to access the DVS Database to perform certain official duties, (ii) instructed employees to only use the DVS Database for official business reasons, and (iii) expected that its policies, as well as known governing laws, would dictate their employees' compliance with these directives.

The evidence will show that, since at least 2002, Defendant Minneapolis's policies addressed officers' appropriate access of, use of, and disclosure of non-public data, referencing state and federal law ("Policy 4-501").  And by April 22, 2009, Policy 4-501specifically stated:  "Employees shall only access Department of Motor Vehicles (DMV) records for official business-related reasons."  Policy 4-501 was circulated to all law enforcement officers, and it was their duty to read it and follow it.

### F.   None of the Subject Accesses Were Made for the Purpose of Carrying Out Law-Enforcement or Government-Related Functions.

Plaintiff Krekelberg was at all relevant times a member of law enforcement.  The evidence will show that she was a highly commended law enforcement officer.  As stated earlier, she was awarded the "Officer of the Year" distinction in 2010, while serving with the Minneapolis Park Police.  In addition to this prestigious award, however, her work history demonstrates ongoing praise and kudos for her service by her supervisors.

Plaintiff Krekelberg was never under investigation by her employer, Defendant Minneapolis, at any time when the subject accesses occurred.  Certainly she was never a

criminal suspect and was never arrested.  The evidence will also confirm that Plaintiff Krekelberg never sought personal assistance from Minneapolis law enforcement at any of the times accesses in question occurred.

The evidence will show that although Defendant Minneapolis learned of the suspicious accesses in July 2013 from Plaintiff, Defendant Minneapolis only investigated accesses by four employees at that time.  The evidence will show that Sergeant MacLean of the Internal Affairs Unit conducted thorough investigations and allegations of misconduct regarding the four officers were sustained.  It will also show that accesses by the other 54 Minneapolis officers were not investigated by Defendant Minneapolis for more than two years.  Two Internal Affairs officers, Officer Gomez and Officer Gossett, were finally assigned to investigate these matters in late 2015.

The evidence will show that the investigative procedures used by Officers Gomez and Gossett were significant departures from typical IA investigations conducted by Defendant Minneapolis at that time.  The investigative interviews for these matters rarely lasted more than seven minutes.  Potential witnesses with relevant information about the accesses (i.e., partners of the accessors in question) were never interviewed.  Historical DVS use by the accessors was not considered in the investigation, nor was the accessor's history of accessing Plaintiff's personal information in the DVS Database.  Although the IA investigators did not seek out this information, according to DPS's records, many of the accessors had accessed Plaintiff's personal information using their government-issued access credentials on dates before the accesses under review.

The evidence will show that, for the most part, each of the 50+ officers gave the exact same statement in the various investigations by Officers Gomez and Gossett.  The overwhelming majority of the accessors acknowledged that they did not believe they had any law-enforcement contact with Plaintiff Krekelberg on the days in question.  Some of the accessors under investigation were not even required to sign their statements.

Defendant Minneapolis has admitted that they are aware of no business records, reports, or incidents corresponding to the dates and times of accesses that would support any law-enforcement reason for its officers accessing Plaintiff Krekelberg's personal information.  Notwithstanding that, Defendant Minneapolis created a special designation for each of the internal affairs investigations relating to DPPA violations (i.e., not a procedure used in any other IA investigations in the history of Defendant Minneapolis's IA procedures), which stated the IA case "will be Cleared Exceptionally" and the case closed "without sending it to the front office."  Other than the first four accessors investigated by Sergeant MacLean, no discipline or consequence has ever been imposed on the subject accessors for their unexplained accesses of Plaintiff Krekelberg's personal information.

**G.    Defendants Olson & Young Willfully and Recklessly Disregarded the Law When They Accessed Plaintiff Krekelberg's Personal Information.**

Every single accessor whose conduct is at issue knew at the time of their accesses of Plaintiffs' personal information that they only were to access someone's personal information if it were done for an official government-related or law-enforcement-related

reason.  Notwithstanding that, punitive damages will only be considered against Defendants Olson and Young.

