# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Amy Elizabeth Krekelberg,

        Plaintiff,

v.

Anoka County, et al.,

        Defendants.

Civil No. 13-3562 (DWF/TNL)

**MEMORANDUM
OPINION AND ORDER**

---

Jonathan A. Strauss, Esq., Lorenz F. Fett, Jr., Esq., and Sonia Miller-Van Oort, Esq., Sapientia Law Group PLLC; and Susan M. Holden, Esq., Jeffrey M. Montpetit, Esq., and Marcia K. Miller, SiebenCarey, PA; counsel for Plaintiff.

Erik Nillson, Interim City Attorney, and Brian S. Carter, Esq., Sharda Enslin, Esq., and Ivan Ludmer, Assistant City Attorneys, counsel for Defendants City of Minneapolis and Heather Young.

Joseph E. Flynn, Esq., and Tal A. Bakke, Esq., Jardine Logan & O'Brien PLLP, counsel for Defendant Matthew Olson.

---

## INTRODUCTION

This matter is before the Court on Plaintiff Amy Elizabeth Krekelberg's

("Krekelberg") Motion and Amended Motion for Attorneys' Fees and Costs (Doc.

Nos. 715, 746); Defendants the City of Minneapolis ("Minneapolis") and Heather

Young's ("Young") Motion for Judgment as a Matter of Law, Motion for New Trial,

Motion to Alter/Amend/Correct Judgment, and Motion to Stay (Doc. No. 720);

Defendant Matthew Olson's ("Olson") (together, "Defendants") Motion for Judgment as

a Matter of Law, Motion for New Trial, Motion to Alter/Amend/Correct Judgment, and Motion to Stay (Doc. No. 721); Krekelberg's Motion to Alter/Amend/Correct Judgment (Doc. No. 722); and Krekelberg's Motion for Relief from Judgment Pursuant to Rule 60 (Doc. No. 767). For the reasons set forth below, the Court grants Krekelberg's Motions for Attorneys' Fees and Costs in part; denies Defendants' Motions for Judgment as a Matter of Law, New Trial, and to Alter/Amend/Correct Judgment; grants Defendants' Motions to Stay; and grants Krekelberg's Motion for Relief from Judgment in part.

## BACKGROUND

This case commenced in 2013 with Krekelberg's complaint asserting claims under the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et seq.* ("DPPA") for alleged violations by numerous government entities and their individual employees. (Doc. No. 1.) Previous orders in this matter include detailed summaries of the factual and procedural background in this case and are incorporated by reference. (*See, e.g.,* Doc. No. 118.) The specific procedural and factual background relevant to each of the pending motions is detailed below, with all facts construed in favor of the verdict. *Washington v. Denney*, 900 F.3d 549, 555 (8th Cir. 2018).

As far back as 2017, Magistrate Judge Leung observed that "the litigation of this case has been a textbook antithesis of Rule 1 [of the Federal Rules of Procedure's] admonition" that parties should construe the Rules "to secure the just, speedy, and inexpensive determination of every proceeding." (Doc. No. 430 at 1 (citing Fed. R. Civ. P. 1).) In his Order, Magistrate Judge Leung noted that while the "facts and law underpinning the complaint are decidedly manageable," this litigation had by that point

already developed a "rancorous history" that devolved into a process marked by mutual distrust and a lack of reasonable compromise, and called for bringing the long-running litigation to a "merciful close." (*Id.* at 2, 42.) Lamentably, it was not until almost two years and hundreds of docket entries later that this matter went to trial on the remaining claims.

In an Order issued on July 30, 2018, the Court denied a motion by Minneapolis for summary judgment on the grounds that the earlier dismissal of numerous claims against individual defendants for being untimely meant that corresponding vicarious liability claims against Minneapolis should also be dismissed. (Doc. No. 535 at 3-4 ("Redacted July 30, 2018 Order") (unredacted version at Doc. No. 527).) The Court ruled that "a dismissal based on the statute of limitations should not operate to preclude vicarious liability," reasoning that there was a meaningful distinction between dismissal of a claim on the merits of an agent's liability and dismissal for a procedural reason, that the issue was not controlled by the principles of either res judicata or collateral estoppel, and that under the circumstance of this case, Fed. R. Civ. P. 41(b) did not mandate dismissal. (Redacted July 30, 2018 Order at 8, 10-11.) In the July 30, 2018 Order, the Court also declined to adopt part of Magistrate Judge Leung's August 9, 2017 Order barring the parties from seeking attorneys' fees and expenses related to the motions addressed at that time but noted that it will "take the Magistrate Judge's [] Order into appropriate consideration" if Krekelberg were to subsequently move for attorneys' fees in this matter. (*Id.* at 37.)

Minneapolis again moved for summary judgment, which was again denied in January of 2019. (Doc. No. 574 ("January 30, 2019 Order").) By that point, Krekelberg's only surviving claims against Minneapolis were for vicarious liability based on allegations of 74 obtainments of her personal information made by Minneapolis police officers in violation of the DPPA. (January 30, 2019 Order at 4.) Minneapolis reasserted its arguments as to why these vicarious liability claims should be dismissed, which the Court rejected, finding that reasonable jurors could conclude that each of the officers accessed Krekelberg's information for an impermissible purpose, "and in doing so, violated a clearly established right protected under the DPPA." (*Id.* at 4, 11.)

The Court made several rulings on the parties' motions in limine following a pretrial conference on May 22, 2019. (Doc. Nos. 665, 666 ("May 24, 2019 Order").) Specifically, the Court ruled that Krekelberg's expert witness would be permitted to testify as to when Minneapolis Police Department ("MPD") officers reasonably knew accessing the Minnesota Department of Public Safety's Driver and Vehicle Services database of records for drivers licensed and vehicles registered in the state ("DVS Database") for a non-law enforcement purpose violated federal law and as to the culture, structure, and practices of law enforcement agencies, including the MPD. (May 24, 2019 Order ¶ 1.) The Court denied Defendants' motion to exclude evidence of untimely or unrelated accesses, finding that, subject to a proper cautionary instruction to the jury, such evidence was sufficiently intrinsic and presumptively admissible under Fed. R. Evid. 403 and 404. (*Id.* ¶ 2.) Further, this evidence would be relevant to the state of

mind, intent, knowledge, and lack of mistake or accident on the part of each officer and would not constitute impermissible propensity evidence. (*Id.*)

In the same Order, the Court denied Defendants' motions for a ruling that vicarious liability did not apply, citing to its previous findings on the issue. (*Id.* ¶ 5.) The Court also denied Defendants' motions to limit Krekelberg to "garden variety" emotional damages and exclude evidence related to her allegations of retaliation, discrimination, and harassment, ruling that Krekelberg would be permitted to testify as to the feelings she experienced and that it was for the jury to decide the relationship between any conditions created by the environment and context in which events took place and how such conditions may relate to proximate cause and emotional damages. (*Id.* ¶¶ 6-7.)

The Court granted Defendants' motion to exclude any reference to liquidated damages during the trial, clarifying that the Court will view sequential accesses close in time as one obtainment consistent with its previous ruling in an order issued June 21, 2018. (*Id.* ¶ 8 (citing Doc. No. 527 at 15 n. 4).) The Court deferred ruling on Defendants' motion to exclude a 2013 Minnesota Legislative Auditor's Report on law enforcement use of state databases, later ruling that Krekelberg's proposed redacted version was admissible as a trial exhibit. (*Id.* ¶ 9; Doc. No. 670.)