The evidence will show that Defendants Olson and Young both had had interactions with Plaintiff Krekelberg before accessing her personal information.  Both had expressed romantic interest in Plaintiff Krekelberg, and Krekelberg had rejected a romantic relationship with both persons.

The evidence will show that both Defendants Olson and Young knew that accessing Plaintiff Krekelberg's personal information for personal reasons was prohibited and violated the DPPA.  Defendant Minneapolis's policies, to which Defendants Olson and Young had a duty to know and follow, specifically advised that state and federal law governed the performance of their duties and that DVS records could not be accessed except for "official business-related reasons."  Notwithstanding their knowledge of their legal obligations, Defendants Olson and Young recklessly and willfully disregarded those obligations when they accessed Plaintiff Krekelberg's personal information.

### H.    Plaintiff Krekelberg Has Suffered Damages, Including a Hefty Professional Price for Trying to Vindicate Her Rights.

Plaintiff Krekelberg will testify about the emotional distress, anxiety, frustration, anger, and fear she has experienced as a result of Defendants' accesses of her information.  She will testify that not only has she experienced distress and anxiety because Defendants and officers violated Plaintiff Krekelberg's privacy, but the willfulness of the rampant conduct and the intentional abuse of her fellow officers' power has caused her significant emotional torment.  Regardless of whether she wears a badge,

the unwanted attention from many men with whom she works who have the ability to cause her physical harm is a scary and distressing position for any woman.

Plaintiff Krekelberg will testify that after reporting the improper conduct, her emotional distress intensified and fear for her physical safety increased.  Since the accesses occurred and since she complained about them, she has experienced instances of not receiving backup on calls by fellow officers, discouragement from seeking promotion within the force, and ongoing negative treatment by her peers.

The evidence will show that the vast majority of the accessors are male officers and that these rampant abusive practices arise directly because of Plaintiff Krekelberg's status as female police officer, which of course contributes to the emotional distress arising from the conduct at issue.  The evidence will show that, despite her exceptional performance as a law-enforcement officer in the past, Plaintiff Krekelberg's career advancement has been significantly limited as a result of the accessors' conduct and her reasonable response to it.

The evidence will show that Plaintiff Krekelberg was condemned behind her back and her reputation in the police force deliberately undermined because of the accesses at issue; her conduct has been attacked without grounds by her supervisor, and that she was discouraged from testing for promotions such as Sergeant.

Expert Quinn will testify regarding the "code of silence" that predominates law-enforcement work settings and culture and the disparate effect it has on female officers in this male-dominated profession.  Although Plaintiff Krekelberg did not ask or want the subject officers to put her in this position, by doing so, she has been stigmatized as a

person who complains about the conduct of other officers.  Expert Quinn will help the jury understand the work dynamics at play in the unique law-enforcement profession and its culture that contribute to the emotional distress and harm she has experienced, as well as the backlash that negatively impacts her career opportunities and advancement simply because she sought accountability for the privacy violations at issue.

## I.     Unresolved Substantive Issues

### A.     Whether Vicarious Liability Has Been Established Under the Standard Articulated by This Court.

As this Court has previously decided in this case (and others), Defendant Minneapolis may be vicariously liability for its agents' conduct at issue here if certain facts are established.  *See Mallak v. Brainerd, et al., 2017 WL 3668759 at \*15 (D. Minn. Aug. 23, 2017); see also Orduno v. Dayton,* 14-cv-01393 ADM/DTS (Dkt. No. 262-1 at 27).  Defendant Minneapolis should be liable under the Driver's Privacy Protection Act if:

1) its employees' misconduct was done in the scope of their employment with Defendant Minneapolis;

2) its employees' misconduct was accomplished because of their role and relationship with Defendant Minneapolis; or,

3) its employees' misconduct arose from the authority that Defendant Minneapolis gave them to act.

*See Mallak v. City of Brainerd,* 2017 WL 44029 at \*15-17 (D. Minn. Feb. 1, 2017).