Defendants' motion to exclude evidence of Internal Affairs ("IA") investigations was granted in part and denied in part, with the Court ruling that evidence of accesses of Krekelberg's information was presumptively admissible as to damages. (May 24, 2019 Order ¶ 11.) Also relevant here, the Court granted Krekelberg's motion to exclude

evidence concerning the current Minnesota Department of Vehicle Services ("DVS") system and changes made to the system after August 23, 2012, finding that such evidence would be presumptively inadmissible but stating that the Court would entertain a motion to introduce such evidence should it become appropriate based on testimony received at trial. (*Id.* ¶ 16.)

Krekelberg's remaining claims for DPPA violations were tried to a jury beginning June 10, 2019 and after the parties presented 19 witnesses and 88 exhibits for the jury's consideration, the trial concluded with a verdict on June 19, 2019. (Doc. Nos. 671, 687, 691-92.)

Before presenting their defense, Defendants Minneapolis and Young moved for a directed verdict in their favor as to the vicarious liability claims against Minneapolis and the direct liability claim against Young. (Doc. No. 708 ("Trial Tr. Vol. 6") at 1099.) Among other arguments, when asked by the Court if it was the position of the MPD that their employees violate department policies and state law every day, but that is not tantamount to a violation of federal law, counsel for Minneapolis and Young answered affirmatively, stating that such violations would not constitute a violation of the DPPA.[1] (Trial Tr. Vol. 6 at 1110-11.) Counsel for Olson joined in the defense motion and arguments as to the claim for direct liability against Olson. (*Id.* at 1117.) The Court denied the motion, finding that, based on the evidence admitted up to that point, a jury could conclude that Defendants made a large number of impermissible accesses and that

---

[1] Oral arguments on these and other motions were held outside the presence of the jury.

Krekelberg met her burden of proof with respect to liability and compensatory and punitive damages. (*Id.* at 1144-45.)

The Court made determinations with respect to several issues in the charge conference, among them that aside from the question of whether an obtainment of Krekelberg's information was permissible under the DPPA, what constitutes an access is a matter of law rather than fact. (Doc. No. 712 ("Trial Tr. Vol. 7") at 1456.) Minneapolis objected to the inclusion of a jury instruction providing that "[t]he Court has also determined that as a matter of law, any access of DVS records that violates applicable City of Minneapolis Police Department policy, state law, or regulation cannot be carrying out a function of that agency."[2] (*Id.* at 1461.) Defendants further objected to an instruction reading "[b]efore the trial began, [the Court] made a legal ruling that [Minneapolis] is responsible for any damages that you may assess to Olson or Young or to the additional accesses at issue." (*Id.* at 1463, 1468.) The Court rejected these arguments, explaining that a Minneapolis police officer necessarily could not claim that an action made in violation of MPD policy was a function of the department; a law

---

[2]     Before the jury began deliberations, the Court instructed: "Now, the Court has determined that, as a matter of law, accessing DVS records for non-law-enforcement purposes is a violation of the DPPA. For the purpose of this case . . . any access by a Minneapolis law enforcement officer that was not related to a legitimate government function or official business was impermissible. Additionally, you have heard the parties discuss federal and state law and police department policy. The Court has also determined that, as a matter of law, any access of DVS records that violates any applicable [MPD] policy, state law, or regulation cannot be carrying out a function of that agency, therefore, is for an impermissible purpose." (Doc. No. 709 ("Trial Tr. Vol. 8") at 1610; *see also* Doc. No. 682 ("Jury Instr.") at 9.)

enforcement officer cannot say "it doesn't really matter if I'm violating policies. I'm still carrying out a function." (*Id.* at 1465, 1467.)

At the close of trial, the Court read the final jury instructions, a copy of which was also provided to each juror. (Trial Tr. Vol. 8 at 1598; Jury Instr.) Relevant here, these included the instruction detailed above. (*Id.* at 1610.) They also included the instruction that, as a matter of law, sequential accesses occurring close in time, meaning within a several-minute time span, must be viewed as a single access. (*Id.* at 1611.) For each access found, the jury was instructed to determine whether there was a legally permissible purpose for obtaining Krekelberg's information, and that each obtainment made without a permissible purpose was a violation of the DPPA. (*Id.*) The Court instructed the jury that Krekelberg, herself an MPD officer, claimed her fellow officers accessed her personal information without permission or authority in violation of the DPPA, which permits law enforcement officers to access personal information from state databases if done to carry out law enforcement functions and official business. (*Id.* at 1611-12.)

Additionally, the Court instructed that before the trial began, it "made a legal ruling that [Minneapolis] is responsible for any damages that you may assess to Olson or to Young or to the additional accesses at issue in this case." (*Id.* at 1613.) The jury was further instructed to determine the amount of money, if any, that will fairly compensate Krekelberg for any damages she sustained as a direct result of unlawful obtainments of her records. (*Id.*) As for punitive damages, the jury was instructed that these should only be awarded if the defendants' culpability, after having paid compensatory damages, "is so

8

reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." (*Id.* at 1614-15.)

The jury asked only one question during the course of its deliberations, requesting a copy of Plaintiff's Exhibit 234, which was a color-coded chart showing the names of officers who were the subject of IA reports as well as the names of the investigators who prepared each report. (Doc. No. 686.) In chambers, neither party objected, and the answer proposed by the Court was accepted with minor edits. (*Id.*; Trial Tr. Vol. 8 at 1630-32.)

The jury returned a verdict in favor of Krekelberg and, after determining that Minneapolis' agents or employees impermissibly accessed Krekelberg's personal information 74 times on or after December 17, 2009, awarded her $285,000 as compensation for Defendants' improper conduct. (Doc. No. 687 ("Special Verdict Form") at 1.) The jury also found that Olson and Young willfully or with reckless disregard violated the DPPA, on one date each, and for each individual defendant, the jury awarded Krekelberg $150,000 in order to punish and deter them from similar violations in the future. (Special Verdict Form at 1-2.) Judgment in favor of the plaintiff was entered on June 25, 2019. (Doc. No. 693 ("Judgment").)

Defendants now move for relief from the verdict and judgment, renewing their motion for judgment as a matter of law or in the alternative, a new trial, that the judgment be amended, and that the judgment be stayed without a supersedeas bond. The plaintiff moves for attorneys' fees and costs, and that the judgment be amended to include

equitable relief and both pre- and post-judgment interest at the rate mandated under Minnesota state law.

## DISCUSSION

**I.     Defendants' Motions for Judgment as a Matter of Law, New Trial, or Amended Verdict**

**A.     Judgment as a matter of law**

Defendants argue that the verdict in favor of the plaintiff should be vacated, with judgment entered in favor of Defendants and Krekelberg's complaint dismissed with prejudice.  (Doc. Nos. 720, 721.)  Rule 50 of the Federal Rules of Civil Procedure authorizes a court to allow judgment on the verdict, if the jury returned a verdict; order a new trial; or direct the entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b)(1-3). There is a high standard placed on overturning a jury verdict because of the "danger that the jury's rightful province will be invaded when judgment as a matter of law is misused," and the analysis for considering such a motion requires that the district court must:

> (1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved.  That done, the court must then deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence.