In addition, an entity is vicariously liable for its agents or employee's misuse of delegated authority where the agent's conduct is aided, facilitated or furthered simply because of the existence of the agency relationship. *Mallak v. Brainerd, et al., 2017 WL 3668759 at \*15 (D. Minn. Aug. 23, 2017); see also Orduno v. Dayton,* 14-cv-01393 ADM/DTS (Dkt. No. 262-1 at 27) (holding city vicariously liable for employee's conduct and punitive damages awarded).  This means that if a law-enforcement officer improperly accessed the DVS Database and obtained Plaintiff's personal information by virtue of the fact that he/she was a law-enforcement officer or government employee and was given access credentials to do so, then Defendant Minneapolis is liable for that employee's conduct. *Id.*

Here, the evidence will show that each accessor accessed Plaintiff's information while acting as a law-enforcement officer, being paid for his/her services, and using his/her DVS Database credentials available to him/her from the employer Defendant. None of the individual accessors would have had access to the DVS Database unless they were employed as a law-enforcement officer for Defendant Minneapolis, demonstrating that their accesses occurred as a result of their agency relationship with Defendant Minneapolis.  In addition, each officer's access (whether proper or not) arose from the authority given to them by Defendant Minneapolis to use the DVS Database.

The Court can determine pre-trial that vicarious liability has been established against Minneapolis (as the *Orduno* Court ruled before that trial).  This would narrow issues for the jury to consider.  But if the Court does not rule that vicarious liability

14

specifically applies here before trial, then the evidence before the jury will lead it to that finding as well.

### B. Whether Defendants' Accesses of Plaintiffs' Personal Information Were Improper and How Many Violations Occurred.

Plaintiff bears the burden of proving each element of her claims by a preponderance of the evidence. With regard to each claim of improper access against each Defendant, Plaintiffs must establish the following:

    a.  the accessor knowingly;

    b.  obtained, disclosed, or used;

    c.  personal information of Plaintiff from a motor vehicle record;

    d.  for a purpose not permitted under the DPPA.

18 U.S.C. § 2724(a).

The first three elements are generally not in dispute.[1] DVS audits, in addition to testimony by a DPS official, will demonstrate that subject accessors knowingly accessed Plaintiff Krekelberg's motor vehicle records in the DVS Database, using their law-enforcement access credentials. The dates and times of these accesses are definitively established by DVS's records.

What *is* contested is whether or not Defendants' accesses were made for legitimate, lawful law-enforcement or other government-related purposes. Accordingly,

---

[1] A handful of Minneapolis personnel claim that they did not access Plaintiff's driver's license information despite the DPS audits attributing those accesses to them. Even if these individuals were correct, there is no dispute that each access at issue is undoubtedly attributed to an employee of Minneapolis who used that officer's password credentials on one Defendant Minneapolis's computers.

one key substantive issue for the jury's consideration is whether the separate obtainments of Plaintiff Krekelberg's personal information by Defendant Minneapolis and its 58 employees were made for legitimate law-enforcement purposes.

Defense counsel has suggested by way of jury instruction and brief comment that Defendant Minneapolis may admit liability as to certain accesses (i.e., that some of the accesses were not for legitimate law-enforcement purposes).  The accessors and accesses being contemplated for this admission have not been shared with Plaintiff.  To assist in the efficiency, preparation, scheduling of witnesses, and culling of exhibits, Plaintiff respectfully requests that Minneapolis inform the Court and Plaintiff what liability will be admitted so this key substantive issue has more clarity to all prior to trial.

The additional liability-related substantive issue that needs to be decided by the jury relates to the number of improper obtainments committed by Defendants.  For purposes of this trial, Plaintiff does *not* maintain that an accessor's contemporary queries into Plaintiff Krekelberg's two motor vehicle records within the same approximate minute or two constitute more than one obtainment.  Plaintiff Krekelberg *does* maintain, however, that in some instances, the DVS audits demonstrate that an individual accessor accessed Plaintiff Krekelberg's motor vehicle records, then exited Plaintiff Krekelberg's motor vehicle records, went about other business accessing unrelated motor vehicle records, and later accessed Plaintiff Krekelberg's motor vehicle records again.  In those instances, Plaintiff Krekelberg maintains that the jury must assess from the evidence presented whether the accessor's conduct constituted two separate obtainments in one

day.  Plaintiff Krekelberg will ask the jury to determine that there were 87 improper

obtainments by Defendants in total.