*Washington*, 900 F.3d at 558-59 (quoting *Haynes v. Bee-Line Trucking Co.*, 80 F.3d 1235, 1238 (8th Cir. 1996)).

In considering a motion for judgment as a matter of law, a trial court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. *Kinserlow v. CMI Corp*, 217 F.3d 1021, 1025 (8th Cir. 2000). "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) as cited in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). The court should review the records as a whole, but disregard all evidence favorable to the moving party that the jury is not required to believe, meaning that the court should give credence to the evidence favoring the nonmovant and only evidence supporting the moving party that is uncontradicted, unimpeached, and comes from disinterested witnesses. *Id.* at 1025.

To prove direct liability, Krekelberg had to show that Olson and Young knowingly obtained, disclosed, or used her personal information from a motor vehicle record for an impermissible purpose. 18 U.S.C. § 2724. Permissible uses include an exception for use by a law enforcement agency "in carrying out its functions." 18 U.S.C. § 2721(b)(1). A person who violates § 2724 is liable to the individual whose information was obtained, and the court may award actual damages, but not less than liquidated damages in the amount of $2,500; attorneys' fees and costs; and punitive damages upon proof of willful or reckless disregard of the law. *McDonough v. Anoka Cty.*, 799 F.3d 931, 938 (8th Cir. 2015) (citing 18 U.S.C. § 2724).

Any individual law enforcement officer who knowingly obtains, discloses, or uses protected information for an impermissible purpose may liable under the DPPA. *See,*

*e.g., Kiminski v. Hunt*, Civ. No. 13-185, 2013 WL 6872425, at *9 (D. Minn. Sept. 20, 2013). While courts have interpreted the law enforcement exception broadly, permitting, for example, actions officers take for their safety or to follow up on encounters with citizens (*Metcalfe v. Priebe*, Civ. No. 13-1692, 2014 WL 5106851, at *4-5 (D. Minn. Oct. 10, 2014)), "numerous courts have held that the DPPA's prohibition against accessing private driver's license information without a permissible purpose was clearly established since shortly after the statute's enactment in 1994" and since that time, "any reasonable officer" would understand that it is unlawful to access such information without a permissible purpose (*Rollins v. City of Albert Lea*, Civ. No. 14-299, 2016 WL 6818940, at *10 (D. Minn. Nov. 17, 2016)).

As the Court explained in its November 7, 2014 Order, law enforcement officers are not entitled to qualified immunity when they violate a clearly established statutory right. (Doc. No. 118 at 17 (citing *Mallak v. Aitkin Cty.*, 9 F. Supp. 3d 1046, 1063 (D. Minn. 2014)). A right is clearly established if, at the time of the conduct and in the context of the case, every reasonable official would understand that the challenged conduct violates that right. *Wallace v. City of Alexander*, 843 F.3d 763, 769 (8th Cir. 2016).[3] What matters is whether a reasonable officer could have believed the action to be

---

[3]     As one court astutely observed, "anyone could claim that he did not 'know' his purpose to be impermissible until a court interpreted the DPPA to proscribe that purpose. Even after such a ruling, a defendant could manufacture a slightly different purpose for his conduct and then claim ignorance of whether the DPPA prohibited the new purpose." *Pichler v. UNITE*, 228 F.R.D. 230, 242 (E.D. Pa. 2005), *aff'd*, 542 F.3d 380 (3d Cir. 2008). The court concluded that it would be a "strange result" out of line with Congressional intent if a plaintiff "could recover only if the defendant repeatedly violated

lawful, not the subjective belief of an individual officer, and "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. at 640-41. Clearly established law should not be defined at a "high level of generality" but it is not necessary that "the very action in question" be previously held unlawful. *Thompson v. Monticello*, 894 F.3d 993, 999 (8th Cir. 2018). By 2003, if not sooner, it was established that it is improper for officers to access an individual's DVS record outside the course of "typical law enforcement functions," such as when the person targeted is not an interested party in any law enforcement matter. *Kampschroer v. Anoka Cty.*, 57 F. Supp. 3d 1124, 1140-41 (D. Minn. 2014), *aff'd*, 840 F.3d 961 (8th Cir. 2016); *see also McDonough*, 799 F.3d at 944 n.6 ("The words of the DPPA alone are specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity." (quoting *Collier v. Dickinson*, 477 F.3d 1306, 1312 (11th Cir. 2007) (internal quotation marks and citations omitted)).

While counsel for Minneapolis and Young tried to cast using state databases to look up fellow officers by name as an action necessary for officer safety, these arguments were strained and borderline absurd. For example, in closing arguments, counsel stated that an officer who responded to an emergency call and saw other officers in the area who were also responding (meaning that this hypothetical officer already recognized the other officers as members of law enforcement) would additionally need to access information

---

her privacy and lacked sufficient creativity to conjure up some conceivable purpose that no court had yet considered." *Pichler*, 228 F.R.D. at 242.

from the DVS database containing photographs, medical conditions, and home addresses (and somehow search for these unfamiliar officers by name) to "know who is on their team" and "figure out who the other employees out in the field are because that's important for their safety." (Trial Tr. Vol. 8 at 1530.) The plaintiff spent days at trial presenting evidence that contradicted this reasoning, providing explanations for defendant officers' actions that were inappropriate and prurient. (*See, e.g.,* Doc. No. 705 ("Trial Tr. Vol. 2") at 303 (Krekelberg's direct testimony that she never needed to look up fellow officers in the DVS database to write a report); Doc. No. 706 ("Trial Tr. Vol. 3") at 580, 582, 595, 600, 602-03, 606 (Sgt. Matthew McLean's testimony explaining that in his role as an MPD internal affairs investigator, he investigated four officers accused of improperly accessing Krekelberg's data including Olson and Young, and concluded that they should have known using DVS databases for the reasons they did was impermissible).)

To prove vicarious liability, Krekelberg had to show that agents of Minneapolis committed violations of the DPPA by impermissibly accessing her personal information within the statute of limitations, and that Minneapolis aided its agents in violating the DPPA by facilitating their access to the DVS databases. As the Court noted in its June 21, 2018 Order, and as determined by the Court in a previous case, under the DPPA vicarious liability may be properly imposed against an entity where its agents are aided in

accomplishing violations by the existence of an agency relationship.[4]  (Doc. No. 527 at

10-12, 29 (citing *Mallak v. City of Brainerd*, Civ. No. 13-2219, 2017 WL 440249, at

*15-17 (D. Minn. Feb. 1, 2017)).)

As the jury was instructed, "[t]he DPPA prohibits individuals, organizations, and

entities, including law enforcement officers and government agencies, from knowingly

obtaining, using, or disclosing personal information contained in a driver's motor vehicle

record unless it is accessed for a permissible purpose.  Viewing or accessing another

individual's personal information from the State's motor-vehicle records is the same as

obtaining the information.  Under the statute, it is permissible for a government agency,

including any law enforcement agency, to access personal information from state

databases if it is done to carry out its law-enforcement functions and official business."