### C.    What Actual and Punitive Damages Plaintiff Krekelberg Should be Awarded.

The DPPA sets forth several types of damages available to a person whose

personal information was wrongly obtained, used, or disclosed:

**(b) Remedies.**--The court may award--

**(1)** actual damages, but not less than liquidated damages in the amount of $2,500;[2]

**(2)** punitive damages upon proof of willful or reckless disregard of the law;

**(3)** reasonable attorneys' fees and other litigation costs reasonably incurred; and

**(4)** such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2724.

Based on the evidence presented, it will be up to the jury to decide the substantive

issue related to actual damages.  If the jury determines that Defendants Minneapolis

(through its agents), Defendant Young, and Defendant Olson impermissibly accessed

Plaintiff Krekelberg's personal information, the jury will determine what damages

Plaintiff Krekelberg has suffered and what it believes compensates her for those injuries.

---

[2] Courts have previously determined that no actual damages must be established for a DPPA plaintiff to be awarded liquidated damages.  *See Kehoe v. Fidelity Federal Bank & Trust*, 421 F.3d 1209, 1214-15 (11th Cir. 2005).

After the verdict is rendered, this Court is to ensure that the actual damages awarded to Plaintiff Krekelberg, equal or exceed the liquidated damage minimum established by the DPPA for the accesses determined to be impermissible.[3]  If the actual damages awarded by the jury is less than the minimum liquidated damages allowed under the DPPA (i.e., *at least* $2500 per violation), then Plaintiff will move the Court to amend the judgment post-trial to conform with the DPPA.  If the jury awards actual damages in an amount greater than the equivalent of $2500 per violation, then Plaintiff need not move the Court to amend the judgment.

The jury will also be asked to consider punitive damages.  Under the plain language of the statute, a party may be liable for "punitive damages upon proof of willful or reckless disregard of the law."  18 U.S.C. § 2724(b)(2); *Pichler v. UNITE,* 542 F.3d 380, 397 (3rd Cir. 2008).  This Court has determined that punitive damages may be awarded against individual defendants only, but not Defendant Minneapolis. Consequently, the jury will only be assessing punitive damages against Defendants Olson and Young.

---

[3] The liquidated damage provision applies to each instance that a person improperly obtains personal information from a motor vehicle record.  The Third Circuit addressed the issue of cumulative damages head on in *Pichler*.  The Court concluded that, "[w]hile we understand Congress to have forecasted 'liquidated damages' as $2,500 for the most likely violation of the DPPA (obtaining and using confidential information), *there is no reason to think that such an amount covers all subsequent violations as well. The plain language of the statute contains no such restriction*." *Id.* The Third Circuit held that because Section 2724 contains no limitations on the ability of the district court to grant cumulative awards, the DPPA permits a district court to grant such awards upon multiple uses or disclosures of confidential information. *Id.; cf. also Orduno v. City of Dayton*, Civil File No. 14-cv-01393, Dkt. No. 317.

18

**D.      What Equitable Relief Should be Awarded.**

In addition to seeking monetary damages in this case, Plaintiff seeks equitable relief under the DPPA.

As recited above, this Court has the ability to and should award injunctive and equitable relief in this case. *See* 18 U.S.C. § 2724(b)(4). Other courts have exercised this discretion in other DPPA cases. *See e.g., Pichler v. UNITE*, 542 F.3d 380, 383 (3d Cir. 2008) (awarding monetary and injunctive relief); *Kehoe*, 421 F.3d at 1217 ("Kehoe did specifically request the destruction of his personal information as a form of injunctive relief. Thus, the district court should address this request for relief on remand."); s*ee also e.g., Fresco v. Auto. Directions, Inc.*, No. 03-CIV-61063-MARTINE, 2009 WL 9054828, at *4 (S.D. Fla. Jan. 20, 2009)("The proposed settlement offers injunctive relief that not only ensures compliance with the DPPA and DPPA state equivalents, but also provides for specific business practice changes and enhancements designed to protect the privacy of the class members.").