(Jury Instr. at 10-11.)  Further, the jury was instructed that Krekelberg "asserts that the

accesses at issue were made for purely personal interests and curiosity having nothing to

do with law-enforcement functions," while Defendants "deny these allegations and

liability under the DPPA" and "assert that some of the accesses were for legitimate

government or law-enforcement purposes" and "deny that any of the accesses caused

[Krekelberg] any damages."  (*Id.* at 11.)

The jury is presumed to have followed instructions as given.  *Muhammad v.

McCarrell*, 536 F.3d 934 (8th Cir. 2008).  Rule 50 motions should only be granted when

there is a "complete absence of probative facts to support the verdict and when the record

---

[4]      Defendants maintain that this holding is erroneous but acknowledge that the
Eighth Circuit found to the contrary in its *Orduno* opinion.  (Doc. No. 734 at 36 (citing
*Orduno v. Pietrzak*, 932 F.3d 710, 718 (8th Cir. 2019)).)

contains "no proof beyond speculation" to support the verdict. *Heaton v. The Weitz Co.*, 534 F.3d 882, 889 (8th Cir. 2008) (internal citations and quotations omitted). Here, from the evidence at trial, a reasonable jury could find Krekelberg's witnesses more credible and her documentation more persuasive in showing that Olson and Young, as well as the remaining 56 MPD officers, accessed Krekelberg's personal information without a permissible purpose, and in so doing, caused her harm. Accordingly, Defendants' motion for judgment as a matter of law is denied.

### B.    New trial

Defendants contend that a new trial is warranted because the Court wrongly instructed the jury as to the applicable law and admitted evidence of time-barred accesses of Krekelberg's personal information.

Under Rule 59 of the Federal Rules of Civil Procedure, the Court may grant a motion for a new trial to all or any of the parties on all issues or on particular issues. Fed. R. Civ. P. 59(a). District courts "enjoy broad discretion" in deciding whether to grant a new trial. *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 656 (8th Cir. 1995). A court can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the jury's verdict. *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). However, inaccuracies or errors are not a basis for setting aside a verdict unless prejudicial error is shown, *Buchholz v. Rockwell Intern. Corp.*, 120 F.3d 146, 148 (8th Cir. 1997), and a trial court is not free to set aside a jury verdict and grant a new trial "merely because it believes the jury could have drawn different inferences or that another result would be more reasonable," *Washburn v. Kansas City Life Ins. Co.*, 831 F.2d 1404,

1409 (8th Cir. 1987) or "simply because the trial court would have found a verdict different from the one the jury found," *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996). The trial court should only reject a jury's verdict where a full review of all the evidence, giving "full respect" to the jury's verdict, leaves the court with a "definite and firm conviction that the jury has erred." *Ryan by Ryan v. McDonough Power Equip., Inc.*, 734 F.2d 385, 387 (8th Cir. 1984). In other words, the trial court may only grant a new trial where the verdict was "so contrary to the evidence as to amount to a miscarriage of justice." *Butler*, 83 F.3d at 944.

The Court's instructions to the jury were clear statements of established law, instead of leaving jurors to rely on assessments or conclusions from any other source. Defendants argue that it cannot be assumed that showing a violation of state law also shows a violation of federal law, ignoring the particulars of this case where no such assumption was required in light of the statutory language of the DPPA and the substantial amount of evidence in the form of testimony and documentation supporting the conclusion that MPD officers knowingly accessed Krekelberg's information without a permissible purpose. As Defendants note, determining whether a violation of a clearly established right has occurred is a case-specific inquiry rather than a broad general proposition.

Trial courts have broad discretion in formulating jury instructions, and they do not need to be "technically perfect" or "a model of clarity." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 252 F.3d 1010, 1012 (8th Cir. 2001) (quoting *Cross v. Cleaver*, 142 F.3d 1059, 1067 (8th Cir. 1998)). What matters is whether taken as a whole and viewed in

light of the evidence and applicable law, the instructions "fairly and adequately submitted the issues in the case to the jury." *B & B Hardware*, 252 F.3d at 1012.

Here, the Court correctly interpreted the law at issue in its instructions to the jury. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). In any question of statutory interpretation, a court's analysis begins with the plain language of the statute, and if that language is unambiguous, it is conclusive absent clear legislative intent to the contrary. *Petersen v. Astrue*, 633 F.3d 633, 637-38 (8th Cir. 2011) (internal citations and quotations omitted). If the intent of Congress can be clearly discerned from the statute's language, that ends the judicial inquiry. *Petersen*, 633 F.3d at 638 (internal citation omitted). As other courts have previously held, conduct on the part of law enforcement officers such as looking up friends or out of curiosity about people who are not interested parties in legal matters "clearly contravenes the plain language of the statute." *Kennedy v. City of Braham*, 67 F. Supp. 3d 1020, 1042, 1044 (D. Minn. 2014).

The DPPA is a "crime-fighting, privacy-protecting measure" enacted with public safety in mind, designed to prevent stalkers and criminals from utilizing motor vehicles records to obtain information about their victims. *Potocnik v. Carlson*, Civ. No. 13-2093, 2016 WL 3919950, at *12 (D. Minn. July 15, 2016). The DPPA's exceptions permit disclosure in a "range of circumstances," but unless "commanded by the text," these exceptions "ought not operate to the furthest reach of their linguistic possibilities if that

result would contravene the statutory design." *Maracich v. Spears*, 570 U.S. 48, 60 (2013). The Court crafted an instruction to clarify the question before the jury. It is well-established that law enforcement officers violate the DPPA when they access personal information contained within drivers' records for impermissible purposes, regardless of the personal justifications they offer. In this district, Judge Nelson stated this clearly in her 2016 *Rollins* opinion, finding that the law-enforcement exception provided in § 2721(b)(1) does not contain any "grievous ambiguity or uncertainty" even though it does not explicitly state what constitutes a "government function" and that "[b]y definition . . .an officer's access of a driver's information based on curiosity or other personal reasons cannot be in furtherance of a government function." *Rollins*, 2016 WL 6818940, at *15. The *Rollins* opinion rejected the argument that it was not clearly established that police officer defendants who "view[ed] records for the purpose of investigating tips [] or aiding with welfare concerns was not a law enforcement function." *Id.* at *10 (internal punctuation omitted). The *Rollins* opinion also noted that "numerous courts have held that the DPPA's prohibition against accessing private driver's license information without a permissible purpose was clearly established since shortly after the statute's enactment in 1994." *Id.* (collecting cases). Judge Nelson also found that while looking up individuals associated with a drug investigation "would undoubtedly be in furtherance of a government function," the lack of evidence to show that such an investigation existed put the purpose behind some accesses into question. *Id.*

Defendants' arguments miss the point of the instruction. Rather than having jurors muddle through layers of different laws and policies issued by different authorities at

different times, the Court directed the jury to focus on what officers were permitted to do in the course of performing their jobs. It is no great leap in logic to interpret the DPPA as forbidding law enforcement officers from abusing their access for personal reasons. Likewise, it is common sense that those who are employed by an agency that prohibits certain conduct cannot substitute their judgment for agency policy, regardless of its source, and redefine their positions and duties in order to claim that prohibited actions are functions of the agency. Quite clearly, the opposite is true, as courts have consistently held throughout years of litigation related to DPPA claims.