From the time this suit was filed and throughout, Plaintiff Krekelberg has sought injunctive and equitable relief from Defendants. In her Complaint, she highlighted the following possible forms of equitable relief as examples of potential relief:

•      Enjoining Defendants from viewing Krekelberg's private information in violation of the DPPA, unless necessary for law enforcement purposes;

•      Permanently and prospectively requiring Defendant Minneapolis to establish and implement all effective monitoring and investigative procedures to end the practice of improper accessing of personal information in state databases;

• Permanently suspending the accessing privileges of violators.

(ECF No. 1 at 74).  Given the evidence to be presented at trial, the following items would also be appropriate and just forms of equitable relief for the Court to order: (i) mandatory training of Defendant Minneapolis's employees and officer who have DVS and/or BCA Database access within three months of a verdict, (ii) initiation and completion of Internal Affairs investigations, consistent with Defendant's regular policies concerning internal investigations, for the accessors whose conduct the jury finds to have violated the DPPA, (iii) an IA policy revision ensuring that complaints assigned to Defendant Minneapolis's IA division are commenced within a specific timeframe; (iv) IA policy revision ensuring that drivers' license database misuse complaints assigned to Defendant Minneapolis's IA division are not handled through a different process than other IA complaints; (v) a letter report to the POST Board (i.e., the law enforcement licensing authority) advising of the jury findings regarding any accessors whose conduct the jury finds to have violated the DPPA and advising of the outcome of any IA done by that Defendant, and (vi) elimination of bias training and gender equity training relating to the actual and potential disparate treatment between male and female officers, especially in the arena of complaints being made.

Depending on the evidence adduced at trial, other types of injunctive and equitable relief could address: (i) the establishment of an internal board or other mechanism to insure proper encouragement for promotions within the police department, focusing on gender issues; (ii) training to insure that the private sexual behavior—real or imagined— of any police officer, but in particular female officers, is never a proper topic of

conversation among other officers; (iii) training that attempts to combat the "code of silence" prevalent in the police ranks, which discourages accountability, and can have a disparate negative impact on females on the force.

Plaintiff seeks this equitable remedy, because Defendant Minneapolis is not likely to take any action to address the misconduct at issue unless the Court requires it to do so. And given that Plaintiff has achieved non-monetary terms of resolution related to training and non-accessing of Plaintiff Krekelberg's information going forward with former defendants in this case, equivalent remedies are important and necessary with the biggest alleged offender.

For the foregoing reasons, at the conclusion of trial, this Court should award equitable relief consistent with the evidence before it.

## III.   Unresolved Evidentiary Issues

Evidentiary issues have been briefed by the parties in the form of motions in limine, which are filed on this date.  As discussed with the Court, the parties are exchanging exhibit lists today and will be preparing and stipulations and objections to the opposing side's exhibits for filing with the Court on May 7, 2019.

## IV.   Unresolved Procedural Issues

### A.      Sequestering of Witnesses

Plaintiff requests that the Court address the issue of witness sequestration for trial under Fed. R. Evid. 615.  Plaintiff asks that witnesses be excluded from attendance at trial so that they cannot hear other witnesses' testimony.

### B.  Admission of Previously-Designated Confidential Documents at Trial

By separate motion, Plaintiff has raised the procedural issue related to confidential

documents and their de-designation as such for purposes of trial.  This issue was raised

with opposing counsel, but no stipulation reached.  As explained in Plaintiff's motion, it

does not seem workable or consistent with presumptions in favor of adjudicating justice

in an open court to have portions of the trial under seal.  Plaintiff requests that the Court

provide guidance and instruction on this issue.