Similarly, with respect to the Court's instruction to the jury about Minneapolis' responsibility, there is nothing about the jury's sole question to suggest that they were confused by the instructions. In fact, there is every indication that the jury properly received this instruction as an explanation for why Minneapolis is defending, rather than condemning, misconduct on the part of MPD officers.

A district court enjoys wide discretion in admitting and excluding evidence and even where an abuse of discretion is shown it will not be reversed unless the ruling is shown to have had a substantial influence on the jury's verdict. *Harris v. Chand*, 506 F.3d 1135, 1139 (8th Cir. 2007) (internal citations omitted).

Defendants point to the Eighth Circuit's recent *Orduno* opinion to support their contention that evidence of time-barred accesses should not have been admitted and constituted veiled propensity evidence barred under Federal Rule of Evidence 404(b). However, this case is easily distinguished. Before trial in the *Orduno* matter, the number of violations was established and the defendant had admitted liability, leaving the jury

only to determine damages from flowing from the unlawful obtainments. *Orduno*, 932 F.3d at 719. The Eighth Circuit held that in that case, it was not an abuse of discretion under Federal Rule of Evidence 403 to exclude evidence of other obtainments. *Id.*

There was no error here in admitting the evidence for the purpose permitted—showing the state of mind, intent, knowledge, and lack of mistake or accident by each officer. (May 24, 2019 Order ¶ 2.) This evidence was intrinsic to the conduct in controversy and provided important context to the circumstances under which it occurred and was relevant to the issue of actual damages. (*Id.*)

### C. Amended, altered, or corrected verdict

Defendants argue that the jury's verdict reflects its misunderstanding of the law and the issues to be decided based on erroneous instructions by the Court, and requests that the judgment be changed so that Krekelberg is awarded damages in an amount consistent with the evidence and constitutional limits on punitive damages.

Rule 59(e) motions serve a limited function of correcting "manifest errors of law or fact or to present newly discovered evidence" and cannot be used to introduce new evidence, tender new legal theories, or raise arguments that could have been raised prior to entry of judgment. *United States v. Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006) (internal quotations omitted). Relief under Rule 59(e) is granted only in "extraordinary" circumstances. *See United States v. Young*, 806 F.2d 805, 806 (8th Cir. 1986).

At closing, counsel for Minneapolis and Young essentially questioned the purpose of the DPPA's damages provisions, minimizing the need to protect personal information

from unauthorized accesses and the value of privacy as well as the need for reform within the MPD.  For example, counsel conceded that Krekelberg "testified that there was some emotional distress around the time she found out about these accesses," but asked "someone looked at her driver's license photo for a second or two.  Where is the stress coming from?"  (Trial Tr. Vol. 8 at 1533-34.)  Counsel also told the jury that many of the accesses at issue were not of a type that was amenable to the internal affairs process and instead "were going to have to get sorted out in civil lawsuits."  (*Id.* at 1519.)  To the contrary, Krekelberg's attorney suggested that if the jury found in her favor, "$300,000 would be fair and reasonable."  (*Id.* at 1584.)

Remittitur is only appropriate "when the verdict is so grossly excessive as to shock the conscience of the court.  A verdict is not considered excessive unless there is plain injustice or a monstrous or shocking result."  *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 763 (8th Cir. 2003) (internal citations and quotations omitted).  Because the amount Krekelberg requested is close to both the compensatory damages awarded by the jury and equal to the total punitive damages awarded, the Court finds that rather than indicating that the jury made any improper calculations in their verdict, it is almost certain that the jury found Krekelberg persuasive and decided to award her damages in an amount close to what she requested.  (Special Verdict Form.)  The jury could have reasonably concluded that such damages were needed to properly compensate Krekelberg for the harm she suffered and to send a strong message to Defendants of disapproval for their past conduct and warning going forward.

For these reasons, Defendants' motions for a new trial or remittitur are denied.

### D. Stay of judgment without bond

Minneapolis asks that the Court impose no bond or security requirement pending the final resolution of all proceedings and contends that its ability to satisfy the cost of judgment is "beyond doubt" and that "requiring a bond would be a waste of taxpayer money." (Doc. No. 734 at 46.) If the Court is not inclined to grant a stay, Defendants request that the Court identify the bond or security it would require to stay execution of the judgment and reserve their right to appeal an adverse determination. (*Id.* at 51.)

Under Federal Rule of Civil Procedure 62, a party may obtain a stay by providing a bond or other security. Fed. R. Civ. P. 62(b).[5] The Court has the discretion to waive the bond requirement and stay the enforcement of the judgment without bond pending appeal. *In re Levaquin Prod. Liab. Litig.*, Civ. No. 07-3960, 2012 WL 2393780, at *1 (D. Minn. June 25, 2012). Factors to consider in determining whether a supersedeas bond may be waived include: (1) the complexity of the collection process, (2) the amount of time required to obtain a judgment on appeal, (3) the degree of confidence that the district court has in the availability of funds to pay the judgment, (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money, and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place the other creditors of the defendant in an insecure position. *Glob. Traffic Techs., LLC v. Morgan*, Civ. No. 10-4110, 2014 WL

---

[5]    Fed. R. Civ. P. 62(b) carries forward the supersedeas bond provision of former Ruled 62(d) in modified form, making the opportunity to post security in a form other than a bond explicit. Fed. R. Civ. P. 62 (2018 Amendments).

3513149, at *1 (D. Minn. July 16, 2014). The burden is on the appellant to convince the district court to depart from the usual requirement of a supersedeas bond. *Id.*

The Court finds that Krekelberg is adequately secured during the pendency of appeal by Defendants' tendered documentation and assurances.[6] While it notes with Minneapolis' expressed concern for taxpayers with some irony given the history of this litigation, the Court is persuaded that Minneapolis will be able to pay and agrees that it is in the best interest of Minneapolis citizens without posing intolerable risk to Krekelberg's interest for the Court to waive the bond requirement.

## II.     Krekelberg's Motion for Attorney's Fees and Costs

### A.     Fees

Krekelberg seeks attorneys' fees totaling $1,309,730.75 and costs totaling $47,086.36. (Doc. No. 761 at 12.) In support of this motion, Defendants contest Krekelberg's calculations of the reasonable fees and costs, arguing that the submitted invoices are full of non-compensable tasks, block billing, vague descriptions, and "bloated" time entries. (Doc. No. 759 at 1.) Defendants submitted a detailed analysis of the invoices in question in support of their objections to the requested amounts and contends that a reasonable award of fees and costs in this case would total $315,256. (Doc. Nos. 759 at 26, 760-1, 760-2.) Krekelberg submitted several documents in support of her request, including an amended petition and a subsequent letter to correct the

---

[6]     The Court notes that Minneapolis provided an affidavit from its Chief Financial Officer attesting to its "high" and "stable" credit ratings and detailed information on the city's operating budget, including its contingency and self-insurance funds. (Doc. No. 735.)

request and affidavits from other attorneys who practice in comparable areas of law and are familiar with the rates in this legal community. (Doc. Nos. 715, 746-52, 754, 761-65.)