### C.  Subpoena Service on Defendant Minneapolis's Officers

This case is unusual in that there are so many law-enforcement officers whose

conduct is at issue.  In addition to the many accessors involved, there are also some

higher ranking officers who will be called as witnesses related to their supervisory roles.

Plaintiff intends to call many of these officers as witnesses in this case to meet her burden

of proof.

During the discovery phase of this litigation, there were significant issues between

the parties regarding individual accessor officers being served with deposition and

subpoena notices.  Defendant Minneapolis took the position that it could not accept

service on behalf of its employees.  However, efforts to serve those officer employees

were thwarted by what seemed like evasive tactics.  As a result of these various issues,

Judge Leung first ordered that Plaintiff provide subpoenas to the Minneapolis City

Attorney's Office and that Minneapolis either accept service on behalf of the officers or

identify a location and time (work shift) that Plaintiff could serve the individual officers.

(ECF. No. 322).  In Judge Leung's subsequent Order after an additional motion to

compel, Judge Leung ordered that Minneapolis either accept service for particular officers OR make the officers appear at a court-designated place and time so that Plaintiff could effectuate service on them. (ECF No. 430).

Plaintiff Krekelberg sought agreement by Defendant Minneapolis to follow the same procedure ordered by Judge Leung with regard to trial witnesses needing to be served with a subpoena.  There was not agreement to do so.  At that time, defense counsel offered to accept service for the police chief, but not other officers.

Plaintiff has begun trying to serve Minneapolis officers with subpoenas to appear at trial, but addresses are not known for all of the officers, and process servers are encountering problems obtaining service.  There are approximately 20 officers served thus far.

In the last day, Defendant Minneapolis has identified about a dozen officers for which it will accept service.  It is unclear when determinations as to service for the remaining officers will be known, and Plaintiff is concerned about timely serving subpoenas.

Consequently, Plaintiff Krekelberg asks the Court to address this procedural issue at the pre-trial conference.  If there remain Minneapolis officers needing to be served with a subpoena to appear at trial at that time, Plaintiff asks that the Court issue an Order requiring cooperation and compliance in effectuating service on the officers either at the Minneapolis police department or City Attorney's Office.  Hopefully this issue will resolve before the pre-trial conference, but if not, Plaintiffs seek the Court's assistance.

### D.   Demonstrative Exhibits/Jury Note-Taking

Again, the number of witnesses in this case is extremely large.  The jury will be challenged to keep the various accessors and their conduct straight.  In this regard, Plaintiffs believe that it would be helpful for each juror to have a packet of materials that identifies each accessor with some of the basic facts regarding date/time of their individual accesses, reference to their IA statement so that they can easily find relevant evidence amongst the exhibits, and space within the materials for the jurors to take their own notes from Plaintiff's and Defendants' presentation of evidence.  Although unusual, Plaintiff Krekelberg believes this would be particularly helpful in this case given the number of witnesses, volume of exhibits, and length of trial.  We ask that this issue be discussed with Court at the pre-trial conference.

Dated:  May 2, 2019                    **SAPIENTIA LAW GROUP, PLLC**

                                       s/ Sonia Miller-Van Oort
                                         Jonathan A Strauss (#279602)
                                         Lorenz F. Fett, Jr. (#196769)
                                         Sonia Miller-Van Oort (#278087)
                                       120 S 6th St, Suite 100
                                       Minneapolis, MN 55402
                                       Phone:  612-756-7100
                                       Fax: 612-756-7101
                                       jons@sapientialaw.com
                                       larryf@sapientialaw.com
                                       soniamv@sapientialaw.com

                                       and

Dated:  May 2, 2019

**SIEBEN CAREY**

<u>s/ Jeffrey  M. Montpetit</u>
  Susan M. Holden (#0189844)
  Jeffrey M. Montpetit (#0291249)
901 Marquette Avenue
Suite 500
Minneapolis, MN 55402
(612) 333-4500
susan.holden@knowyourrights.com
Jeffrey.montpetit@knowyourrights.com

*Attorneys for Plaintiff Amy Krekelberg*