Krekelberg requests an award of attorneys' fees in the amount of $1,289,198.25 for approximately 2,500 hours of work performed by five attorneys plus staff—from the Sieben Carey firm, Mr. Montpetit at a rate of $550 per hour, Ms. Miller at a rate of $400 per hour, and Mr. Miklesh at a rate of $75 per hour (Doc. Nos. 749 ¶¶ 5, 9, 11; 765 ¶ 3); and from Sapientia Law Group, Mr. Fett at a rate of $475 per hour, Ms. Miller-Van Oort and Mr. Strauss at a rate of $450 per hour, Ms. Wolpert at a rate of $425 per hour, Ms. Gernon at a rate of $400 per hour, Mr. Fukuda and Mr. Wille at a rate of $225 per hour, and paralegals (some unnamed) at a rate of $110 per hour (Doc. No. 751 ¶ 37). Together, these attorneys spent 2,533 hours on this case over the course of six years.[7] (Doc. No. 752 at 7.)

Under § 2724(b)(3) of the DPPA, a court may award "reasonable attorneys' fees and other litigation costs reasonably incurred." "Just what is a reasonable attorneys' fee is a matter peculiarly within the district court's discretion," as the district court has extensive contact with the parties and is thoroughly familiar with the issues involved and work required in a case. *Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d 926, 931 (8th Cir. 1984). The Supreme Court provided the framework for determining reasonable fees in its *Hensley* opinion, which set forth the factors a district

---

[7]     The Court accepts the claims of Krekelberg's attorneys without agreeing that all hours spent were necessary or reasonably taxed to the opposing parties.

court should use in awarding fees to prevailing parties in litigation under the Civil Rights

Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. *Hensley v. Eckerhart*, 461 U.S.

424 (1983). The *Hensley* criteria have since been applied in other decisions concerning

federal fee-shifting statutes. *Perdue v. Kenny A. ex re. Winn*, 559 U.S. 542, 552 (2010).

Factors courts should consider include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley* at 430, n. 3. Many of these factors usually are subsumed within the initial

calculation of the lodestar. *Id.*, n. 9.

The lodestar, calculated by multiplying the number of hours reasonably expended

by the reasonable hourly rate, is the starting point in determining attorneys' fees. *Fish v.

St. Cloud State Univ.*, 295 F.3d 849, 851 (8th Cir. 2002). "A reasonable rate is usually

the ordinary rate for similar work in the community where the case has been litigated."

*Id.* However, the "most important factor in determining what is a reasonable fee is the

magnitude of the plaintiff's success in the case as a whole." *Wal-Mart Stores, Inc. v.

Barton*, 223 F.3d 770, 773 (8th Cir. 2000) (citing *Jenkins by Jenkins v. Missouri*, 127

F.3d 709, 716 (8th Cir. 1997)). Where a plaintiff achieves only partial or limited success,

the lodestar amount may be excessive. *Farrar v. Hobby*, 506 U.S. 103, 114 (1992).

The burden is on the fee applicant to document the appropriate hours expended and hourly rates. *Fish v. St. Cloud State Univ.*, 295 F.3d at 851. The district court is in the best position to assess the work performed by counsel and may use its familiarity with the case to decide a reasonable hourly rate for each attorney. *Id.* at 852. Courts should exclude hours that were not reasonably expended—for example, hours that were excessive, redundant, or otherwise unnecessary to a degree that a lawyer in private practice would be ethically obligated to exclude them from a fee submission to a client. *Hensley*, 461 U.S. at 434. Courts may reduce the fee award for reasons related to the quality of work performed or the documentation provided in the fee application. *Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 675 (8th Cir. 1995) (award reduced for clerical errors, duplicative and inflated efforts, and request for hours spent on clerical duties); *H.J. Inc. v. Flygt Corp.*, 925 F.2d 257, 260 (8th Cir. 1991) (court reduced award based on the quality of counsel's legal briefing and analysis). In determining reasonable hourly rates, district courts may rely on their own experience and knowledge of prevailing rates. *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005).

Krekelberg is the prevailing party, having succeeded on the claims "at the heart of her case." *Barton*, 223 F.3d at 773; *see Jenkins by Jenkins v. State of Mo.*, 127 F.3d 709, 714 (8th Cir. 1997). Krekelberg obtained a significant award, distinguishing this case from the outcome in *Orduno*, exposed concerning and egregious misconduct, and potentially deterred future misconduct. *See Orduno*, 2017 WL 4354686 at *14. Krekelberg's attorneys' requested rates are reasonable in consideration of the expertise and experience of these attorneys and fall within the typical range for attorneys who

litigate DPPA matters in this region.[8]  The Court will use the requested rates in calculating the lodestar.  Importantly, Krekelberg is unquestionably the prevailing party, having won a favorable verdict on all her claims and significant damages.  While work on unsuccessful claims cannot be deemed to have been expended in pursuit of the ultimate result achieved, in a lawsuit involving a "common core of facts" and related legal theories cannot be viewed as a series of discrete claims, and the district court should focus on the significance of the overall relief obtained.  *Hensley*, 461 U.S. at 435.

Defendants object to Krekelberg's use of block billing, a term for "lumping together of daily time entries consisting of two or more task descriptions."  *King v. Turner*, Civ. No. 05-388, 2007 WL 1219308, at *3 (D. Minn. Apr. 24, 2007).  Other circuits have warned against the practice of block billing, but the Eighth Circuit has no requirement that attorneys refrain from it use.  *Id.*  Krekelberg has indeed used block billing in her request, and some entries are glaringly vague, but the Court finds that its time sheet entries generally contain enough specific information for the Court to tell what was done by whom and how it contributed to the work on this case.  Consequently, the Court does not weigh the factor of vagueness of entries heavily in discounting the lodestar.

As for the detailed items in dispute, as an initial matter, the Court will not award fees and costs for Krekelberg's response to Defendants' objections to the fee petitions.  Defendants raised and thoroughly described several arguably valid disputes with

---

[8]     The attorneys' rates are reasonably adjusted in accordance with their years of experience, which range from four to over 35.  (Doc. No. 751 ¶ 37.)

Krekelberg's petition. (*See generally,* Doc. No. 759.) The burden is on the applicant to establish reasonable fees and expenses, yet Defendants found several errors and inaccuracies in addition to what they contend are unacceptably vague entries or excessive hours billed. Krekelberg's attorneys later conceded at least a few errors occurred. (Doc. Nos. 754, 761, 762 ¶ 12, 765 ¶ 2.) The Court emphasizes that this litigation was exceptionally long and complicated—overly so, as Magistrate Judge Leung eloquently described—but the length and complexity of this case cannot be blamed on Krekelberg and her counsel alone. Defendants fought this case vigorously, as was their absolute right, and the Court declines to penalize the plaintiff for responding with equal vigor. *See, e.g., Ewald v. Royal Norwegian Embassy*, Civ. No. 11-2116, 2015 WL 1746375, at *15 (D. Minn. Apr. 13, 2015) ("a heavily-litigated case is not typically a one-sided affair"). However, Krekelberg's numerous revisions and errors were not caused by Defendants, and Defendants carried more than their share of the burden in clarifying billing issues. *See, e.g.*, *Orduno*, 2017 WL 4354686, at *14 n. 10. The Court deducts $20,532.50 from the starting fee amount for the time spent on its (final) reply brief and supporting documents, bringing the amount down to $1,289,198.25. (Doc. No. 761 at 11.) Additionally, rather than parse out which items in Krekelberg's fee petition relate to which overstaffed or poorly described entry the Court finds that a 25 percent reduction of the lodestar is appropriate, reducing the fee amount to $966,898.69.

The Court agrees with Defendants that the petition contains indications of inefficiencies throughout, but rather than adopt Defendants' approach, finds that an across-the-board reduction is warranted. *See, e.g.*, *Werb v. ReliaStar Life Ins. Co.*, Civ.

No. 13-669, 2014 WL 5431585, at *3 (D. Minn. Oct. 27, 2014) (finding that even in a case with an "especially large" record, one reason more experienced counsel can command higher pay is because they should be better able to efficiently litigate a case). Issues litigated in this case, such as the method for counting close-in-time accesses and the imposition of direct or vicarious liability on municipalities "are recurring themes throughout the dozens of DPPA cases filed in this District." *Orduno*, 2017 WL 4354686, at *13. Moreover, the course of these proceedings would have been far different had counsel placed a greater premium on Magistrate Judge Leung and this Court's time. The Court observes that Krekelberg's lawyers often allocated tasks in the most expensive way possible, with more expensive counsel spending significant amounts of time drafting pleadings and researching now-familiar and frequently occurring issues and with attorneys performing administrative and clerical tasks such as proofreading.[9] For these reasons, the Court reduces the lodestar by an additional 25 percent, meaning that the lodestar is reduced from its starting point by 50 percent overall for a total fee award of $644,599.13. This approach sufficiently addresses the *Hensley* factors without further downward adjustment of fees. Based on the Court's careful review of the record, its familiarity with the work of the attorneys, and its experience and knowledge of the local

---

[9]     Notably, the documentation offered in support of the fee petition contains quite a few glaring errors in punctuation and spelling that reflect carelessness on the part of the preparer(s), such as listing time spent "proof reading" [sic] and submitting a redlined version of an affidavit. (Doc. Nos. 750 ¶ 13, 751 generally.) These oversights are minor, to be sure, and the Court typically does not hold unimportant typos against a party before it. However, in this instance, these mistakes undermine Krekelberg's claim that hours of scrutiny by multiple experienced attorneys were needed to produce these documents.

legal market, this amount reasonably compensates Krekelberg's attorneys for the results obtained.

**B. Costs**

Krekelberg also seeks costs in the amount of $47,086.36 for expenses such as transcripts, depositions, and filing fees. These amounts are reasonable and supported by the record, and the Court awards the full amount requested.

**III. Krekelberg's Motion for Equitable Relief**

Krekelberg moves for an order to amend the Judgment to include the following equitable relief: (1) revisions to MPD Policy No. 4-501, (2) the creation of an employee directory for MPD, (3) completion of MyBCA online training within three months by those MPD accessors of Krekelberg's information who are still employed by the MPD, (4) for MPD to mandate that new employees with access to state databases of personal information complete a special training session on proper use, (5) a review and report to the MPD Chief of Police of MPD's IA processes and policies with respect to complaints of inappropriate use of driver information databases and the historical impact on female complainants, and (6) implementation of a Peer Intervention Program. (Doc. No. 722.)

In response, Minneapolis agrees to the first three requests, but in turn requests that the Court make a finding that all sworn officers "reasonably require access" to photographs of their fellow employees and that Krekelberg also be ordered to complete the requested training. (Doc. No. 733 at 1-2.) As for Krekelberg's remaining requests, Defendants argue that the plaintiff cannot meet her burden to demonstrate that she lacks access to adequate legal remedies or that there is any evidence of any likelihood of future

harm.  (*Id.* at 3, 5.)  In particular, Defendants aver that 90 percent of instances of misuse of the DVS system took place before 2011 and point to an Administrative Announcement issued in 2013 that they argue further reduced instances of misuse.  (*Id.* at 6, 8.)  Rather incredibly, contrary to the verdict, Defendants further claim that Minneapolis and the State of Minnesota "took various actions to curtail misuse of the DVS system beginning in March 2011" and that "[n]othing in the record suggests that these efforts have not been successful."[10]  (*Id.* at 2.)  Finally, Defendants dismiss the notion of peer intervention training, arguing that there is no reliable evidence showing its effectiveness, and further, condemning Krekelberg's expert witness on the topic of police misconduct as "a bad cop and an admitted criminal" who only took responsibility for his own misconduct once [he] could start monetizing his crimes," admonishing the Court that "it borders on a disgrace for him to have the Court's imprimatur as an expert witness."  (*Id.* at 14-15.)

The DPPA provides that a court may award as a remedy "such other preliminary and equitable relief as the court determines to be appropriate."  18 U.S.C. § 2724(b)(4).  The Court finds that the damages awarded by the jury do not fully address the harms established at trial and the potential for ongoing harm and grants additional equitable remedies as explained below.

---

[10]     The Court notes Defendants' careful avoidance in their memorandum of any claim that misuse has been eliminated completely but finds that, in light of the ample evidence presented to show that misuse continued throughout at least 2012, Defendants' statements stretch the definition of "successful."

### A.  Requests for equitable relief 1 through 3

The Court grants the first three forms of equitable relief requested.  Specifically, as to the first request, the MPD shall amend its Policy No. 4-501 to include language advising employees that they shall only access DVS records for official business purposes.  As to the second request, the Court finds that sworn officers of the MPD reasonably require access to an internal directory of their fellow officers which includes identification photographs.  Notably, no party has argued against it, and the Court is persuaded that it will aid in the prevention of future abuses of private information systems without any drawbacks.  Organizations, both public and private and of every size and type, manage to provide such directories for their employees' use, often on an intranet or by other protected means.  Although testimony offered at trial countered the notion that abuse of access to DVS databases was necessary to perform law enforcement functions, it did show demand at all levels of the MPD for the ability to use the employee directory presently only available to higher-ranked personnel.  Further, as Krekelberg seems to concede that to the extent she fits the criteria described in her request, she is likewise obligated to complete MyBCA training if she has not yet done so.  (*See* Doc. No. 737 at 1-2.)

### B.  Mandatory special training sessions

As to the fourth request, that all employees with access to databases containing motor vehicle records be required to undergo special training sessions, the Court is neither persuaded by Defendants that this is unnecessary nor convinced by Krekelberg that a special training session is needed.  To the extent that training specifically

instructing Minneapolis employees with access to information protected by the DPPA on permissible use is not now taking place, the Court finds that specific training must take place either as part of a larger program or a separate session and individual employees should be required to affirm their understanding of the restrictions.

## C.     Internal Affairs process and policies

Krekelberg requests that the MPD undertake a review of its IA procedures with respect to allegations of DPPA violations and the approach previously used in such investigations, with a special focus on any disparity in the way that complaints of violations of female officers have been addressed, and with a report of this analysis to be presented to the MPD Chief of Police and a Declaration filed with the Court attesting to the completion of this process.  (Doc. No. 725 at 29-30.)

The Court is persuaded that the inconsistencies shown in past investigations and described by current investigators warrant review.  The Defendants, in consultation with Krekelberg, shall submit an agreement as to the scope and nature of a review and report. Absent an agreement between the parties, each party must submit a short memorandum, up to five pages in length, describing their recommendation to the Court.

## D.     Peer Intervention Training

Finally, Krekelberg requests that the Court require Minneapolis to develop and implement a peer intervention program to address deficiencies in internal discipline at the MPD.  (Doc. No. 725 at 30.)  Krekelberg asserts that "[t]his has been done in other police departments in the country with laudable success."  (*Id.* at 32.)  The Court finds that through evidence at trial and pleadings submitted, Krekelberg failed to define or describe

the training she requests, much less establish its value to the members of this community moving forward.  This statement should not be construed as a finding that such programs are lacking merit or that MPD officers are not in need of additional and different training; the unprecedented lack of cooperation from many of the people involved throughout these proceedings and the evidence at trial leave the Court with the impression that there is significant room for improvement in the training and discipline at the MPD.  Further, Defendants' general criticism of Mr. Quinn's qualifications is without merit—very often, it takes someone with a personal history of wrongdoing to explain the circumstances of such actions to a trier of fact, and testimony from such a person should not be dismissed out of hand.  However, the Court simply does not have enough information about the type of training requested or what benefits it would provide to impose it upon Minneapolis.  Consequently, Krekelberg's request is denied.

## IV.    Krekelberg's Motion for Pre- and Post-Judgment Interest

The Court observes that Krekelberg's motion is untimely and inappropriately brought under Federal Rule of Civil Procedure 60(b), which provides that a court may relieve a party from a final judgment or order for the following reasons:

(1)    Mistake, inadvertence, surprise, or excusable neglect;

(2)    Newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)    Fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)    The judgment is void;

(5)     The judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     Any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(1-6).  "A motion under Rule 60(b) must be made within a reasonable time."  Fed. R. Civ. P. 60(c).  Prejudgment interest is generally awarded "when the amount is reasonably ascertainable and to make the claimant whole because he or she has been denied the use of the money."  *Winter v. Cerro Gordo Cty. Conservation Bd.*, 924 F.2d 1069, 1073 (8th Cir. 1991).  Pre-judgment interest is intended to compensate prevailing parties for the true costs of money damages incurred and to promote settlement and deter delay where liability and the amount of damages are "fairly certain."  *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986).  Pre-judgment interest "should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable."  *Id.*  The Court finds that this case is unusual in that the key issues of liability and the magnitude of a potential award was strongly contested for years.  While the Court recognizes the value that pre-judgment interest would have in deterring delay and finds this to be a close call, additional equitable relief in this form is not warranted.  The issue of equitable relief was previously briefed and argued on the schedule agreed to by the parties, no error had occurred in entry of the judgment, and Krekelberg has not persuaded the Court that such relief is justified in light of the substantial damages awarded to remedy harm that was not related to a financial loss.

Krekelberg also requests that the Court amend its order to include post-judgment interest. Defendants do not dispute that this is appropriate. Accordingly, the Court will amend its order to include post-judgment interest.

The parties dispute the appropriate rate to apply. Krekelberg argues that the "closest analogy" to the claim on which she prevailed would be 42 U.S.C. § 1983 and that courts have applied state law to § 1983 cases. (Doc. No. 775 at 4, 2.)

Where the cause of action arises from a federal statute, the question of whether interest is to be allowed and the rate of computation is one of federal law. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1330 (8th Cir. 1995). The proper measure for determining rates of both pre- and post-judgment interest is found in 28 U.S.C. §1961. *Mansker*, 54 F.3d at 1331. "Interest shall be allowed on any money judgment in a civil case recovered in a district court," and shall be calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding" and the interest "shall be compounded annually." 28 U.S.C. § 1961(a-b). The Court grants post-judgment interest on the award in this case to be calculated in accordance with 28 U.S.C. § 1961.

## V.    Liquidated damages

The text of the DPPA neither requires not forecloses per violation awards. *Ela v. Destefano*, 869 F.3d 1198, 1201 (11th Cir. 2017); *Pichler*, 542 F.3d at 398. The liquidated damages provision of the DPPA serves as an actual-damages "floor" of $2,500, included in recognition of the fact that emotional injuries would often result from DPPA violations but would be difficult to quantify. *Potocnik* at *11. Liquidated

damages are a substitute for actual damages. *Orduno*, 2017 WL 4354686, at *14. Other courts in this District have construed the language of the DPPA to set a floor of $2,500 per violation in certain circumstances. *See, e.g.*, *Id.*, at *10; *Kerr Karasov v. Caplan Law Firm, P.A.*, Civ. No. 14-1503, 2016 WL 6836930, at *14 (D. Minn. Nov. 18, 2016). The Court finds that under the circumstances here, Krekelberg is fairly compensated by the amount awarded by the jury and the Court's decision to award attorneys' fees and costs. However, in the event that no actual damages had been awarded, or if the actual damages amount is reduced on appeal, the Court finds that a cumulative award of $2,500 for each of the 74 violations would be appropriate in order to fairly compensate and deter repeated violations.

## CONCLUSION

The jury "represents the conscience of the community." *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). There is every reason to conclude that the jury intended its verdict as a sharp rebuke to two individual officers who seem to think that they, and only they—not their supervisors, not department policies, not state or federal legislators nor courts at any level—decide what they are permitted to do with their access to the personal information of people in their community and throughout the state. It is equally likely that the verdict was intended as a strong message to the city government that was unwilling or unable to rein in these officers. The magnitude of the damages awarded reflects the seriousness of the unacceptable conduct in question. By now taking even stronger corrective action, the MPD has an opportunity to show that this unfortunate episode, involving a relative few individual officers, will not be repeated in the future and

does not reflect the professionalism of the majority of Minneapolis' law enforcement officers. The MPD can set an example for other departments, and in so doing, can serve the public interest and the interests of justice.

**ORDER**

Based upon the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff Amy Elizabeth Krekelberg's Request for Attorneys' Fees (Doc. Nos. [715], [746]) is **GRANTED** in part. The Court awards Plaintiff $644,599.13 in attorneys' fees and $47,086.36 in costs.

2.      Defendants Minneapolis, Heather Young, and Matthew Olson's Motions for Judgment as a Matter of Law, for a New Trial, to Alter/Amend/Correct Judgment, and to Stay (Doc. Nos. [720]), [721]) are **GRANTED** in part and **DENIED** in part. The verdict shall remain as entered. Judgment is stayed without a requirement of bond pending the outcome of Defendants' appeal.

3.      Plaintiff's Motion for Equitable Relief (Doc. No. [722]) is **GRANTED** in part.

      a.      Plaintiff's Requests Nos. 1-4 are **GRANTED** as described in the Opinion Memorandum.

      b.      Plaintiff's Request No. 5 is **GRANTED.** The parties shall submit a joint proposal outlining the scope and nature of the review and report within thirty (30) days of this Order. Absent an agreement between the parties, each party shall submit its own recommendation for the Court's consideration in a memorandum

up to five pages in length, no later than thirty (30) days from the issuance of this Order.

      c.     Plaintiff's Request No. 6 is respectfully **DENIED.**

4.     Plaintiff's Motion for Relief from Judgment to Add Pre-Judgment and Post-Judgment Interest (Doc. No. [767]) is **GRANTED** in part and **DENIED** in part. Post-judgment interest in awarded, to be calculated and accrue in accordance with 28 U.S.C. § 1961.

5.     The Court declines to award liquidated damages.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  February 13, 2020                   s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               United States District Judge